**LAW OFFICES OF BRONZE & TANG**
A Professional Corporation
BankPacific Building, 2nd Floor
825 South Marine Drive
Tamuning, Guam 96913
Telephone: (671) 646-2001
Facsimile: (671) 647-7671



FILED
DISTRICT COURT OF GUAM
DEC 30 2003
MARY L. M. MORAN
CLERK OF COURT

*Attorneys for Defendant*
*Hongkong and Shanghai Banking Corporation, Ltd.*

### DISTRICT COURT OF GUAM

| | |
|---|---|
| ALAN SADHWANI, LAJU SADHWANI, and K. SADHWANI'S INC., a Guam corporation,<br><br>Plaintiffs,<br><br>v.<br><br>HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., et al.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL CASE NO. 03-00036

**DECLARATION OF I. C. UNDERWOOD IN SUPPORT OF MOTION TO STRIKE JURY TRIAL DEMAND**

**I, I. C. UNDERWOOD,** do hereby declare and state as follows:

1.      All matters herein are based on my own personal knowledge.

2.      I am the Manager Guam and Saipan of Defendant Hongkong and Shanghai Banking Corporation, Ltd., in the above-entitled matter.

3.      I am over 18 years of age, and legally competent to testify to the facts below and I do so based upon my own personal knowledge.

4.      Attached as Exhibit "1," is a true and correct copy of the Renewal and Amendment of Credit Facilities.

**ORIGINAL**

5.      Attached as Exhibit "2," is a true and correct copy of the Unlimited Continuing

Guaranty.

6.      Attached as Exhibit "3", is a true and correct copy of the Renewal and

Amendment of Credit Facilities effective December 31, 1997.

7.      Attached as Exhibit "4," is a true and correct copy of the Business Loan

Agreement.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

**EXECUTED** this ___ day of December 2003.

T. C. UNDERWOOD

# HongkongBank



*Member HSBC Group*

**The Hongkong and Shanghai Banking Corporation Limited**
436 So. Marine Drive, Tamuning, Guam 96911 U.S.A.

27 June 1997

Our Ref: GUM CBA 970453

**PRIVATE AND CONFIDENTIAL**
K. Sadhwani's Inc.
Sharp Plaza Building
361A South Marine Drive
Tamuning, Guam 96911

| HSBC CORPORATE BANKING | | |
|---|---|---|
| RECEIVED BY / DATE: | 26 | 2/7/97 |
| CRF COPY BY / DATE: | 26 | 2/7/97 |
| I/E INITIAL / DATE: | 2 | 7-22-9 |

Attn: Mr. Alan Sadhwani, President

RE: <u>RENEWAL AND AMENDMENT OF CREDIT FACILITIES</u>

Dear Mr. Sadhwani:

With reference to our discussions we, The Hongkong & Shanghai Banking Corporation Limited (the "Bank"), are pleased to confirm having renewed the undermentioned credit facilities granted to K. Sadhwani's Inc. (the "Borrower"). These facilities will be made available on the specific terms and conditions outlined herein and upon the satisfactory completion of the security detailed below. These facilities are subject to review at any time and in any event by 31 October 1997, and also subject to our overriding right of withdrawal and repayment on demand, including the right to call for cash cover on demand for prospective and contingent liabilities. This commitment letter supercedes our earlier letter of 13 June 1997 referenced under GUM CBA 970423.

| A. | FACILITY TYPE | OLD LIMITS | NEW LIMITS |
|---|---|---|---|
| 1. | Term Loan | USD1,151,643+ | USD1,151,643+ |
| 2. | Import Line: | | |
| | a) Letters of Credit (LC) of which | USD2,500,000 | USD2,500,000* |
| | b) Clean Import Loans (CIL) | USD1,500,000 | USD1,500,000* |
| 3. | Standby Letters of Credit (Standby LC) | USD 330,000 | USD 330,000 |
| 4. | Term Loan | NIL | USD4,900,000 |
| 5. | Term Loan | NIL | USD 386,000 |
| 6. | Term Loan | USD4,520,328+ | NIL |
| 7. | Unauthorized Overdraft | <u>USD 52,000</u> | <u>NIL</u> |
| | Total: | <u>USD8,553,971</u> | <u>USD9,267,643</u> |

\* Combined limits not to exceed USD2,500,000
+ Balance as at 27 June 1997

*Incorporated in Hong Kong with limited liability*
P.O. Box 27C, Agana, Guam 96932 *: Telephone: (671) 646-3757-62 • Cables: Hongbank
Telex: 6309 * Fax: (671) 646-3767

*Please address all letters to The Manager*

**EXHIBIT 1**

**B.** **PURPOSE:**

1. To term out past due Clean Import Loans.
2. To facilitate/finance the importation of stock.
3. To issue Standby L/Cs on behalf of Tip Top Travel Agency and K.Sadhwani's Inc.
4. To refinance loan under no. 6 above and apply surplus proceeds toward construction of a 10,000 s.f. commercial building on the former Donald's Mart property ("the project") and to term out the unauthorized overdraft.
5. To facilitate construction of the project.

**C.** **INTEREST RATES:**

1. 0.75% over the Bank's Base Lending Rate adjusted monthly.
2. LC - 1/8 of 1.00% of DC amounts per month.
   CIL- 0.75% over the Bank's Base Lending Rate adjusted monthly.
3. 1/8 of 1.00% of Standby LC amounts per month.
4. 0.75% over the Bank's Base Lending Rate adjusted monthly.
5. 0.75% over the Bank's Base Lending Rate adjusted monthly.

The Bank's Base Lending Rate means the base index rate established by the New York Office of the Bank from time to time in good faith in its discretion for general pricing of its short term loans to ordinary commercial borrowers. Such rates may be established and changed from time to time.

For information purposes, interest on overdue amounts, both principal and interest, will accrue additional interest at 5% over the above rate.

**D.** **REPAYMENT TERMS:**

1. USD 28,333.33 per month plus interest with provision for a balloon payment on the 60th month. Principal amortized over 5 years.
2. a) Due at sight.
   b) Interest and principal due in 180 days.
3. Due upon claim in accordance with Standby L/C terms.
4. USD 50,430.00 inclusive of interest with provisions for a balloon payment on the 60th month. Principal amortized over 15 years. After the second year anniversary of the loan, monthly payments will be adjusted to match a 13 year straight line amortisation schedule.

## D.   REPAYMENT TERMS continued:

5.   Interest only to be paid during the first year of the loan. Thereafter, USD2,680.00 per month plus interest to be paid with provision for a balloon payment to be made on the 60th month. Principal amortized over 12 years.

## E.   OTHER CHARGES:

A non-refundable arrangement fee of USD10,000.00 is due upon acceptance of this commitment letter.

## F.   AVAILABILITY:

Disbursement of the new facilities described under sections A-4 and A-5 above shall occur by 31 December 1997.

Facility A-5 must be fully drawdown within 365 days from initial drawdown but in any event not later than 31 December 1998. Any portion of the facility which has not been drawdown by said date shall thereupon be automatically cancelled and of no further effect.

## G.   SECURITY:

1.   Consolidated first mortgage over the following properties for the full facility amount:

   a.   Lot No. 2136-1-2,Tamuning, Guam (Dallas Lounge Building).
   b.   Lot Nos. 2141-1-3NEW & 2141-1-1-R1 Tamuning, Guam (Sharp Plaza Building).
   c.   Lot Nos. 2023-2-1-R1, 2025-4, & 2023-2-1-1 Tamuning, Guam (Tick Tock Building).
   d.   Lot No. 7, Block 8, Tamuning, Guam (Perezville vacant land).
   e.   Lot Nos. 10054-6, 10054-7, 10054-8, & 10054-R8, Dededo, Guam (Vacant lot).
   f.   Lot No. 2104-6NEW, Tamuning, Guam (HongkongBank Building).
   g.   Lot No. 16 & 19, Block 10, Dededo, Guam (Sateena Shopping Mall).
   h.   Lot Nos. 2136 #1-9-1, 2136 #1-8-1, & 2136 #1-7-1, Tamuning, Guam (site of the project).

## G.    SECURITY continued:

2.    Consolidated Title Insurance policy over the above properties for the mortgaged amount showing the bank as beneficiary.

3.    First leasehold mortgage for USD139,000 over Lot No. 006 H45 (the Saipan Tick Tock Building), Chalan Kanoa, Saipan.

4.    Title Insurance Policy on security item no. 3 above for the mortgaged amount showing the Bank as beneficiary.

5.    Hazard insurance policies on the improved properties listed above for not less than their replacement value showing the Bank as loss payee.

6.    Assignment of rental income over the above properties.

7.    Uniform Commercial Code First (UCC1) Financing Statement on all inventory, receivables, furniture, fixtures and equipment of the Borrower showing the Bank as senior lien holder.

8.    Hazard insurance policy on the items covered by the UCC1 Financing Statement above in form and content satisfactory to the Bank showing the Bank as loss payee.

9.    Joint and several personal guarantees of Ashok and Laju Sadhwani for the full facility amount.

## H.    COVENANTS:

1.    The Borrower shall maintain Gearing and Debt-to-Equity ratios (defined in the Appendix to this document) of no greater than 3.50 and 4.0 respectively.

2.    The Borrower will at all times retain an adjusted Tangible Net Worth (defined in the Appendix to this document) of no less than USD 16.0 million.

3.    The Borrower will not enter into any additional financial commitments without the Bank's prior written consent.

4.    The audited financial statements of the Borrower should be submitted to the Bank no later than four months after the end of its fiscal year. Interim financial statements should be submitted to the Bank on a semi-annual basis, no later than 60 days after the end of each half year.

## I.    CONDITIONS PRECEDENT TO DRAWDOWN:

1.    Submission of 1996 audited financial statements with no material adverse change from management accounts sighted by the Senior Management of the Bank and applied in the analysis of the financing arrangement provided herein.

2.    Submission of plans, specifications and budget for the project.

## I. CONDITIONS PRECEDENT TO DRAWDOWN continued:

3. Submission of pre-lease agreements for the project covering not less than 40% of the net leaseable area in form and content acceptable to the Bank.
4. Confirmed renewal of the Guam Marketing Corporation lease for a period of not less than 3 years and lease payments not less than the existing contract.
5. Submission of Architects' progress payment certificates and/or invoices covering drawdown requests for facility A-5.

## J. OTHER TERMS AND CONDITIONS:

1. This facility is subject to review at any time and, in any event, by 31 October 1997.
2. The net worth statement of Ashok and Laju Sadhwani shall be submitted to the Bank on request.
3. The Bank reserves the right to require updated property appraisals once every two years by an appraiser approved by the Bank. The cost of the appraisal shall be for your account and will be automatically debited to your account if no other arrangements are made.
4. All appraisal/processing/legal/recording/inspection fees, if any, shall be for the Borrower's account. Your account will be debited automatically for these charges.
5. In the event the Bank has not received evidence that a required insurance policy has been renewed at least 10 days prior to expiry, the Bank reserves the right to purchase the required insurance without reference to you. The cost of this insurance will be automatically debited to your account or added to the loan amount payable.
6. Sale proceeds from any mortgaged property sales are to be applied to outstanding loans.

Notwithstanding the other terms mentioned above, we reserve our customary overriding right of repayment upon demand.

If the effect of any, or a change in any, law or regulation is to increase the cost to us of advancing, maintaining or funding this facility or to reduce the effective return to us, we reserve the right to require payment on demand of such amounts as we consider necessary to compensate us for any increased costs which continued to be incurred after the serving of 60 days notice.

Please arrange for the authorized signatories of your company, in accordance with the terms of the mandate given to the Bank, to sign and return to us the duplicate copy of this letter to signify

your confirmation as to the correctness of the security held, and your continued understanding and acceptance of the terms and conditions under which these facilities are granted.

These facilities will remain open for acceptance until the close of business on 30 June 1997 and if not accepted by that date will be deemed to have lapsed.

We are pleased to be of continued assistance.

Very truly yours,

Anthony G. Wise
Vice President Corporate Banking

AGW\alg

ENCLOSURE

## BORROWER'S ACKNOWLEDGMENT AND ACCEPTANCE:

On behalf of K. SADHWANI'S INC., I hereby accept the terms and conditions of this commitment letter.

By:     Mr. Alan Sadhwani
Its:    President
Date:   July . 2 . 97

## GUARANTORS' ACKNOWLEDGMENT:

As guarantors, we hereby acknowledge the terms and conditions of this offer letter.

Mr. Alan Sadhwani
Date: July. 2. 97

Mrs. Laju Sadhwani
Date: 7/2/97

# APPENDIX

"**Adjusted Tangible Net Worth**" as defined by the Bank, includes capital stock plus retained earnings and other reserves (including the hidden reserve accruing from the market value of fixed assets) less tangible assets.

"**Gearing**", as defined by the Bank, is total interest bearing debt dividend by adjusted tangible net worth.

"**Debt to Equity**", as defined by the Bank, is total debts divided by adjusted tangible net worth.



# UNLIMITED CONTINUING GUARANTY
## (CORPORATION, INDIVIDUAL, PROPRIETORSHIP, PARTNERSHIP)

Date: __7/24/97__

| NAME | NO. AND STREET |
|---|---|
| SADHWANI, ASHOK AND LAJU | 136-C Kayen Chando Sateena Mall |
| **CITY, VILLAGE, OR TOWN** | **COUNTY**      **STATE** |
| Dededo, Guam 96912 | |
| **LENDING OFFICE** | **DEPARTMENT OR DIVISION** |
| THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED | GUAM AGENCY |
| **NO. AND STREET** | **CITY**      **STATE** |
| P.O. Box 27-C      AGANA,      GUAM | 96932 |

agree as follows:

1. **Guaranty of Payment.**

    (a)    Guarantor hereby unconditionally guarantees the full and prompt payment to Bank when due, whether by acceleration or otherwise, of any and all indebtedness (as hereinafter defined) of __K. Sadhwani's Inc.__ (Debtor) to Bank.

    (b)    As used in this Guaranty, "Indebtedness" shall mean any and all indebtedness and other liabilities of Debtor to Bank of every kind and character and all extensions, renewals and replacements thereof, including, without limitation, all unpaid accrued interest thereon and all costs and expenses payable as hereinafter provided: (i) whether now existing or hereafter incurred; (ii) whether direct, indirect, primary, absolute, joint, several or joint and several, secondary, contingent, secured, unsecured, matured or unmatured, by guarantee or otherwise; (iii) whether such indebtedness is from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred; (iv) whether such indebtedness was originally contracted with Bank or with another or other; (v)whether or not such indebtedness is evidenced by negotiable or non-negotiable instrument or any other writing; and (vi) whether such indebtedness is contracted by Debtor alone, jointly, severally or jointly and severally with another or others.

    (c)    Guarantor acknowledges that valuable consideration supports this guaranty, including, without limitation, any commitment to lend, extension of credit or other financial accommodation, whether heretofore or hereafter made by Bank to Debtor; any extension, renewal or replacement of any indebtedness, any forbearance with respect to any Indebtedness or other wise, any cancellation of any existing guaranty; any purchase of any of Debtor's assets by Bank; or any other valuable consideration.

2. **Bank's Costs and Expenses.**  Guarantor agrees to pay on demand all costs and expenses of every kind incurred by Bank:

    (a) on enforcing this Guaranty;

    (b) in collecting any Indebtedness from Debtor or Guarantor; (c) in realizing upon or protecting any collateral for this Guaranty or for payment of any indebtedness: and (d) for any other purpose related to the Indebtedness or this Guaranty. "costs and expenses" as used in the preceding sentence shall include, without limitation, the actual attorneys' fee incurred by Bank in retaining counsel for advice, suit, appeal, any insolvency or other proceedings under the Federal Bankruptcy Code or otherwise, or for any purpose specified in the preceding sentence.

3. **Nature of Guaranty:  Continuing, Absolute and Unconditional.**

    (a)    This Guaranty is and is intended to be a continuing guaranty of payment of the Indebtedness and not of collection of the Indebtedness (irrespective of the aggregate amount thereof and whether or not the Indebtedness from time to time exceeds the amount of this Guaranty, if limited), independent of, in addition and without modification to, and does not impair or in any way affect, any other guaranty, indorsement, or other agreement in connection with the indebtedness, or in connection with any other indebtedness or liability to Bank, or collateral held by Bank therefor or with respect thereto, whether or not furnished by Guarantor.  This Guaranty and Guarantor's obligations hereunder shall not be modified, terminated, impaired or in any way affected by the execution, delivery, or performance by Guarantor, Debtor, or any other person of any other guaranty, indorsement, or other agreement or the delivery of collateral therefor.  Guarantor waives any claim, remedy or other right which Guarantor might now have or hereafter acquire against Debtor or any other person that is primarily or contingently liable for the Indebtedness including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, or any right to participate in any claim or remedy of Bank against Debtor or any collateral therefor which Bank now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute, or common law.

-1-

**EXHIBIT** __"2"__

**(b)** This Guaranty is absolute and unconditional and shall not be changed or affected by any representation, oral agreement, act, or thing whatsoever, except as herein provided. This Guaranty is intended by Guarantor to be the final, complete and exclusive expression of the agreement between Guarantor and Bank. Guarantor expressly disclaims any reliance on any course of dealing or usage of trade or oral representation of Bank including, without limitation, representations to make loans to Debtor or enter into any other agreement with Debtor or Guarantor. No modification or amendment of any provision of this Guaranty and no waiver of any right by Bank shall be effective unless in writing and signed by a duly authorized officer of Bank.

4.    **Certain Rights and Obligations.**

**(a)** Guarantor authorizes Bank, without notice, demand or additional reservation of rights against Guarantor and without affection Guarantor's obligations hereunder, from time to time: (i) to renew, refinance, modify, subordinate, extend, increase, accelerate, or otherwise change the time for payment of, the terms of or the interest on the Indebtedness or any part thereof; (ii) to accept from any person or entity and hold collateral for the payment of the Indebtedness or any part thereof, and to exchange, enforce or refrain from enforcing, or release such collateral or any part thereof; (iii) to accept and hold any indorsement or guaranty of payment of the Indebtedness or any part thereof or any negotiable instrument or other writing intended by any party to create an accord and satisfaction with respect to the Indebtedness or any part thereof, and to discharge, terminate, release, substitute, replace or modify any such obligation of any such indorser or guarantor, or any person or entity who has given any security interest in any collateral as security for the payment of the Indebtedness or any part thereof, or any other person or entity in any way obligated to pay the Indebtedness or any part thereof, and to enforce or refrain from enforcing, or compromise or modify, the terms of any obligation of any such indorser, guarantor, person or entity; (iv) to dispose of or substitute any and all collateral securing the Indebtedness in any manner as Bank, in its sole discretion, may deem appropriate, and to direct the order or manner of such disposition or substitution and the enforcement of any and all indorsement and guaranties relating to the Indebtedness or any part thereof as Bank, in its sole discretion, may determine; and (v) to determine the manner, amount and time of application of payments and credits, if any, to be made on all or any part of any component or components of the Indebtedness (whether principal, interest, costs and expenses, or otherwise), including, without limitation, if this Guaranty is limited in amount, to make any such application to Indebtedness, if any, in excess of the amount of the Guaranty.

**(b)**    If any default shall be made in the payment of any Indebtedness, Guarantor hereby unconditionally agrees to pay the same in full: (i) without deduction by reason of any setoff, defense or counterclaim of Debtor; (ii) without requiring protest, presentment or notice of non-payment or notice of default to Guarantor, to Debtor or to any other person; (iii) without demand for payment or proof of such demand; (iv) without requiring Bank to resort first to Debtor (this being a guaranty of payment and not of collection) or to any other guaranty or any collateral which the Bank may hold, (v) without requiring notice of acceptance hereof (or of any liability to which this Guaranty applies or may apply) or assent hereto by Bank; (vi) without requiring notice that any indebtedness has been incurred or of the reliance by the bank upon this Guaranty; and (vii) without notice of dishonor, notice of acceleration, notice of intent to accelerate, and all other notices and demands, collection suit and the taking of any other action by Bank; all of which Guarantor hereby waives.

**(c)**    Guarantor's obligation hereunder shall not be affected by any of the following, all of which Guarantor hereby waives: (i) any failure to perfect or continue the perfection of any security interest in or other lien on any collateral securing payment of any Indebtedness or Guarantor's obligations hereunder; (ii) the invalidity, unenforceability, propriety of manner of enforcement of, or loss or change in priority of any such security interest or other lien; (iii) any taking, holding, continuation, collection, modification, leasing, impairment, surrender or abandonment of, or any delay or failure to protect, preserve or insure, any such collateral; (iv) any delay in the exercise or waiver of, any failure to exercise, or any forbearance in the exercise of, any right, power or remedy of Bank or any person (including, without limitation, those remedies described in Section 4(c)(iii) of this Guaranty) against Guarantor, Debtor, any person or entity or relating to the Indebtedness or any part thereof or the collateral therefor; (v) failure of Guarantor to receive notice of any intended disposition of such collateral; (vi) any defense arising by reason of the cessation from any cause whatsoever of liability of the Debtor including without limitation any failure, delay, waiver, forbearance, negligence or omission by Bank in enforcing its claims against the Debtor or any collateral therefor including, without limitation, any failure to make, prove, or vote any claim relating to the Indebtedness or any collateral therefor in any case or proceeding pursuant to the Federal Bankruptcy Code or any similar law, or any satisfaction of the Indebtedness or any part thereof by reason of the failure of Bank to recover against any collateral therefor or the failure of Bank to obtain a judgment for any deficiency; (vii) any release, settlement, composition, adjustment, renewal, extension, modification, increase, rearrangement, compromise, replacement, cancellation, discharge, assignment, sale, exchange, conversion, participation or other transfer or disposition of any obligation of Debtor or of any collateral therefor; (viii) the invalidity or unenforceability of any of the Indebtedness; (ix) the creation of any security interest, lien or other encumbrance in favor of any person other than Bank; (x) any refusal or failure of Bank or any other person prior to the date hereof or hereafter to grant any additional loan or other credit accommodation to Debtor or Bank's or any other party's receipt of notice of such refusal or failure; (xi) any refusal or failure of Bank or any other person to provide to guarantor any information relating to Debtor, any other guarantor, indorser, or any person or entity who has given any collateral as security for the payment of the Indebtedness or any information relating to Debtor's or such guarantor's, indorser's, person's, or entity's financial condition, business or assets, or if such information is provided, to provide such information completely and accurately; (xii) any change in the ownership or membership of Guarantor or Debtor; (xiii) the expiration of the period of any statute of limitations with respect to any lawsuit or (xiv) any other thing or circumstance which might otherwise constitute a defense to Guarantor's obligations hereunder.

5.    **Collateral.**

**(a)**    As further security for payment of the Indebtedness and of any other indebtedness, now existing or hereafter incurred, of Guarantor to Bank, Guarantor hereby grants to Bank a security interest in and lien on any and all money, securities and other property of whatever nature, of Guarantor, and all proceeds, replacements, increases, renewals, accessions, products, additions, appurtenances and substitutions thereof, which is or hereafter may be in the actual or constructive possession or control of Bank n any capacity or of any third party acting on Bank's behalf, including, without limitation, all deposit and other accounts and all moneys owed or to be owed by Bank to Guarantor; and with respect to all such money, securities and other property, Bank shall have all the rights and remedies of a secured party under the Uniform Commercial Code and under any other applicable law, as the same may from time to time be in effect in the Territory of Guam, in addition to those rights granted herein or in any other agreement now or hereafter in effect between Guarantor and Bank.

-2-

**(b)**    Guarantor agrees to furnish on Bank's demand, collateral satisfactory to Bank, as security for this Guaranty and to execute such security agreements, financing statements and other documents with respect thereto as Bank shall reasonably request.

**6.**    **Guaranty of Performance.** Guarantor also agrees the full, prompt and unconditional performance of all covenants, duties, obligations and agreements of every kind owed or hereafter to be owed by Debtor to Bank. Every provision for the benefit of the Bank contained in this Guaranty shall apply to the guaranty of performance given in this paragraph.

**7.**    **Termination.** This Guaranty shall remain in full force and effect as to each Guarantor until the officer in charge of the Lending Office, Department or Division of Bank indicated above shall actually receive from such guarantor written notice of this discontinuance, or notice of the death or judicial declaration of incompetency of such Guarantor; provided, however, that this Guaranty shall remain in full force and effect thereafter until: (i) all indebtedness outstanding, or contracted or committed for (whether or not outstanding), before the receipt of such notice by Bank, and any modifications, extensions, renewals or replacements thereof (whether made before or after receipt of such notice), together with interest accruing thereon after such notice, shall be finally and irrevocably paid in full; and (ii) all of Debtor's covenants and obligations under any document, instrument or writing at any time evidencing, securing or in any way relating to the indebtedness are performed and satisfied in full, as determined in Bank's sole and absolute discretion. Discontinuance of this Guaranty as to one Guarantor shall not operate as a discontinuance hereof as to any other Guarantor. Payment of all of the indebtedness from time to time shall not operate as a discontinuance of this Guaranty, unless notice of discontinuance as above provided has theretofore actually been received by Bank. Guarantor agrees that, to the extent that Debtor makes a payment or payments to Bank on the indebtedness, or Bank receives any proceeds of collateral to be applied to the indebtedness, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or otherwise are required to be repaid to Debtor, its estate, trustee, receiver or any other party, including, without limitation, under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such repayment, the obligation or part thereof which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred, notwithstanding any contrary action which may have been taken by Bank in reliance upon such payment or payments. As of the date any payment or proceeds of collateral are returned, the statute of limitations shall start anew with respect to any action or proceeding by Bank against Guarantor under this Guaranty. Guarantor shall defend and indemnify Bank of and from any claim or loss under this paragraph including actual attorneys' and paralegals' fees and expenses in the defense of any such suit.

**8.**    **Other Parties; Joint and Several Liability; Subordination.**

**(a)**    Bank shall have the right to discharge or release one or more of the undersigned form any obligation hereunder, in whole or in part, or any other guarantor, without in any way releasing, impairing or affecting its right against the other or others of the undersigned or guarantor. The failure of any other person to sign this Guaranty shall not release or affect the obligations or liability of the undersigned.

**(b)**    If more than one party executes this Guaranty, the obligations of the undersigned hereunder shall be joint and several and the term "Guarantor' shall include each as well as all of them.

**(c)**    So long as any of the indebtedness is outstanding, Guarantor hereby subordinates all indebtedness if Debtor to Guarantor to such indebtedness. Guarantor agrees that any payment with respect to such subordinated indebtedness received by Guarantor shall be received by Guarantor as trustee for, and shall be promptly remitted to, Bank.

**9.**    **Hazardous Substances.** Debtor hereby agrees to indemnify, pay and hold Secured Party, and the officers, directors, employees, attorneys, agents and affiliates of Secured Party (Indemnities) harmless from and against any and all liabilities, claims, damages, fines, penalties, liens, expenditures, costs, fees (including attorneys' fees), losses and charges, including, without limitation, all costs of investigation, monitoring, legal representation, remedial, response, removal, restoration or permit acquisition, which may now or in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred by or asserted against any of the Indemnities as a result of or related to, either directly or indirectly, the improper user of wetlands; noise, solid, liquid or gaseous waste generation, release, or other management activities; the presence or suspected presence of, Release (as defined below) or of threatened Release of any Hazardous Substances (as defined below) on, in , under or near any property or improvements thereon, owned, leased or operated by Debtor, regardless of whether or not caused by, or within the control of Debtor and regardless of whether caused in whole or in part by any Indemnities' negligence. The obligations of Debtor under this paragraph 9 shall survive foreclosure (or its equivalents), repayment of the indebtedness and termination of this Agreement and shall not be reduced or impaired by any investigation made by or on behalf of any of the Indemnities. For the purposes of this Paragraph 9, (i) "Hazardous Substances" means, without limitation, any explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum oil, or fractions thereof, methane, 'hazardous materials' as defined by or listed pursuant to the hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq., hazardous wastes, hazardous or toxic substances or any other material defined as a hazardous substance in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 et seq., or as a hazardous or toxic substance or other contaminant under applicable state or local law, regulation or ordinance; and (ii) "Release" has the same meaning as given to that term in Section 101(22) of such Act and the regulations promulgated thereunder. Debtor shall bear the burden of proof by preponderance of the evidence that the indemnification contained in this Guaranty is inapplicable to any claim or assertion made hereunder.

**10.**    **Miscellaneous.**

**(a)**    "Debtor" and "Guarantor" as used in this Guaranty shall include: (i) any successor individual or individuals, association, partnership or corporation to which all or a substantial part of the business or assets of Debtor or Guarantor shall have been transferred including, without limitation, a debtor in possession under the Federal Bankruptcy Code; (ii) in the case of a partnership Debtor or Guarantor, any new partnership which shall have been created by reason of the admission of any new partner or partners therein or by reason of the dissolution of the existing partnership by voluntary agreement or the death, resignation or other withdrawal of any partner; and (iii) in the case of a corporate Debtor or Guarantor, any other corporation into or with which Guarantor or Debtor (if Debtor is a corporation) shall have been merged, consolidated, reorganized, or absorbed.

-3-

    **(b)**    Without limiting another right or Bank, whenever Bank has the right to declare any indebtedness to be immediately due and payable (whether or not it has so declared), Bank at its sole election may set off against the Indebtedness any and all moneys then owed to Guarantor by Bank in any capacity, whether or not the Indebtedness or the obligation to pay such moneys owed by Bank is then due, and Bank shall be deemed to have exercised such right of setoff immediately at the time of such election even though any charge therefor is made or entered on Bank's records subsequent thereto.

    **(c)**    Guarantor's obligation hereunder is to pay the Indebtedness in full when due according to its terms, and shall not be affected by any extension of time for payment by Debtor, any bar to the enforceability of the Indebtedness, or any limitation on the right to attorneys' fees, resulting from any proceeding under the Federal Bankruptcy code or any similar law. Guarantor's obligation under this Guaranty shall also include payment of interest accrued on the Indebtedness before or after a filing of a petition under the bankruptcy laws and interest on, and principal of, loans made to the debtor in possession after the filing of such a petition by or against Debtor.

    **(d)**    No course of dealing or usage of trade, and no oral or written representations or agreement, between Debtor or Guarantor and Bank, whether or not relied on or acted upon, and no act, delay or omission by Bank in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. The giving of notice or a demand by Bank at any Bank at any time shall not operate as a waiver in the future of the Bank's right to exercise any right or remedy without notice or demand. Bank may remedy any default by Debtor under any agreement with Debtor or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Debtor. After Debtor's failure to pay the Indebtedness in full, or any part thereof, Bank may exercise against Guarantor each right and remedy of a creditor against a principal debtor upon a past due liquidated obligation. All rights and remedies of Bank hereunder, at law and in equity, are cumulative.

    **(e)**    Bank and Guarantor as used herein shall include the respective heirs, legal representatives, beneficiaries, trustees, executors or administrators, or successors or assigns, of those parties. The rights and benefits of Bank hereunder shall, if Bank so directs, inure to any party acquiring any interest in the Indebtedness or any part thereof. If any right of Bank hereunder is construed to be a power of attorney, such power of attorney shall not be affected by the subsequent disability or incompetence of Debtor or Guarantor.

    **(f)**    Bank's rights and remedies under this Guaranty are assignable and any participation may be granted by Bank herein in connection with the assignment or granting of a participation by Bank in the Indebtedness or any part thereof.

    **(g)**    Captions of the sections of this Guaranty are solely for the convenience of Bank and Guarantor, and are not an aid in the interpretation of this Guaranty.

    **(h)**    GUARANTOR IRREVOCABLY AGREES THAT, SUBJECT TO BANK'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS GUARANTY OR THE TRANSACTIONS RELATED HERETO SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY AND STATE IN WHICH SECURED PARTY'S AS SPECIFIED ABOVE IS LOCATED. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SUCH CITY AND STATE AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON GUARANTOR AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO GUARANTOR AT THE ADDRESS SPECIFIED ABOVE OR IN ANY OTHER MANNER PERMITTED BY LAW. GUARANTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST GUARANTOR BY BANK IN ACCORDANCE WITH THIS PARAGRAPH.

    **(i)**    If any provision of this Guaranty is unenforceable in whole or in part for any reason, it shall be deemed modified to the extent necessary to make it or the applicable provision enforceable, or if for any reason such provision is not deemed modified, the remaining provisions shall continue to be effective.

    **(j)**    Any payment or other act which results in the extension or renewal of the statute of limitations in connection with any action or proceeding against the Debtor relating to the Indebtedness, shall extend or renew the statute of limitations in connection with any action or other proceeding against the Guarantor in connection with this Guaranty whether or not Guarantor had notice of, or consented to, such payment or act.

    **(k)**    Any demand for payment against Guarantor made by Bank under this Guaranty shall be in writing and delivered in person or by first class mail postage prepaid at the Guarantor's address first written above, and shall be deemed received: (i) upon delivery, if delivered in person, and (ii) two days after deposited in the mail or delivered to the post office, if mailed.

    **(l)**    This Guaranty and the transactions evidenced hereby shall be governed by, and construed and enforced in accordance with, the laws of the Territory of Guam without regard to principles of conflicts of law.

    **(m)**    GUARANTOR AND BANK HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY GUARANTOR AND BANK MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THIS GUARANTY OR THE TRANSACTIONS RELATED HERETO. GUARANTOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF BANK HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BANK WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS JURY TRIAL WAIVER. GUARANTOR ACKNOWLEDGES THAT BANK HAS BEEN INDUCED TO ENTER INTO THIS GUARANTY BY, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.

    **(n)**    If this guaranty or the Indebtedness is secured in whole or in part by real property, Guarantor hereby waives, to the fullest extent permitted by law, the benefit of any applicable anti-deficiency law and one form of action rule.

This Guaranty is unlimited in amount, unless an amount is inserted in the space at the end of this paragraph. Only if an amount is so inserted, this Guaranty is limited to that amount (hereinafter referred to as the "Maximum Amount"), plus the sum of: (a) all unpaid interest which accrues on the Maximum Amount until payment of the Maximum Amount in full, calculated at the rate provided for in any instrument, document or agreement evidencing or pertaining to the Indebtedness; (b) all costs and expenses payable pursuant to Section 2(a) of this Guaranty; and (c) an amount equal to a fraction of all costs and expenses payable pursuant to Sections 2(b), 2(c) and 2(d) of this Guaranty, the numerator of which fraction is the Maximum Amount and the denominator of which fraction is the sum of all outstanding Indebtedness (less any unpaid accrued interest thereon), if such Indebtedness is either (i) payable on demand by terms and for which the bank has made demand for payment, or (ii) payable other than on demand by its terms and is presently due and owing, whether by maturity, acceleration or otherwise.  Maximum Amount _____ in aggregate for all borrowers named in the foregoing.

GUARANTOR:

By: _ASHOK SADHWANI_

By: _LAJU SADHWANI_

-5-

# HongkongBank

*Member HSBC Group*
**The Hongkong and Shanghai Banking Corporation Limited**
436 So. Marine Drive, Tamuning, Guam 96911 U.S.A.

| HSBC CORPORATE BANKING | | |
|---|---|---|
| RECEIVED BY / DATE: | *Sgd* | 31/Dec/97 |
| CRF COPY BY / DATE: | *Sgd* | 31/Dec/97 |
| I/E INITIAL / DATE: | *JM* | 06/Feb/98 |

29 December 1997

Our Ref: GUM CBA 970995

**PRIVATE AND CONFIDENTIAL**
K. Sadhwani's Inc.
Sharp Plaza Building
136 C Kayen Chando
Sateena Mall
Dededo, Guam 96912



Attn: Mr. Alan Sadhwani, President

## RE: RENEWAL AND AMENDMENT OF CREDIT FACILITIES

Dear Mr. Sadhwani:

With reference to our discussions we, The Hongkong and Shanghai Banking Corporation Limited (the "Bank"), are pleased to confirm our agreement to the amendment and renewal of the undermentioned credit facilities granted to K. Sadhwani's Inc. (the "Borrower"). These facilities are made available on the specific terms and conditions outlined herein and upon the satisfactory completion of the security detailed below. These facilities are subject to review at any time and in any event by 31 October 1998 and also subject to our overriding right of withdrawal and repayment on demand, including the right to call for cash cover for prospective and contingent liabilities.

| A. | **FACILITY TYPE** | **OLD LIMITS** | **NEW LIMITS** |
|---|---|---|---|
| 1. | Term Loan | NIL | USD6,500,000 |
| 2. | Term Loan | USD1,151,643 | USD   800,000 |
| 3. | Term Loan | NIL | USD   500,000 |
| 4. | Overdraft | NIL | USD   250,000 |
| 5. | Import Line: | | |
| | a) Letters of Credit (LC) of which | USD2,500,000 | USD1,500,000 |
| | b) Clean Import Loans (CIL) | USD1,500,000 | NIL |
| 6. | Standby Letters of Credit (Standby LC) | USD   330,000 | USD   225,000 |
| 7. | Term Loan | USD   386,000 | NIL |
| 8. | Term Loan | USD4,900,000 | NIL |
| | | USD9,267,643 | USD9,775,000 |

*Incorporated in Hong Kong with limited liability*
P.O. Box 27C, Agana, Guam 96932 • Telephone: (671) 646-3757-62 • Cables: Hongbank
Telex: 6309 • Fax: (671) 646-3767

*Please address all letters to The Manager*

EXHIBIT ___3___

B.  **PURPOSE:**

1.  To consolidate Term, Revolving and Clean Import Loans.
2.  To term our past due Clean Import Loans.
3.  To finance the purchase of a warehouse complex.
4.  For working capital purposes.
5.  To facilitate the importation of stock.
6   To issue Standby LCs in favor of suppliers/airlines.

C.  **INTEREST RATES:**

1-4.  0.75% over the Bank's Base Lending Rate adjusted monthly.
5a.  LC - 1/8 of 1.00% of LC amounts per month.
6.   Standby LC - 1/8 of 1.00% of Standby LC amounts per month.

The Bank's Base Lending Rate means the base index rate established by the New York Office of the Bank from time to time in good faith in its discretion for general pricing of its short term loans to ordinary commercial borrowers. Such rates may be established and changed from time to time.

Interest on overdue payments, both principal and interest, will accrue at 5% over the above rate.

D.  **REPAYMENT TERMS:**

1.  USD83,225 per month inclusive of interest for 5 years with a balloon repayment due at the end of the 60th month. Repayments are based on a 10 year amortization.
2.  USD25,535 per month inclusive of interest for 3 years.
3.  USD6,402 per month inclusive of interest for 5 years with a balloon repayment due at the end of the 60th month. Repayments are based on a 10 year amortization.
4.  Interest monthly, principal payable on demand. Interest charges will be automatically charged from the checking account.
5a.  Due at sight.
6.   Due upon claim in accordance with Standby L/C terms.

E.  **OTHER CHARGES:**

A non-refundable renewal fee of USD5,000.00 is due upon acceptance of this letter.

F.  **SECURITY:**

1.  Consolidated first mortgage over the following properties for the full facility amount:
    a.  Lot No. 2136-1-2,Tamuning, Guam (Dallas Lounge Building).
    b.  Lot Nos. 2141-1-3NEW & 2141-1-1-R1 Tamuning, Guam (Sharp Plaza Building).
    c.  Lot Nos. 2023-2-1-R1, 2025-4, & 2023-2-1-1 Tamuning, Guam (Tick Tock Building).
    d.  Lot No. 7, Block 8, Tamuning, Guam (Perezville vacant land).
    e.  Lot Nos. 10054-6, 10054-7, 10054-8, & 10054-R8, Dededo, Guam (Vacant Lot).
    f.  Lot No. 2104-6NEW, Tamuning, Guam (HongkongBank Building).
    g.  Lot No. 16 & 19, Block 10, Dededo, Guam (Sateena Shopping Mall).
    h.  Lot Nos. 2136 #1-9-1, 2136 #1-8-1, & 2136 #1-7-1, Tamuning, Guam.
    I.  New property to be acquired (Second Mortgage) Tamuning, Guam.
2.  Consolidated Title Insurance policy over the above properties for the mortgaged amount showing the bank as beneficiary.
3.  First leasehold mortgage for USD139,000 over Lot No. 006 H45 (the Saipan Tick Tock Building), Chalan Kanoa, Saipan.
4.  Title Insurance Policy on security item no. 3 above for the mortgaged amount showing the Bank as beneficiary.
5.  Hazard insurance policies on the improved properties listed above for not less than their replacement value showing the Bank as loss payee.
6.  Assignment of rental income over the above properties.
7.  Uniform Commercial Code First (UCC1) Financing Statement on all inventory, receivables, furniture, fixtures and equipment of the Borrower showing the Bank as senior lien holder.
8.  Hazard insurance policy on the items covered by the UCC1 Financing Statement above in form and content satisfactory to the Bank showing the Bank as loss payee.
9.  Joint and several personal guarantees of Ashok and Laju Sadhwani for the full facility amount.

G.  **COVENANTS:**

1.  The Borrower shall maintain Gearing and Debt-to-Equity ratios (defined in the Appendix to this document) of no greater than 3.50 and 4.0 respectively.
2.  The Borrower will at all times retain an adjusted Tangible Net Worth (defined in the Appendix to this document) of no less than USD 2.3 million.
3.  The Borrower will not enter into any additional financial commitments without the Bank's prior written consent.

4. The audited financial statements of the Borrower should be submitted to the Bank no later than four months after the end of its fiscal year. Interim financial statements should be submitted to the Bank on a semi-annual basis, no later than 60 days after the end of each half year.

5. A detailed inventory report to be submitted by the Borrower to the Bank on a half yearly basis by the 15th of the following month.

## H.   OTHER TERMS AND CONDITIONS:

1. This facility is subject to review at any time and, in any event, by 31 October 1998.

2. The net worth statement of Ashok and Laju Sadhwani shall be submitted to the Bank on request.

3. The Bank reserves the right to require updated property appraisals once every two years by an appraiser approved by the Bank. The cost of the appraisal shall be for your account and will be automatically debited to your account if no other arrangements are made.

4. All appraisal/processing/legal/recording/inspection fees, if any, shall be for the Borrower's account. Your account will be debited automatically for these charges.

5. In the event the Bank has not received evidence that a required insurance policy has been renewed at least 10 days prior to expiry, the Bank reserves the right to purchase the required insurance without reference to you. The cost of this insurance will be automatically debited to your account or added to the loan amount payable.

6. Sale proceeds from any mortgaged property sales are to be applied to outstanding loans.

7. The loan documents, including without limitation the Business Loan Agreement (or Credit Agreement, whichever applies), shall contain terms and conditions satisfactory to the Bank with respect to any items not specifically provided herein.

Notwithstanding the other terms mentioned above, we reserve our customary overriding right of repayment upon demand.

If the effect of any, or a change in any, law or regulation is to increase the cost to us of advancing, maintaining or funding this facility or to reduce the effective return to us, we reserve the right to require payment on demand of such amounts as we consider necessary to compensate us for any increased costs which continued to be incurred after the serving of 60 days notice.

Please arrange for the authorized signatories of your company, in accordance with the terms of the mandate given to the Bank, to sign and return to us the duplicate copy of this letter to signify your confirmation as to the correctness of the security held, and your continued understanding and

acceptance of the terms and conditions under which these facilities are granted.

These facilities will remain open for acceptance until the close of business on 31 December 1997 and if not accepted by that date will be deemed to have lapsed.

We are pleased to be of continued assistance.

Yours sincerely,

Stephen J. Grantham
Assistant Vice President - Corporate Banking

SJG\egv
enc.

## BORROWER'S ACKNOWLEDGMENT AND ACCEPTANCE:

On behalf of K. SADHWANI'S INC., I hereby accept the terms and conditions of this commitment letter.

By:     Mr. Alan Sadhwani
Its:    President
Date:   31DEC97

## GUARANTORS' ACKNOWLEDGMENT:

As guarantors, we hereby acknowledge the terms and conditions of this offer letter.

Mr. Alan Sadhwani                                     Mrs. Laju Sadhwani
Date:   31DEC97                                       Date:   31DEC97

## APPENDIX

" Adjusted Tangible Net Worth" as defined by the Bank, includes capital stock plus retained earnings and other reserves (including the hidden reserve accruing from the market value of fixed assets) less tangible assets.

"Gearing", as defined by the Bank, is total interest bearing debt divided by adjusted tangible net worth.

"Debt to Equity", as defined by the Bank, is total debts divided by adjusted tangible net worth.

# BUSINESS LOAN AGREEMENT

| Principal $9,775,000.00 | Loan Date | Maturity | Loan No 001-100023 | Call | Collateral | Account 001-100023 | Officer CR71 | Initials |
|---|---|---|---|---|---|---|---|---|

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** K. SADHWANI'S INC.
SHRAP PLAZA 136 C KAYEN CHANDO SATEENA MALL
DEDEDO, GU 96912

**Lender:** The Hongkong and Shanghai Banking Corporation, Limited
436 South Marine Drive
Tamuning, GU 96911

THIS BUSINESS LOAN AGREEMENT between K. SADHWANI'S INC. ("Borrower") and The Hongkong and Shanghai Banking Corporation, Limited ("Lender") is made and executed on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans and other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. All such loans and financial accommodations, together with all future loans and financial accommodations from Lender to Borrower, are referred to in this Agreement individually as the "Loan" and collectively as the "Loans." Borrower understands and agrees that: (a) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements, as set forth in this Agreement; (b) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (c) all such Loans shall be and shall remain subject to the following terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of _December 31, 1997_ and shall continue thereafter until all Indebtedness of Borrower to Lender has been performed in full and the parties terminate this Agreement in writing.

**DEFINITIONS.** The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means K. SADHWANI'S INC.. The word "Borrower" also includes, as applicable, all subsidiaries and affiliates of Borrower as provided below in the paragraph titled "Subsidiaries and Affiliates."

**CERCLA.** The word "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

**Cash Flow.** The words "Cash Flow" mean net income after taxes, and exclusive of extraordinary gains and income, plus depreciation and amortization.

**Collateral.** The word "Collateral" means and includes without limitation all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Debt.** The word "Debt" means all of Borrower's liabilities excluding Subordinated Debt.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

**Event of Default.** The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "EVENTS OF DEFAULT."

**Grantor.** The word "Grantor" means and includes without limitation each and all of the persons or entities granting a Security Interest in any Collateral for the Indebtedness, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with any Indebtedness.

**Indebtedness.** The word "Indebtedness" means and includes any Documentary Credits (DCs)/Bills Receivable (BR) of which Trust Receipts (TR)/ Clean Import Loans (CILs).

**Lender.** The word "Lender" means The Hongkong and Shanghai Banking Corporation, Limited, its successors and assigns.

**Liquid Assets.** The words "Liquid Assets" mean Borrower's cash on hand plus Borrower's readily marketable securities.

**Loan.** The word "Loan" or "Loans" means and includes without limitation any and all commercial loans and financial accommodations from Lender to Borrower, whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means and includes without limitation Borrower's promissory note or notes, if any, evidencing Borrower's Loan obligations in favor of Lender, as well as any substitute, replacement or refinancing note or notes therefor.

**Permitted Liens.** The words "Permitted Liens" mean: (a) liens and security interests securing Indebtedness owed by Borrower to Lender; (b) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (c) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (d) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (e) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (f) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean and include without limitation any type of collateral security, whether in the form of a lien,

EXHIBIT 4

charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**SARA.** The word "SARA" means the Superfund Amendments and Reauthorization Act of 1986 as now or hereafter amended.

**Subordinated Debt.** The words "Subordinated Debt" mean indebtedness and liabilities of Borrower which have been subordinated by written agreement to indebtedness owed by Borrower to Lender in form and substance acceptable to Lender.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total Debt.

**Working Capital.** The words "Working Capital" mean Borrower's current assets, excluding prepaid expenses, less Borrower's current liabilities.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Loan Advance and each subsequent Loan Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following documents for the Loan: (a) the Note, (b) Security Agreements granting to Lender security interests in the Collateral, (c) Financing Statements perfecting Lender's Security Interests; (d) evidence of insurance as required below; and (e) any other documents required under this Agreement or by Lender or its counsel, including without limitation any guaranties described below.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents, and such other authorizations and other documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any advance a condition which would constitute an Event of Default under this Agreement.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of Loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation which is duly organized, validly existing, and in good standing under the laws of the Territory of Guam and is validly existing and in good standing in all states in which Borrower is doing business. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage. Borrower also is duly qualified as a foreign corporation and is in good standing in all states in which the failure to so qualify would have a material adverse effect on its businesses or financial condition.

**Authorization.** The execution, delivery, and performance of this Agreement and all Related Documents by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; do not require the consent or approval of any other person, regulatory authority or governmental body; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Borrower or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

**Financial Information.** Each financial statement of Borrower supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used, or filed a financing statement under, any other name for at least the last five (5) years.

**Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the "CERCLA," "SARA," the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the properties, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties. (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters. (c) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from any of the properties; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Borrower's ownership or interest in the properties, whether or not the same was or should have been known to Borrower. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination or expiration of this Agreement and shall not be affected by Lender's acquisition of any interest

in any of the properties, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all tax returns and reports of Borrower that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note and all of the Related Documents are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Commercial Purposes.** Borrower intends to use the Loan proceeds solely for business or commercial related purposes.

**Employee Benefit Plans.** Each employee benefit plan as to which Borrower may have any liability complies in all material respects with all applicable requirements of law and regulations, and (i) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan, (ii) Borrower has not withdrawn from any such plan or initiated steps to do so, (iii) no steps have been taken to terminate any such plan, and (iv) there are no unfunded liabilities other than those previously disclosed to Lender in writing.

**Location of Borrower's Offices and Records.** Borrower's place of business, or Borrower's Chief executive office, if Borrower has more than one place of business, is located at SHRAP PLAZA 136 C KAYEN CHANDO SATEENA MALL, DEDEDO, GU 96912. Unless Borrower has designated otherwise in writing this location is also the office or offices where Borrower keeps its records concerning the Collateral.

**Information.** All information heretofore or contemporaneously herewith furnished by Borrower to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Borrower to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

**Survival of Representations and Warranties.** Borrower understands and agrees that Lender, without independent investigation, is relying upon the above representations and warranties in extending Loan Advances to Borrower. Borrower further agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

**Litigation.** Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with generally accepted accounting principles, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with, as soon as available, but in no event later than one hundred sixty (160) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender, and, as soon as available, but in no event later than sixty (60) days after the end of each fiscal half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared and certified as correct to the best knowledge and belief by Borrower's chief financial officer or other officer or person acceptable to Lender. All financial reports required to be provided under this Agreement shall be prepared in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Tangible Net Worth.** Maintain a minimum Tangible Net Worth of not less than **$2,300,000.00.**

**Net Worth Ratio.** Maintain a ratio of Total Liabilities to Tangible Net Worth of less than **4.00 to 1.00.** Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the properties insured; (e) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (f) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions spelled out in those guaranties.

| Guarantors | Amounts |
|---|---|
| ASHOK H. SADHWANI | Unlimited |
| LAJU A. SADHWANI | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Borrower shall have established on its books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Borrower, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Borrower's properties, income, or profits.

**Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Borrower learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable federal, state and municipal laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to Borrower's employee benefit plans.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificate.** Unless waived in writing by Lender, provide Lender at least annually and at the time of each disbursement of Loan proceeds with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with all environmental protection federal, state and local laws, statutes, regulations and ordinances; not cause or permit to exist, as a result of an intentional or unintentional action or omission on its part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except U.S. federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (a) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (c) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (a) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (b) except as allowed as a Permitted Lien, sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets, or (c) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (a) Engage in any business activities substantially different than those in which Borrower is presently engaged, (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, (c) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of stock of Borrower, or (d) purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (a) Loan, invest in or advance money or assets, (b) purchase, create or acquire any interest in any other enterprise or entity, or (c) incur any obligation as surety or guarantor other than in the ordinary course of business.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (a) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (b) Borrower or any Guarantor becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (c) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; (d) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (e) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**BE IT FURTHER RESOLVED.** that the Corporation is hereby authorized to apply for and obtain from the Lender letters of credit and in connection therewith to execute such agreements, applications, guarantees, indemnities and other financial undertakings as the Lender may require, to apply to said Bank for letters of guaranty, bonds to produce bills of lading or bonds in lieu of production of original bills of lading, to make, execute and deliver to the Lender trust receipts and other (similar) security instruments or documents in such form and amounts and for such property as Lender may require, and to enter into and execute foreign exchange contracts with the Lender. BE IT FURTHER RESOLVED THAT THE AGGREGATE AT ANY ONE TIME OF LETTERS OF CREDIT AND ACCEPTANCES, TRUST RECEIPTS, FOREIGN EXCHANGE CONTRACTS ISSUED, IF ANY, PURSUANT TO THIS AUTHORITY, SHALL NOT EXCEED THE TOTAL COMBINED LIMITS AS PRESCRIBED IN THE LOAN AGREEMENT OR THE BANK'S COMMITMENT LETTER ISSUED FROM TIME TO TIME.

**RIGHT OF SETOFF.** Borrower grants to Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Default on Indebtedness.** Failure of Borrower to make any payment when due on the Loans.

**Other Defaults.** Failure of Borrower or any Grantor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or failure of Borrower to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower or any Grantor under this Agreement or the Related Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any Security Agreement to create a valid and perfected Security Interest) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower, any creditor of any Grantor against any collateral securing the Indebtedness, or by any governmental agency. This includes a garnishment, attachment, or levy on or of any of Borrower's deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor, as the case may be, as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding, and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and furnishes reserves or a surety bond for the creditor or forfeiture proceeding satisfactory to Lender.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure the Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender, in good faith, deems itself insecure.

**Right to Cure.** If any default, other than a Default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (a) cures the default within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the

**Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in the Territory of Guam. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the Territory of Guam. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other. This Agreement shall be governed by and construed in accordance with the laws of the Territory of Guam.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Multiple Parties; Corporate Authority.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loans to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loans and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loans irrespective of the failure or insolvency of any holder of any interest in the Loans. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Costs and Expenses.** Borrower agrees to pay upon demand all of Lender's expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. Lender may pay someone else to help collect the Loans and to enforce this Agreement, and Borrower will pay that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Borrower, notice to any Borrower will constitute notice to all Borrowers. For notice purposes, Borrower will keep Lender informed at all times of Borrower's current address(es).

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used herein shall include all subsidiaries and affiliates of Borrower. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any subsidiary or affiliate of Borrower.

**Successors and Assigns.** All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns. Borrower shall not, however, have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival.** All warranties, representations, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will survive the making of the Loan and delivery to Lender of the Related Documents, regardless of any investigation made by Lender or on Lender's behalf.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waiver.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any obligations of Borrower or of any Grantor as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of Lender.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT, AND BORROWER AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF _31 December 1997_

**BORROWER:**

**K. SADHWANI'S INC.**

By: _____

    ASHOK H. SADHWANI, PRESIDENT

**LENDER:**

The Hongkong and Shanghai Banking Corporation, Limited

By: _____

    **Authorized Officer**

LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.24 (c) 1997 CFI ProServices, Inc. All rights reserved. [GU-C40 KSI.LN C1.OVL]