**LAW OFFICES OF BRONZE & TANG**
A Professional Corporation
BankPacific Building, 2nd Floor
825 South Marine Corp Drive
Tamuning, Guam 96913
Telephone: (671) 646-2001
Facsimile: (671) 647-7671

FILED
DISTRICT COURT OF GUAM

APR 30 2004

MARY L. M. MORAN
CLERK OF COURT

*Attorneys for Defendant Hongkong and Shanghai Banking Corporation, Ltd.*

## DISTRICT COURT OF GUAM

| | |
|---|---|
| ALAN SADHWANI, LAJU SADHWANI, and K. SADHWANI'S INC., a Guam corporation,<br><br>    Plaintiffs,<br><br> v.<br><br>HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., et al.,<br><br>    Defendants. | **CIVIL CASE NO. 03-00036**<br><br>**HONGKONG AND SHANGHAI BANKING CORPORATION, LTD.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE THE FIRST AMENDED COMPLAINT IN WHOLE OR IN PART, OR, IN THE ALTERNATIVE, MOTION TO DISMISS THE THIRD AND SIXTH CAUSES OF ACTION AND FOR SANCTIONS** |

### JURISDICTION

This action is before this Court under federal diversity jurisdiction pursuant to 28 U.S.C. § 1322 and 48 U.S.C. § 1424. This Court has authority to hear this motion pursuant to FRCP 15(a), 12(f), 12(b)(6) and 11(c)(1)(B).

### FACTS

On or about October 21, 2003, Plaintiffs filed their Complaint alleging six causes of action: Breach of the Covenant of Good Faith and Fair Dealing; Intentional Misrepresentation; Breach of Contract under the Promissory Note Modification Agreement; Breach of Contract under the Workout Agreement; Breach of Fiduciary Duty; and Violation of Banking and

Confidentiality Laws. On December 30, 2003, Hongkong and Shanghai Banking Corporation, Ltd. ("HSBC") filed its Motion to Dismiss Plaintiffs' entire Complaint pursuant to FRCP 12(b)(6). This Court took the matter under advisement. On April 9, 2004, District Judge John S. Unpingco, granted HSBC's Motion as to the Third and Sixth Causes of Action and granted Plaintiffs' limited leave to amend their complaint. *See, Order, filed herein on April 9, 2004.*

On April 27, 2004, Plaintiffs' filed their First Amended Complaint for Damages ("FAC") amending Counts III and VI. However, Plaintiffs surreptitiously, without leave of court, asserted new facts in paragraphs 5 and 7, a new paragraph 16, new facts to paragraph 18, a new paragraph 21 and new facts and deletions to paragraph 26. Paragraph 24 from the original Complaint was deleted. In addition, Plaintiffs' asserted new facts to paragraph 30, a complete new paragraph 31A-D and deleted paragraph 28 to its First Cause of Action. As to the Second Cause of Action, Plaintiffs' asserted a new paragraph 36, and asserted new facts to paragraphs 38 and 39. As it relates to the Fourth Cause of Action, Plaintiffs added additional language to paragraph 49 and as well as additional allegations and deletions to paragraph 50. Lastly, Plaintiffs' asserted new facts to paragraphs 54C and F to its Fifth Cause of Action. Plaintiffs undertook all those amendments surreptitiously, in violation of this Court's April 9, 2004, Order and without leave of court. Attached hereto as Exhibit "A" and incorporated herein by this reference is a marked-up copy of the FAC. The underlined portions of Exhibit "A" indicate new insertions and the mark "∠" indicates deletions from the original Complaint filed by Plaintiffs.

/ / /

/ / /

/ / /

/ / /

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

## ANALYSIS

## I. ALL AMENDMENTS IN THE FIRST AMENDED COMPLAINT, OTHER THAN THOSE TO THE THIRD CAUSE OF ACTION, SHOULD BE STRICKEN BECAUSE PLAINTIFFS FAILED TO SEEK LEAVE OF COURT.

A party is entitled to amend its pleading once anytime before a responsive pleading is served. *See, FRCP 15(a)*. Otherwise, a party is required to obtain "leave of court or by written consent of the adverse party . . . ." *Id.* HSBC did not consent to the new amendments and Plaintiffs have not sought leave of court to file such new amendments.

The Court addressed the exact strategy employed by Plaintiffs herein in *Equal Employment Opportunity Commission v. Pacific Maritime Association, Marine Terminals Corp., 2000 WL 222 627 (D. Or. 2000)*. In that case, defendants moved to strike the amended complaint-in-intervention filed by the plaintiff intervenor on the grounds that it failed to file the amended complaint within the ten (10) day time limitation set by the court in its order and that the amended complaint-in-intervention was not the same as the proposed amended complaint-in-intervention which was attached to intervenor's motion for leave to file an amended complaint-in-intervention as it alleged several new claims. Id. In that case, the District Court granted Pacific Maritime Association's motion to strike the amended complaint. *Id.; see, also, Kirk v. IRS, 2000 WL 1902254 (D. Ariz., 2000)* (second amended complaint stricken for failure to comply with FRCP 15(a)). Moreover, failure to seek leave of court under FRCP 15(a) before filing an amended complaint leaves the amended complaint without legal effect. *See, Hoover v. Blue Cross & Blue Shield, 855 F.2d 1538, 1544 (11th Cir. 1988)*.

Thus, HSBC respectfully requests that the entire FAC be stricken as being without legal effect or, in the alternative, all new amendments except for the amendments to the Third Cause of

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29 4.04.wpd

Action be stricken.[1] Should the Court only strike the new amendments unrelated to Count III of the FAC, then the Court must address HSBC's FRCP 12(b)(6) Motion to Dismiss Counts III and VI of the FAC. It is to be noted that before dismissing for failure to state a claim, a district court is not required to grant Plaintiff leave to amend the complaint *sua sponte* when Plaintiff failed to seek leave to amend. *See, Romani v. Shearson Lehman Hutton, 929 F.2d 875, 880-881 (1st Cir. 1991); Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1068 n.1 (4th Cir. 1993); Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1041-1042 (6th Cir. 1991); Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1192 (7th Cir. 1990); Glenn v. First Nat'l Bank, 868 F.2d 368, 371 (10th Cir. 1989); Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542-545 (11th Cir. 2002) (en banc); Government of Guam v. American President Lines, 28 F.3d 142, 144 (D.C. Cir. 1994).*

### A.   Based on Plaintiffs' outrageous conduct, this Court should order Plaintiffs' attorneys to show cause why they have not violated subdivision FRCP 11(c)(1)(B).

FRCP 11(c)(1)(B) provides, "[o]n its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto." Plaintiffs' claims are certainly not warranted by existing law nor by the specific Order filed by Judge Unpingco on April 9, 2004. Plaintiffs' actions were intentional, surreptitious and in violation of Rule 15 and such conduct should not be permitted by this Court.

---

[1]

The Order filed by this Court on April 9, 2004, which dismissed the Sixth Cause of Action contained in the Complaint dated October 21, 2003, granted limited leave to Plaintiffs to replead their claim by specifically identifying the statutes which Plaintiffs claimed that HSBC violated. However, without the Court's permission, Plaintiffs have alleged a new cause of action based upon an alleged "general duty" of confidentiality and implied contract. The Sixth Cause of Action must also be stricken as being in violation of Rule 15 and this Court's Order.

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

## II. THE THIRD CAUSE OF ACTION MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CAUSE OF ACTION AGAINST HSBC UPON WHICH RELIEF CAN BE GRANTED.

In support of their Third Cause of Action, titled "Breach of Contract-Promissory Note Modification", Plaintiffs assert that while the Promissory Note Modification Agreement ("PMNA"), attached to the FAC as Exhibit "C", only extends the maturity date of the subject Note to August 31, 2003, the alleged "workout agreement" between the parties "implicitly extended the date of maturity" under the PMNA to a date unknown. *FAC at ¶ 44.* The "workout agreement" alleged by Plaintiffs is not clearly identified, however, it appears to be embodied in letters attached as Exhibits "G" and "H" to the FAC. *See, FAC at ¶¶ 12, 13.* Plaintiffs claim that when HSBC sold and assigned the subject note, loan, and security instruments to Pacific Marine Corporation ("PMC") HSBC thereby breached the PMNA "as amended by the workout agreement". *FAC at ¶ 44.*

Unfortunately for Plaintiffs, there are no documents attached to the FAC and no facts alleged therein that support Plaintiffs' conclusion that the maturity date of the note was "implicitly extended". Plaintiffs admit that the maturity date of the Note as specified in the PMNA is August 31, 2003. *FAC at ¶ 44.* There is nothing in either Exhibit "G" or "H" from which it may be implied that either party ever contemplated, much less agreed to, an extension of the maturity date of the note. Plaintiffs allegation that the maturity date of the note was "implicitly extended" pursuant to the "workout agreement" is drawn from thin air and nothing more.

Further, it is simply of no consequence whether there was any agreement to extend the maturity date of the note because HSBC admittedly sold the note to PMC before it matured. Plaintiffs' conclusion that the PMNA was breached by HSBC when it sold the note is nothing more than sheer sophistry. Also, the operative loan agreement upon which the PMNA is based

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

specifically provides that no amendment to the loan agreement or any related documents, including any promissory note, "shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." *See, Business Loan Agreement, attached hereto as Exhibit "B", previously identified, authenticated and attached as Exhibit "4" to the Declaration of I. C. Underwood in Support of Motion to Strike Jury demand, filed herein on December 30, 2003.* Plaintiffs cannot claim that the PMNA was "implicitly" amended by the "workout agreement" since the claimed extension was never reduced to writing, as required by the Business Loan Agreement. Accordingly, there was no "implicit extension".

Finally, Plaintiffs' claim of an "implied contract" fails to clear several other legal hurdles. Under Guam law, a contract is either express or implied. *18 G.C.A. § 86101.* An "implied contract" is one in which the "existence and terms of (the contract) are manifested by conduct." *18 G.C.A. § 86103.* One of the essential elements of all contracts is "sufficient cause or consideration". *18 G.C.A. § 85102.* "Good consideration" is any benefit conferred upon the promisor or any prejudice suffered by the promisee that at the time of consent he or she is not legally bound to suffer. *18 G.C.A. § 85501.* As shown above, Plaintiffs have failed to plead any facts in the FAC which show conduct on the part of HSBC or, for that matter, on the part of Plaintiffs, which manifested any implied contract to extend the maturity date of the note. Further, Plaintiffs have failed to allege any facts showing there was any benefit conferred upon HSBC or or detriment suffered by Plaintiffs that they were not already bound to suffer under the legal obligations they had a duty to perform pursuant to the subject loan. Accordingly, there was no conduct by the parties alleged showing an agreement to extend the maturity date and no consideration alleged. For these reasons alone, the Third Cause of Action fails to state a claim upon which relief can be granted.

- 6 -

As a fallback, Plaintiffs also assert in the Third Cause of Action that since "none of the Loan agreements" allow for the sale of the loan to PMC, then HSBC breached such loan agreements, as amended by the "workout agreement", by selling the loan to PMC. *FAC at ¶ 46.* This claim is a ruse and was earlier disposed of in this Court's April 9 Order.

A promissory note is a negotiable instrument. *See, 13 G.C.A. § 3104.* By its very terms, a negotiable instrument is freely transferable by the holder to a third party. *Id. at §§ 3201, 3202.* Just as importantly, a contractual right, such as HSBC's rights in the subject promissory note, may be freely assigned unless such assignment is precluded by the contract itself or forbidden by statute. *Restatement (Second) of Contracts § 317(2) (1981).* Even more importantly, Guam law specifically provides that a right arising out of an obligation is the property of the person to whom it is due and may be freely transferred. *18 G.C.A. § 81102.* Further, Guam law provides that even nonnegotiable instruments, including written contracts for the repayment of money, may be transferred just as if they were negotiable instruments. *Id. at § 81103.* Accordingly, HSBC had the explicit right under Guam law to sell the loan and note to PMC and needed no futher authorization to do so under the PMNA or the "workout agreement". Accordingly, Plaintiffs have no cognizable legal theory under the Third Cause of Action and it must be dismissed for failure to state a claim upon which relief may be granted against HSBC.

## III. THE SIXTH CAUSE OF ACTION MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CAUSE OF ACTION AGAINST HSBC UPON WHICH RELIEF CAN BE GRANTED.

In support of their Sixth Cause of Action, Plaintiffs assert that HSBC has a "general duty" not to disclose their "financial condition" to third parties. *FAC at ¶ 58.* Plaintiffs also claim that there was "an implied term of contract" between the parties that prohibited HSBC from divulging to third persons "either the state of plaintiffs' accounts or any of plaintiffs' transactions with

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29 4.04.wpd

HSBC." *Id.* Additionally, Plaintiffs allege that "it is an implied condition of the contract" between the parties that HSBC will not divulge to third persons the "financial condition and the business affairs of the Plaintiffs." *Id.*

Plaintiffs complain that HSBC's sale and assignment of the subject loan, note, security instruments, and guaranties to PMC constituted not only a breach of HSBC's "general duty" not to disclose Plaintiffs' financial condition, but a breach of the "implied contract" between the parties which required that HSBC not divulge the "state of plaintiffs' accounts or any of plaintiffs' transactions with HSBC." *Id. at* ¶ 61. As shown below, the Sixth Cause of Action fails to state a claim against HSBC upon which relief can be granted.[2]

It is axiomatic that a promissory note is a negotiable instrument. *See, 13 G.C.A. § 3104.* By its very terms, a negotiable instrument is freely transferable by the holder to a third party. *Id. at §§ 3201, 3202.* Just as importantly, a contractual right, such as HSBC's rights in the subject promissory note, may be freely assigned unless such assignment is precluded by the contract itself or forbidden by statute. *Restatement (Second) of Contracts § 317(2) (1981).* Even more importantly, Guam law specifically provides that a right arising out of an obligation is the property of the person to whom it is due and may be freely transferred. *18 G.C.A. § 81102.* Further, Guam law provides that even nonnegotiable instruments, including written contracts for the repayment of money, may be transferred just as if they were negotiable instruments. *Id. at § 81103.* Finally, HSBC incorporates it discussion above related to implied contracts under Guam

_____

2

The Order filed by this Court on April 9, 2004, which dismissed the Sixth Cause of Action contained in the Complaint dated October 21, 2003, granted limited leave to Plaintiffs to replead their claim by specifically identifying the statutes which Plaintiffs claimed that HSBC violated. However, without the Court's permission, Plaintiffs have alleged a new cause of action, albeit just as fruitless, based upon an alleged "general duty" of confidentiality and implied contract. This violation by Plaintiffs' has been addressed in HSBC's Motion to Strike, *supra.*

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

law, *supra at p. 6*, to show that Plaintiffs have failed to adequately plead the elements of an implied contract in the Sixth Cause of Action as well.

There is ample reason why no such restrictions on the right to sell and transfer a note and loan exist. If the law were as the Plaintiffs have alleged in the Sixth Cause of Action, then no bank or other lending institution would ever be able to sell a note or loan without the express consent of the borrower. In such a case, the law of negotiable instruments would be invalidated and the secondary market for notes and mortgages, such as the Federal National Mortgage Association ("Fannie Mae") and the Government National Mortgage Association ("Ginnie Mae'), would be virtually impossible. Further, a mortgagor would not be able to file notices of foreclosure and conduct foreclosure proceedings, without the express consent of the debtor, because such actions would invariably divulge information concerning the borrower's "account" and "financial condition" to third parties. Finally, if the law were as Plaintiffs have asserted, banks could never "divulge" account information to credit reporting agencies without the express consent of the borrower.

Simply put, a lender has no implied obligation or "general duty" of confidentiality to a borrower. In *Graney Development Corp. v. Taksen, 400 N.Y.S. 2d 717 (Sup. 1978), aff'd, 411 N.Y.S. 2d 756 (App. Div. 1978),* the plaintiff claimed that a bank breached an implied agreement not to disclose information about the plaintiff's financial affairs and the bank moved to dismiss. *Id. at 718.* In distinguishing the relationship between a bank and depositior with that of a lender and borrower, the court held that the bank, in its capacity as a lender, is in no different position than that of any other lender or creditor and that there existed no implied agreement of confidentiality to the relations of a bank with its borrowers. *Id. at 720.* The court dismissed the borrower's claim. *Id.; also see, Boccardo v. Citibank, N.A., 579 N.Y.S. 2d 836, 838-9 (Sup.*

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

*1991)* (as to the relationship between bank and borrower, there is no basis for imposing a duty of confidentiality on bank; motion to dismiss granted); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693, 721 (S.D.N.Y. 1996)* (no duty of confidentiality exists between debtor and creditor); *Hopewell Ent., Inc. v. Trustmark Nat. Bank, 680 So. 2d 812, 817-818 (Miss. 1996)* (Supreme Court holds that no duty of confidentiality exists in bank-borrower relationship); *Schoneweis v. Dando, 435 N.W. 2d 666, 673 (Neb. 1989)* (Supreme Court holds that in debtor-creditor relationship bank owed no duty of confidentiality).

There is no question that the relationship between HSBC and Plaintiffs was that of lender and borrower. It is equally clear that HSBC was explicitly authorized under Guam law to sell and assign to subject note, loan and security instruments. Since the Sixth Cause of Action is wholly based upon the allegation that HSBC "divulged" financial information to PMC by selling the subject loan and note, which HSBC had the right to do under Guam law, then no cause of action can arise against HSBC for doing that which it was legally entitled to do. Further, as shown above, no duty of confidentiality exists between debtor and creditor. Accordingly, Plaintiffs have no cognizable legal theory under the Sixth Cause of Action and it must be dismissed for failure to state a claim upon which relief may be granted against HSBC.

For the foregoing reasons, HSBC's Motion to Strike the First Amended Complaint in Whole or in Part, or, in the Alternative, Motion to Dismiss the Third and Sixth Causes of Action and for Sanctions should be granted.

*Respectfully submitted* this 30th day of April 2004.

LAW OFFICES OF BRONZE & TANG
A Professional Corporation

By: _____
JACQUES G. BRONZE

C:\My Documents\HSBC MEMO OF P&A RE MOTION TO STRIKE, DISMISS FAC 29.4.04.wpd

# EXHIBIT "A"

Joaquin C. Arriola
Anita P. Arriola
**ARRIOLA, COWAN & ARRIOLA**
259 Martyr Street, Suite 201
Hagåtña, Guam 96910
Telephone: (671) 477-9730/33
Telecopier: (671) 477-9734

FILED
DISTRICT COURT OF GUAM

APR 2 7 2004

MARY L. M. MORAN
CLERK OF COURT

Counsel for Plaintiffs Alan Sadhwani, Laju Sadhwani,
and K. Sadhwani's Inc., a Guam corporation

<div align="center">

IN THE UNITED STATES
DISTRICT COURT OF GUAM

</div>

| | |
|---|---|
| ALAN SADHWANI, LAJU SADHWANI, and K. SADHWANI'S INC., a Guam corporation, ) ) ) | CIVIL CASE NO. CV03-00036 |
| Plaintiffs, ) ) | **FIRST AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL** |
| vs. ) ) ) | |
| HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., a foreign corporation, JOHN DOE I through JOHN DOE X, ) ) ) ) ) | |
| Defendants. ) ) | |

Plaintiffs complain of Defendants:

1.      Jurisdiction is vested in this Court pursuant to Section 3105, Title 7, Guam

Code Annotated, this being an action arising under the laws of Guam.

2.      Plaintiffs Alan Sadhwani and Laju Sadhwani are husband and wife, residents

of Guam for many years.  K. Sadhwani's Inc., is a Guam corporation authorized and

licensed to do business in Guam. Defendant Hongkong & Shanghai Banking Corporation,

Ltd., is a foreign corporation licensed and authorized to do banking business in Guam.

**EXHIBIT A**

BRONZE & TANG, P.C.
Date: 4/27/04
Time: 3:32
Received: 100

3.      Defendants John Doe I through John Doe X, are the fictitious names of defendants whose true names are unknown to the Plaintiffs, and Plaintiffs ask that when such true names are discovered that this Complaint may be amended by inserting such true names in the place and stead of said fictitious names.

4.      At all times material herein, Plaintiffs have engaged in the business of acquiring real properties and developing them. They have also engaged in the business of leasing, renting real properties, including offices and other commercial building, and selling electronics, fixtures and appliances. At all times material herein, Defendant Hongkong & Shanghai Banking Corporation, Ltd. (hereafter "Defendant Bank") was in the business of a full service bank, lending funds to customers, taking mortgages, security instruments and other evidences of indebtedness, and taking deposits.

5.      Plaintiffs have been for about twenty five (25) years, customers of Defendant Bank, executing and delivering to Defendant Bank evidences of their indebtedness secured by mortgages and other security instruments, and depositing funds in Defendant Bank. Plaintiffs went into business, Tick Tock, in 1978. Mr. Sadhwani met the then Manager of Defendant Bank, in 1978, at a meeting of Rotarians, and since then has banked exclusively with Defendant Bank (except for credit card deposits to Citibank, because Defendant Bank, a foreign corporation, did not accept credit card deposits from merchants). All of Plaintiffs' deposits and borrowings, were with Defendant Bank exclusively. Plaintiffs deposited

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

-2-

about $100 million with Defendant Bank during these twenty-five (25) years. Throughout the years, plaintiffs would borrow money from Defendant Bank, purchase real properties and develop them, and/or develop their retail business of electronics, fixtures and appliances. At one time, Plaintiffs total obligation to Defendant Bank was $12 million. Mr. Sadhwani negotiated with Defendant Bank to build their Bank building in Tamuning, thus becoming Defendant Bank's Landlord. In addition to the long-standing relationship, Plaintiffs also had social relationships with the Defendant Bank. The Sadhwanis socialized with Bank Managers (who changed every 3 years) at Mr. Sadhwani's home, at the home of the Bank Managers, or in restaurants. As borrowers, Plaintiffs have paid the Defendant Bank thousands of dollars in interest and fees. By virtue of such long relationship, Plaintiffs placed explicit faith, trust, and confidence in the Defendant Bank, trusting that the Defendant Bank and its officers and employees would deal fairly and honestly with them, the Plaintiffs.

6. On November 6, 2002, Plaintiffs and Defendant Bank entered into an agreement entitled "Amendment to Credit Facility/Lease" a copy of which is attached as **Exhibit "A"**. Pursuant to this Agreement, the balance of Plaintiffs' Note to Defendant Bank was $6,821,494.56, as of September 27, 2002 (hereafter the "Loan").

7. On February 13, 2003, representatives of the Defendant Bank met with Plaintiff Alan Sadhwani (hereafter "Mr. Sadhwani"), and informed Mr. Sadhwani that

-3-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

HSBC would close its office in Guam. On February 17, 2003, the Defendant Bank wrote to Mr. Sadhwani purportedly memorializing the discussion which took place on February 13, 2003. A copy of Defendant Bank's letter is attached as **Exhibit "B"**.

8. On March 5, 2003, Mr. Sadhwani met with representatives of the Defendant Bank at the Defendant Bank's office, at which time representatives of the Defendant Bank informed Mr. Sadhwani that Defendant Bank would give a "hairline discount" if Plaintiffs paid off the Loan. Additionally, said representatives suggested a "friendly foreclosure". Based upon these representations, Mr. Sadhwani was induced to believe that if he found funding for repayment of the Plaintiffs' Loan with Defendant Bank, the Defendant Bank would discount or reduce the balance of the Loan. On the same date, Plaintiffs and Defendant Bank entered into an agreement entitled "Promissory Note Modification Agreement", a copy of which is attached and marked **Exhibit " C "**.

9. On March 6, 2003, Defendant Bank wrote to the Plaintiffs again reiterating that the Defendant Bank would consider a discount on the Loan and a "friendly foreclosure". A copy of such letter is attached as **Exhibit "D"**.

10. By letter dated March 13, 2003, Defendant Bank reiterated its recommendation for a "friendly foreclosure". A copy of said letter is attached as **Exhibit "E"**.

11. By letter dated March 14, 2003, Mr. Sadhwani requested clarification and

-4-

asked for details about the "friendly foreclosure". Additionally, Mr. Sadhwani requested more information about the "discount" which was offered by the Defendant Bank in the March 5, 2003 meeting. A copy of such letter is attached as **Exhibit "F"**.

12. By letter dated March 21, 2003, Defendant Bank offered three proposals to work out the Loan: Plaintiffs could sell the mortgaged properties; Plaintiffs could execute deeds in lieu of foreclosure at "negotiated values;" or Plaintiffs could refinance the Loan. Additionally, Defendant Bank assured Plaintiffs that ". . . Bank is ready, able and willing to assist . . ." Plaintiffs in their ". . . negotiation of replacement financing." A copy of such letter is attached as **Exhibit "G"**.

13. Plaintiffs accepted Defendant Bank's first and third proposals. Pursuant to the on-going work out agreement with Defendant Bank, Plaintiffs sought the services of Century 21, to find buyers for the properties subject to the Defendant Bank mortgage. By letter dated April 3, 2003, Century 21 reported on its efforts to sell the properties. A copy of such letter is attached as **Exhibit "H"**.

14. By letter dated April 3, 2003, Defendant Bank transmitted a copy of the Promissory Note Modification dated March 5, 2003. A copy of such letter is attached as **Exhibit "I"**.

15. By letter dated April 4, 2003, Mr. Sadhwani wrote to Defendant Bank notifying it that he was trying to obtain financing to pay off Plaintiff's Loan, and the

-5-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

attempt to sell the properties to pay off the Loan, enclosing a copy of the Century 21 letter (Exhibit "H"). A copy of such letter is attached and marked **Exhibit "J"**.

16.    While plaintiffs were attempting to find alternate financing and to sell their properties in furtherance of the workout agreement, in early May 2003 HSBC, without plaintiffs' knowledge, began negotiations with Joseph K. Fang to sell the Loan to Mr. Fang's Guam company, Paradise Marine Corporation ("PMC"). After over a month of negotiations, HSBC and Mr. Fang executed a Loan Purchase Agreement on June 25, 2003 for the sale of plaintiffs' Loan. In May 2003 HSBC did not disclose to plaintiffs that the Loan was for sale. HSBC also did not disclose to plaintiffs that the Loan was sold on June 23, 2003.

17.    On July 18, 2003, Plaintiffs received a document entitled "Notice of Intent to Sell Loan", dated July 15, 2003, a copy of which is attached as **Exhibit "K"**. This Notice came as a total surprise to Plaintiffs, since Defendant Bank assured Mr. Sadhwani that the Plaintiffs had until August 31, 2003, to settle their Loan.

18.    On July 22. 2003, Mr. Sadhwani telephoned Mr. Underwood. Mr. Underwood came to Mr. Sadhwani's office. Mr. Underwood did not inform Mr. Sadhwani that the Loan had been sold. Mr. Sadhwani asked, but Mr. Underwood declined to name the purchase price for the Loan. Mr. Sadhwani pleaded not to sell the Loan. Mr. Sadhwani asked Mr. Underwood whether the Bank would accept $3 million for the Loan; Mr. Underwood replied "No." Mr. Sadhwani then said how about $3.5 million. Mr.

-6-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

Underwood said: "Get me the money or guarantee, and I will try to stop the sale."

19.     On July 31, 2003, Mr. Sadhwani detailed his attempts to settle the Loan. A copy of such letter is attached and marked **Exhibit "L"**. Mr. Sadhwani saw Mr. Underwood and again pleaded not to sell the Loan. Mr. Underwood assured him that if he received the offer [i.e., money or bank letter] by August 8, Mr. Underwood said, "I will see what I can do."

20.     On August 5, 2003, Mr. Sadhwani obtained terms and conditions for alternative financing from First Hawaiian Bank for $3.5 million, a copy of which is attached and marked **Exhibit "M"**. On the same date, by letter (**Exhibit "N"**) Mr. Sadhwani transmitted the First Hawaiian Bank letter to Defendant Bank.

21.     Although First Hawaiian Bank eventually denied Mr. Sadhwani's application for a loan, Mr. Sadhwani continued to make efforts to obtain alternate financing. He had an oral agreement with two individuals that in the event bank financing was unavailable, he could borrow up to $3.5 million from both individuals in order to buy his loan from HSBC.

22.     On August 11, 2003, Mr. Underwood addressed a letter to Mr. Sadhwani stating: "I am pleased to inform you that on Monday , the 11th of August 2003 your loan was sold to Paradise Marine Corporation." A copy of such letter is attached and marked **Exhibit "O"**.

-7-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

23.     Although Plaintiffs requested of the Bank and Paradise Marine Corporation a copy of the Loan purchase agreement, they both refused. Both also refused to divulge the purchase price. Upon information and belief, Plaintiffs allege that the purchase price for the Loan is less than $3 million.

24.     Paragraph 1 of the Promissory Note Modification Agreement (**Exhibit "C"**) provides:

"1.     Extension of Maturity Date. <u>The Maturity Date of the Note is hereby extended for a period of time up to and including August 31, 2003. The Lender will review the note every six months</u>, and reserves the right in its sole discretion to call for repayment of principal and interest then outstanding and unpaid. <u>Default on the terms of the Note will supercede this review process</u>, and entitle the Lender to call for immediate repayment of one." (Emphasis added).

25.     Plaintiffs fully complied with the payment terms provided in the Amendment to Credit Facility/Lease (**Exhibit " A"**), i.e., payment of $51,719 from October 2001 to May 2003, and $75,000 commencing June 30, 2003.

26.     Many parcels of real property owned by the Plaintiffs were mortgaged to secure the Loan. These parcels are prime properties on Guam. Several of the buildings are Guam landmarks, e.g., the Tick Tock Building in East Agana; the HSBC Building, Marine Drive, Tamuning; the Deloitte & Touche Building along Marine Drive, Tamuning; and

-8-

Sateena Mall in Dededo, among others. At one time, these properties were worth much more than $12 million. At one time, these properties secured a Loan to the Plaintiffs from Defendant Bank in excess of $12 million. Yet, Defendant Bank, nowithstanding the pleas of the Plaintiffs to give them time within which to obtain other financing in order to buy back their Loan, nonetheless sold the Loan to Paradise Marine Corporation for an amount, according to information and belief, of less than $3 million, even though Plaintiffs and HSBC had a workout agreement to settle plaintiffs' Loan.

## FIRST CAUSE OF ACTION

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

27.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 26 above as if fully set forth herein.

28.     Defendant Bank, as a party to the Loan agreement and the work out agreement with plaintiffs, has a duty to deal fairly with Plaintiffs and in good faith.

29.     In the March 21, 2003 letter (**Exhibit "G"**), Defendant Bank offered three (3) proposals to work out the Loan: Plaintiffs could sell the mortgaged properties; Plaintiffs could execute deeds in lieu of foreclosure "at negotiated values"; or Plaintiffs could refinance the Loan. On this latter option, Defendant Bank agreed that it was "ready, able and willing to assist your negotiation of replacement financing."

-9-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

30. Plaintiffs accepted the first and third proposals offered by Defendant Bank. Relying on these work out proposals, Plaintiffs immediately listed certain properties for sale with Century 21 Realty Management and applied to various banks, including First Hawaiian Bank, to obtain alternative financing. Plaintiffs obtained terms and conditions for alternative financing from First Hawaiian Bank and forwarded such terms and conditions to Defendant Bank on August 5, 2003. Defendant Bank failed and refused to allow plaintiffs a reasonable time under the workout agreement to sell their properties and failed and refused to allow plaintiffs a reasonable time under the workout agreement to obtain alternate financing to pay off their Loan.

31. Defendant Bank acted in bad faith and failed to deal fairly with Plaintiffs as follows:

A. By misrepresenting to plaintiffs that it intended to perform on the workout agreement when in fact it intended to sell plaintiffs' Loan;

B. By reneging on the workout agreement and refusing to allow plaintiffs a reasonable time under the agreement to sell their properties or to obtain alternate financing;

C. By misrepresenting that it would try to stop the sale of the Loan if plaintiffs obtained alternate financing when the Loan had already been sold to PMC;

-10-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

D.   By failing to inform plaintiffs that it was selling the Loan and refusing to give plaintiffs the opportunity to purchase or pay off their Loan at the same price offered by PMC.

32.   As a result of Defendant Bank's bad faith and failure to deal fairly with Plaintiffs, Plaintiffs have suffered damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

33.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 32 above as if fully set forth herein.

34.   Defendant Bank represented to Plaintiffs that it would give a "hairline discount" on the Loan if Plaintiffs paid off the Loan.

35.   Defendant Bank also represented to Plaintiffs that it was willing to work out the Loan with Plaintiffs and further represented that Plaintiffs could resolve its indebtedness by accepting the options proposed by Defendant Bank, as detailed in paragraph 12, above.

36.   Defendant Bank further represented to Plaintiffs that it would try to stop the sale of the Loan if Plaintiffs obtained alternate financing.

37.   In reliance upon Defendant Bank's representations, Plaintiffs were induced to list their properties for sale with Century 21 Commonwealth Realty and to apply for

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

-11-

alternative financing with various banks and others.

38.  Had HSBC given Plaintiffs a reasonable time to sell their properties and/or obtain alternate financing, Plaintiffs would have saved thousands of dollars in interest and loan payments and increased costs, and they would not be required to make the loan payments as required by Paradise Marine Corporation.

39.  Defendant Bank intentionally misrepresented that it would give a "hairline discount" on the Loan if Plaintiffs paid off the Loan; that it was interested in pursuing a commercially reasonable work out, when it had no desire or intention to work out the Loan; and that it would try to stop the sale of the Loan if plaintiffs obtained alternate financing, when it had no desire or intention to stop the sale of the Loan to Paradise Marine Corporation.

40.  As a result of the intentional misrepresentations made by Defendant Bank to Plaintiffs, Plaintiffs have suffered damages in an amount to be proved at trial.

<center>THIRD CAUSE OF ACTION</center>

<center>BREACH OF CONTRACT - PROMISSORY NOTE MODIFICATION</center>

41.  Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42.  Plaintiffs and Defendant Bank entered into a valid loan contract for the Loan. Paragraph 1 of the Promissory Note Modification Agreement (**Exhibit "C"**) provides:

<center>-12-</center>

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

**Extension of Maturity Date.** <u>The Maturity Date of the Note is</u>

<u>hereby extended for a period of time up to and including</u>

<u>August 31, 2003. The Lender will review the note every six</u>

<u>months</u>, and reserves the right in its sole discretion to call for

repayment of principal and interest then outstanding and

unpaid. <u>Default on the terms of the Note will supercede this</u>

<u>review process</u>, and entitle the Lender to call for immediate

repayment of one. (Emphasis added)

43.    Plaintiffs fully complied with the payment terms provided in the Amendment

to Credit Facility/Lease (**Exhibit " A"**), i.e., payment of $51,719 from October 2001 to May

2003, and $75,000 commencing June 30, 2003. Plaintiffs were not in default of the Loan

documents, the Amendment to Credit Facility/Lease, or the Promissory Note Modification

Agreement.

44.    The Promissory Note Modification Agreement explicitly provided that the

maturity date of the Note is "extended up to and including August 31, 2003." The workout

agreement between the parties implicitly extended the date of maturity under the

Promissory Note Modification Agreement. While the workout agreement did not contain

a specific deadline for plaintiffs to sell their properties and/or obtain alternate financing,

the law implies a reasonable time under the circumstances of the case. Plaintiffs performed

-13-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

their obligations under the terms of the workout agreement. When Defendant Bank sold the Loan to PMC, Defendant Bank breached the Promissory Note Modification Agreement, as amended by the workout agreement.

45.     Because the workout agreement implicitly extended the maturity date under the Promissory Note Modification Agreement, Defendant Bank failed to fulfill the terms of the Promissory Note Modification Agreement to review the Note every six months, in violation of the Promissory Note Modification Agreement.

46.     In addition, none of the Loan agreements between Plaintiffs and Defendant Bank allow for the sale of the Loan to Paradise Marine Corporation. Defendant Bank breached its Loan agreement, as amended by the workout agreement, with Plaintiffs by selling the Loan to Paradise Marine Corporation.

47.     As a proximate result of Defendant Bank's breaches of contract, Plaintiffs suffered damages including but not limited to, increased interest payments, increased costs, and other damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## BREACH OF CONTRACT - WORK OUT AGREEMENT

48.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 47 above as if fully set forth herein.

49.     Plaintiffs and Defendant Bank entered into a valid work out agreement,

-14-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

where Defendant Bank offered proposals to work out the Loan and Plaintiffs accepted two of the proposals. Plaintiffs immediately listed certain properties for sale with Century 21 Realty Management and Plaintiffs attempted to obtain alternative financing from First Hawaiian Bank and others.

50.     Defendant Bank failed to assist Plaintiffs' negotiations for replacement financing. While the workout agreement did not contain a specific deadline for plaintiffs to sell their properties and/or obtain alternate financing, the law implies a reasonable time under the circumstances of the case.   Defendant Bank did not give plaintiffs a reasonable time to sell their properties or obtain alternate financing and failed to give a "hairline discount" on the Loan. Defendant Bank sold the Loan to Paradise Marine Corporation instead of complying with the parties' work out agreement. All of these acts constitute breaches of the work out agreement.

51.     As a proximate result of Defendant Bank's breaches of the work out agreement, Plaintiffs suffered damages including but not limited to increased interest payments, increased costs, as well as other damages to be proven at trial.

### FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

52.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 51  above as if fully set forth herein.

-15-

53. Because of the longstanding, close and confidential relationship between Defendant Bank and Plaintiffs, and by virtue of the trust and confidence which Defendant Bank encouraged Plaintiffs to place in the Bank and which the Plaintiffs did place in the Bank, as well as the assurances that the Bank gave Plaintiffs that it would agree to a commercially reasonable work out, Defendant Bank owed to Plaintiffs a duty of fiduciary care.

54. Defendant Bank breached its fiduciary duties owed to Plaintiffs by its acts, including but not limited to the following:

A. By disclosing confidential information, including but not limited to, account and deposit information, loan payment history, and other banking transactions between Plaintiffs and Defendant Bank, to Paradise Marine Corporation, a non-bank and purchaser of Plaintiffs' Loan with Defendant Bank.

B. By failing to assist Plaintiffs' negotiations for replacement financing, as Defendant Bank had represented;

C. By failing and refusing to give plaintiffs a reasonable time to sell their properties and/or obtain alternate financing, as required by the parties' work out agreement;

D. By failing to give a "hairline discount" on Plaintiffs' Loan;

-16-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

E.     By selling the Loan to Paradise Marine Corporation, a Guam corporation that is not licensed to conduct banking and has never conducted banking business in Guam; and

F.     By failing to notify plaintiffs that their Loan was for sale and refusing to allow plaintiffs the opportunity to purchase or pay off their Loan at the same price offered by PMC.

55.     As a proximate result of the breaches of fiduciary duty as alleged herein, Plaintiffs have suffered damages, including but not limited to, increased interest payments, increased costs, and other damages in an amount to be proven at trial.

56.     In doing the acts herein alleged, Defendant Bank acted with oppression, fraud, and malice, and Plaintiffs are therefore entitled to punitive damages.

### SIXTH CAUSE OF ACTION

### BREACH OF DUTY NOT TO DIVULGE PLAINTIFFS' CONFIDENTIAL BANKING INFORMATION

57.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

58.     HSBC has a general duty not to disclose the financial condition of plaintiffs to third parties. In addition, it is an implied term of the contract between HSBC and plaintiffs that HSBC will not divulge to third persons without plaintiffs' consent, either the state of plaintiffs' account or any of plaintiffs' transactions with HSBC. Like other banks,

-17-

HSBC demanded and received financial information from the Plaintiffs. Unless provided as demanded by HSBC, it, HSBC, would not loan funds to Plaintiffs. Having no choice, Plaintiffs did provide such information to HSBC with the explicit understanding that absent their consent and permission, HSBC would not divulge such information to third parties who may be competitors of the Plaintiffs' business. The competition for rentals of buildings and sales of various electronic products is extremely stiff given the economic condition of the Island. Like other banks, HSBC has a general duty not to disclose information received by it from the Plaintiffs concerning Plaintiffs' financial condition, business plans, rentals, marketing and pricing strategies, and a host of other information, including personal matters, without the consent and permission of the Plaintiffs. Thus, it is an implied condition of the contract between HSBC and the Plaintiffs that HSBC will not divulge to third persons without Plaintiffs' consent and permission the financial condition and the business affairs of the Plaintiffs.

59.     The purchaser of Plaintiffs' Loan is Paradise Marine Corporation. Paradise Marine Corporation (hereafter "PMC"), is a Guam corporation, whose primary purpose, according to its Articles of Incorporation, is "to engage in the business of commercial fisheries operation."

60.     PMC does not now and has never obtained a license to do banking business on Guam; PMC is not now and has never been in the banking business; PMC is not

-18-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

required to keep confidential any information concerning Plaintiffs' Loan, banking relationship with Defendant Bank, deposit accounts and transactions.

61.     Absent the consent of the plaintiffs, Defendant Bank expressly or impliedly agreed that it, Defendant Bank, will not divulge to third persons the terms or the state of Plaintiffs' accounts with the Defendant Bank, any of their transactions with Defendant Bank, or any other information about the Plaintiffs acquired by Defendant Bank throughout the 25 years of their banking relationship. Disclosure of information about plaintiffs' financial condition, their accounts and transactions with HSBC, which were acquired by PMC from HSBC during the negotiation, sale, assignment, and transfer of Plaintiffs' Loan to PMC, constitutes a breach of Defendant Bank's general duty not to disclose the financial condition of plaintiffs to third parties. In addition, such conduct by HSBC constituted a breach of the implied contract between HSBC and plaintiffs that HSBC will not divulge to third persons without plaintiffs' consent, either the state of plaintiffs' accounts or any of plaintiffs' transactions with HSBC.

62.     As a proximate result of Defendant Bank's breach of its duty not to disclose plaintiffs' financial condition and its breach of the implied contract not to divulge plaintiffs' accounts or any of plaintiffs' transactions with HSBC, Plaintiffs suffered damages including but not limited to increased interest payments, increased costs, as well as other damages to be proven at trial.

-19-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

WHEREFORE, Plaintiffs pray judgment against Defendant Bank as follows:

1.  For compensatory and consequential damages according to proof.

2.  For punitive damages according to proof.

3.  For costs of suit and for such other and further relief as the Court may deem appropriate.

<p style="text-align:center"><strong>JURY TRIAL DEMAND</strong></p>

Plaintiffs demand a jury trial on all issues so triable.

Dated this _27th_ day of April, 2004.

<div style="margin-left:50%">

**ARRIOLA, COWAN & ARRIOLA**
Attorney for Plaintiffs

BY: _____

JOAQUIN C. ARRIOLA

</div>

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

-20-

EXHIBIT "B"

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $9,775,000.00 | | | 001-100023 | | | 001-100023 | CR71 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** K. SADHWANI'S INC.
SHRAP PLAZA 136 C KAYEN CHANDO SATEENA MALL
DEDEDO, GU 96912

**Lender:** The Hongkong and Shanghai Banking Corporation, Limited
436 South Marine Drive
Tamuning, GU 96911

THIS BUSINESS LOAN AGREEMENT between K. SADHWANI'S INC. ("Borrower") and The Hongkong and Shanghai Banking Corporation, Limited ("Lender") is made and executed on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans and other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. All such loans and financial accommodations, together with all future loans and financial accommodations from Lender to Borrower, are referred to in this Agreement individually as the "Loan" and collectively as the "Loans." Borrower understands and agrees that: (a) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements, as set forth in this Agreement; (b) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (c) all such Loans shall be and shall remain subject to the following terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of December 31, 1997 and shall continue thereafter until all Indebtedness of Borrower to Lender has been performed in full and the parties terminate this Agreement in writing.

**DEFINITIONS.** The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means K. SADHWANI'S INC.. The word "Borrower" also includes, as applicable, all subsidiaries and affiliates of Borrower as provided below in the paragraph titled "Subsidiaries and Affiliates."

**CERCLA.** The word "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

**Cash Flow.** The words "Cash Flow" mean net income after taxes, and exclusive of extraordinary gains and income, plus depreciation and amortization.

**Collateral.** The word "Collateral" means and includes without limitation all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Debt.** The word "Debt" means all of Borrower's liabilities excluding Subordinated Debt.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

**Event of Default.** The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "EVENTS OF DEFAULT."

**Grantor.** The word "Grantor" means and includes without limitation each and all of the persons or entities granting a Security Interest in any Collateral for the Indebtedness, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with any Indebtedness.

**Indebtedness.** The word "Indebtedness" means and includes any Documentary Credits (DCs)/Bills Receivable (BR) of which Trust Receipts (TR)/ Clean Import Loans (CILs).

**Lender.** The word "Lender" means The Hongkong and Shanghai Banking Corporation, Limited, its successors and assigns.

**Liquid Assets.** The words "Liquid Assets" mean Borrower's cash on hand plus Borrower's readily marketable securities.

**Loan.** The word "Loan" or "Loans" means and includes without limitation any and all commercial loans and financial accommodations from Lender to Borrower, whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means and includes without limitation Borrower's promissory note or notes, if any, evidencing Borrower's Loan obligations in favor of Lender, as well as any substitute, replacement or refinancing note or notes therefor.

**Permitted Liens.** The words "Permitted Liens" mean: (a) liens and security interests securing Indebtedness owed by Borrower to Lender; (b) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (c) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (d) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (e) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (f) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean and include without limitation any type of collateral security, whether in the form of a lien,



EXHIBIT B

charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**SARA.** The word "SARA" means the Superfund Amendments and Reauthorization Act of 1986 as now or hereafter amended.

**Subordinated Debt.** The words "Subordinated Debt" mean indebtedness and liabilities of Borrower which have been subordinated by written agreement to indebtedness owed by Borrower to Lender in form and substance acceptable to Lender.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total Debt.

**Working Capital.** The words "Working Capital" mean Borrower's current assets, excluding prepaid expenses, less Borrower's current liabilities.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Loan Advance and each subsequent Loan Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

> **Loan Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following documents for the Loan: (a) the Note, (b) Security Agreements granting to Lender security interests in the Collateral, (c) Financing Statements perfecting Lender's Security Interests; (d) evidence of insurance as required below; and (e) any other documents required under this Agreement or by Lender or its counsel, including without limitation any guaranties described below.

> **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender property certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents, and such other authorizations and other documents and instruments as Lender or its counsel, in their sole discretion, may require.

> **Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

> **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

> **No Event of Default.** There shall not exist at the time of any advance a condition which would constitute an Event of Default under this Agreement.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of Loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

> **Organization.** Borrower is a corporation which is duly organized, validly existing, and in good standing under the laws of the Territory of Guam and is validly existing and in good standing in all states in which Borrower is doing business. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage. Borrower also is duly qualified as a foreign corporation and is in good standing in all states in which the failure to so qualify would have a material adverse effect on its businesses or financial condition.

> **Authorization.** The execution, delivery, and performance of this Agreement and all Related Documents by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; do not require the consent or approval of any other person, regulatory authority or governmental body; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Borrower or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

> **Financial Information.** Each financial statement of Borrower supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

> **Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

> **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used, or filed a financing statement under, any other name for at least the last five (5) years.

> **Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the "CERCLA," "SARA," the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the properties, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties. (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters. (c) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from any of the properties; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Borrower's ownership or interest in the properties, whether or not the same was or should have been known to Borrower. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination or expiration of this Agreement and shall not be affected by Lender's acquisition of any interest

in any of the properties, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all tax returns and reports of Borrower that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note and all of the Related Documents are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Commercial Purposes.** Borrower intends to use the Loan proceeds solely for business or commercial related purposes.

**Employee Benefit Plans.** Each employee benefit plan as to which Borrower may have any liability complies in all material respects with all applicable requirements of law and regulations, and (i) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan, (ii) Borrower has not withdrawn from any such plan or initiated steps to do so, (iii) no steps have been taken to terminate any such plan, and (iv) there are no unfunded liabilities other than those previously disclosed to Lender in writing.

**Location of Borrower's Offices and Records.** Borrower's place of business, or Borrower's Chief executive office, if Borrower has more than one place of business, is located at SHRAP PLAZA 136 C KAYEN CHANDO SATEENA MALL, DEDEDO, GU 96912. Unless Borrower has designated otherwise in writing this location is also the office or offices where Borrower keeps its records concerning the Collateral.

**Information.** All information heretofore or contemporaneously herewith furnished by Borrower to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Borrower to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

**Survival of Representations and Warranties.** Borrower understands and agrees that Lender, without independent investigation, is relying upon the above representations and warranties in extending Loan Advances to Borrower. Borrower further agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

**Litigation.** Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with generally accepted accounting principles, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with, as soon as available, but in no event later than one hundred sixty (160) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender, and, as soon as available, but in no event later than sixty (60) days after the end of each fiscal half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared and certified as correct to the best knowledge and belief by Borrower's chief financial officer or other officer or person acceptable to Lender. All financial reports required to be provided under this Agreement shall be prepared in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Tangible Net Worth.** Maintain a minimum Tangible Net Worth of not less than $2,300,000.00.

**Net Worth Ratio.** Maintain a ratio of Total Liabilities to Tangible Net Worth of less than 4.00 to 1.00. Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the properties insured; (e) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (f) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions spelled out in those guaranties.

| Guarantors | Amounts |
|---|---|
| ASHOK H. SADHWANI | Unlimited |
| LAJU A. SADHWANI | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Borrower shall have established on its books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Borrower, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Borrower's properties, income, or profits.

**Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Borrower learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable federal, state and municipal laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to Borrower's employee benefit plans.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificate.** Unless waived in writing by Lender, provide Lender at least annually and at the time of each disbursement of Loan proceeds with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with all environmental protection federal, state and local laws, statutes, regulations and ordinances; not cause or permit to exist, as a result of an intentional or unintentional action or omission on its part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except U.S. federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (a) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (c) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (a) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (b) except as allowed as a Permitted Lien, sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets, or (c) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (a) Engage in any business activities substantially different than those in which Borrower is presently engaged, (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, (c) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of stock of Borrower, or (d) purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (a) Loan, invest in or advance money or assets, (b) purchase, create or acquire any interest in any other enterprise or entity, or (c) incur any obligation as surety or guarantor other than in the ordinary course of business.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (a) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (b) Borrower or any Guarantor becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (c) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; (d) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (e) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**BE IT FURTHER RESOLVED.** that the Corporation is hereby authorized to apply for and obtain from the Lender letters of credit and in connection therewith to execute such agreements, applications, guarantees, indemnities and other financial undertakings as the Lender may require, to apply to said Bank for letters of guaranty, bonds to produce bills of lading or bonds in lieu of production of original bills of lading, to make, execute and deliver to the Lender trust receipts and other (similar) security instruments or documents in such form and amounts and for such property as Lender may require, and to enter into and execute foreign exchange contracts with the Lender. BE IT FURTHER RESOLVED THAT THE AGGREGATE AT ANY ONE TIME OF LETTERS OF CREDIT AND ACCEPTANCES, TRUST RECEIPTS, FOREIGN EXCHANGE CONTRACTS ISSUED, IF ANY, PURSUANT TO THIS AUTHORITY, SHALL NOT EXCEED THE TOTAL COMBINED LIMITS AS PRESCRIBED IN THE LOAN AGREEMENT OR THE BANK'S COMMITMENT LETTER ISSUED FROM TIME TO TIME.

**RIGHT OF SETOFF.** Borrower grants to Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Default on Indebtedness.** Failure of Borrower to make any payment when due on the Loans.

**Other Defaults.** Failure of Borrower or any Grantor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or failure of Borrower to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower or any Grantor under this Agreement or the Related Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any Security Agreement to create a valid and perfected Security Interest) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self–help, repossession or any other method, by any creditor of Borrower, any creditor of any Grantor against any collateral securing the Indebtedness, or by any governmental agency. This includes a garnishment, attachment, or levy on or of any of Borrower's deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor, as the case may be, as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding, and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and furnishes reserves or a surety bond for the creditor or forfeiture proceeding satisfactory to Lender.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure the Event of Default.

**Change in Ownership.** Any change in ownership of twenty–five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender, in good faith, deems itself insecure.

**Right to Cure.** If any default, other than a Default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (a) cures the default within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

| Guarantors | Amounts |
|---|---|
| ASHOK H. SADHWANI | Unlimited |
| LAJU A. SADHWANI | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Borrower shall have established on its books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Borrower, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Borrower's properties, income, or profits.

**Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Borrower learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable federal, state and municipal laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to Borrower's employee benefit plans.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificate.** Unless waived in writing by Lender, provide Lender at least annually and at the time of each disbursement of Loan proceeds with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with all environmental protection federal, state and local laws, statutes, regulations and ordinances; not cause or permit to exist, as a result of an intentional or unintentional action or omission on its part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except U.S. federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (a) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (c) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (a) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (b) except as allowed as a Permitted Lien, sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets, or (c) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (a) Engage in any business activities substantially different than those in which Borrower is presently engaged, (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, (c) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of stock of Borrower, or (d) purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (a) Loan, invest in or advance money or assets, (b) purchase, create or acquire any interest in any other enterprise or entity, or (c) incur any obligation as surety or guarantor other than in the ordinary course of business.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (a) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (b) Borrower or any Guarantor becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (c) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; (d) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (e) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**BE IT FURTHER RESOLVED.** that the Corporation is hereby authorized to apply for and obtain from the Lender letters of credit and in connection therewith to execute such agreements, applications, guaranties, indemnities and other financial undertakings as the Lender may require, to apply to said Bank for letters of guaranty, bonds to produce bills of lading or bonds in lieu of production of original bills of lading, to make, execute and deliver to the Lender trust receipts and other (similar) security instruments or documents in such form and amounts and for such property as Lender may require, and to enter into and execute foreign exchange contracts with the Lender. BE IT FURTHER RESOLVED THAT THE AGGREGATE AT ANY ONE TIME OF LETTERS OF CREDIT AND ACCEPTANCES, TRUST RECEIPTS, FOREIGN EXCHANGE CONTRACTS ISSUED, IF ANY, PURSUANT TO THIS AUTHORITY, SHALL NOT EXCEED THE TOTAL COMBINED LIMITS AS PRESCRIBED IN THE LOAN AGREEMENT OR THE BANK'S COMMITMENT LETTER ISSUED FROM TIME TO TIME.

**RIGHT OF SETOFF.** Borrower grants to Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Default on Indebtedness.** Failure of Borrower to make any payment when due on the Loans.

**Other Defaults.** Failure of Borrower or any Grantor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or failure of Borrower to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower or any Grantor under this Agreement or the Related Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any Security Agreement to create a valid and perfected Security Interest) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower, any creditor of any Grantor against any collateral securing the Indebtedness, or by any governmental agency. This includes a garnishment, attachment, or levy on or of any of Borrower's deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor, as the case may be, as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding, and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and furnishes reserves or a surety bond for the creditor or forfeiture proceeding satisfactory to Lender.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure the Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender, in good faith, deems itself insecure.

**Right to Cure.** If any default, other than a Default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (a) cures the default within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in the Territory of Guam. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the Territory of Guam. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other. This Agreement shall be governed by and construed in accordance with the laws of the Territory of Guam.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Multiple Parties; Corporate Authority.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loans to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loans and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loans irrespective of the failure or insolvency of any holder of any interest in the Loans. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Costs and Expenses.** Borrower agrees to pay upon demand all of Lender's expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. Lender may pay someone else to help collect the Loans and to enforce this Agreement, and Borrower will pay that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Borrower, notice to any Borrower will constitute notice to all Borrowers. For notice purposes, Borrower will keep Lender informed at all times of Borrower's current address(es).

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used herein shall include all subsidiaries and affiliates of Borrower. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any subsidiary or affiliate of Borrower.

**Successors and Assigns.** All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns. Borrower shall not, however, have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival.** All warranties, representations, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will survive the making of the Loan and delivery to Lender of the Related Documents, regardless of any investigation made by Lender or on Lender's behalf.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waiver.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any obligations of Borrower or of any Grantor as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of Lender.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT, AND BORROWER AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF _31 December 1997_

**BORROWER:**

K. SADHWANI'S INC.

By: _____
ASHOK H. SADHWANI, PRESIDENT

**LENDER:**

The Hongkong and Shanghai Banking Corporation, Limited

By: _____
Authorized Officer

LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.24 (c) 1997 CFI ProServices, Inc. All rights reserved. [GU–C40 KSI.LN C1.OVL]