JOAQUIN C. ARRIOLA
ANITA P. ARRIOLA
ARRIOLA, COWAN & ARRIOLA
259 Martyr Street, Suite 201
Hagåtña, Guam 96910
Telephone: (671) 477-9730/33
Telecopier: (671) 477-9734



FILED
DISTRICT COURT OF GUAM
AUG 16 2004
MARY L. M. MORAN
CLERK OF COURT

Counsel for Plaintiffs Alan Sadhwani, Laju Sadhwani,
and K. Sadhwani's Inc., a Guam corporation

## IN THE UNITED STATES
## DISTRICT COURT OF GUAM

| | |
|---|---|
| ALAN SADHWANI, LAJU SADHWANI, and K. SADHWANI'S INC., a Guam corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., a foreign corporation, JOHN DOE I through JOHN DOE X, <br><br> Defendants. | CIVIL CASE NO. CV03-00036 <br><br><br> **THIRD AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL** |

Plaintiffs complain of Defendants:

1.      This action was removed by Defendant from the Superior Court of Guam to the U.S. District Court of Guam, based on federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 and 48 U.S.C. § 1424.

2.      Plaintiffs Alan Sadhwani and Laju Sadhwani are husband and wife, residents of Guam for many years.  K. Sadhwani's Inc., is a Guam corporation authorized and

**ORIGINAL**

licensed to do business in Guam. Defendant Hongkong & Shanghai Banking Corporation, Ltd. ("HSBC"), is a foreign corporation licensed and authorized to do banking business in Guam.

3.　　At all times material herein, Defendants John Doe I through John Doe X, are the fictitious names of defendants whose true names are unknown to the Plaintiffs, and Plaintiffs ask that when such true names are discovered that this Complaint may be amended by inserting such true names in the place and stead of said fictitious names.

4.　　At all times material herein, Plaintiffs have engaged in the business of acquiring real properties and developing them. They have also engaged in the business of leasing, renting real properties, including offices and other commercial building, and selling electronics, fixtures and appliances. At all times material herein, HSBC was in the business of a full service bank, lending funds to customers, taking mortgages, security instruments and other evidences of indebtedness, and taking deposits.

5.　　Plaintiffs have been for about twenty five (25) years, customers of HSBC, executing and delivering to HSBC evidences of their indebtedness secured by mortgages and other security instruments, and depositing funds in HSBC. Plaintiffs went into business, Tick Tock, in 1978. Mr. Sadhwani met the then Manager of HSBC, in 1978, at a meeting of Rotarians, and since then has banked exclusively with HSBC (except for credit card deposits to Citibank, because HSBC, a foreign corporation, did not accept credit card

-2-

deposits from merchants). All of Plaintiffs' deposits and borrowings, were with HSBC

exclusively. Plaintiffs deposited about $100 million with HSBC during these twenty-five

(25) years. Throughout the years, Plaintiffs would borrow money from HSBC, purchase

real properties and develop them, and/or develop their retail business of electronics,

fixtures and appliances. At one time, Plaintiffs total obligation to HSBC was $12 million.

Mr. Sadhwani negotiated with HSBC to build their Bank building in Tamuning, thus

becoming HSBC's Landlord. In addition to the long- standing relationship, Plaintiffs also

had social relationships with the HSBC. The Sadhwanis socialized with Bank Managers

(who changed every 3 years) at Mr. Sadhwani's home, at the home of the Bank Managers,

or in restaurants. As borrowers, Plaintiffs have paid the HSBC thousands of dollars in

interest and fees. By virtue of such long relationship, Plaintiffs placed explicit faith, trust,

and confidence in the HSBC, trusting that the HSBC and its officers and employees would

deal fairly and honestly with them, the Plaintiffs.

6. Over the course of their banking relationship, plaintiffs had obtained

numerous loans from HSBC. On December 29, 1997, K. Sadhwani's Inc. and HSBC

executed a "Renewal and Amendment of Credit Facilities" ("Renewal"). A true and correct

copy of the Renewal is attached hereto as Exhibit A. The Renewal letter referred to

plaintiffs' and HSBC's agreement to renew and amend the various loans plaintiffs had with

the bank.

-3-

7. The parties memorialized the terms of the Renewal and Amendment of Credit Facilities by executing a Business Loan Agreement ("BLA") on December 31, 1997. A true and correct copy of the BLA is attached hereto as Exhibit B. The BLA evidenced the loan given by HSBC to plaintiffs ("the Loan").

8. On the same day (December 31, 1997) that the BLA was executed, K. Sadhwani's Inc. also executed a Promissory Note ("the Note") in favor of HSBC. A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

9. On November 6, 2002, Plaintiffs and HSBC entered into an agreement entitled "Amendment to Credit Facility/Lease" a copy of which is attached as Exhibit D. Pursuant to this Agreement, the balance of Plaintiffs' Note to HSBC was $6,6821,494.56, as of September 27, 2002 (hereafter the "Loan").

10. On February 13, 2003, representatives of the HSBC met with Plaintiff Alan Sadhwani (hereafter "Mr. Sadhwani") and informed Mr. Sadhwani that HSBC would close its office on Guam. On February 17, 2003, the HSBC wrote to Mr. Sadhwani purportedly memorializing the discussion which took place on February 13, 2003. A copy of HSBC's letter is attached as Exhibit E.

11. On March 5, 2003, Mr. Sadhwani met with representatives of the HSBC at the HSBC's office, at which time representatives of the HSBC informed Mr. Sadhwani that HSBC would give a "hairline discount" if Plaintiffs paid off the Loan. Additionally, said

-4-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

representatives suggested a "friendly foreclosure". Based upon these representations, Mr. Sadhwani was induced to believe that if he found funding for repayment of the Plaintiffs' Loan with HSBC, that HSBC would discount or reduce the balance of the Loan. On the same date, Plaintiffs and HSBC entered into an agreement entitled "Promissory Note Modification Agreement", a copy of which is attached and marked Exhibit F.

12.     On March 6, 2003, HSBC wrote to the Plaintiffs again reiterating that the HSBC would consider a discount on the Loan and a "friendly foreclosure". A copy of such letter is attached as Exhibit G.

13.     By letter dated March 13, 2003, HSBC reiterated its recommendation for a "friendly foreclosure". A copy of said letter is attached as Exhibit H.

14.     By letter dated March 14, 2003, Mr. Sadhwani requested clarification and asked for details about the "friendly foreclosure". Additionally, Mr. Sadhwani requested more information about the "discount" which was offered by the HSBC in the March 5, 2003 meeting. A copy of such letter is attached as Exhibit I.

15.     By letter dated March 21, 2003, HSBC offered three proposals to work out the Loan: Plaintiffs could sell the mortgaged properties; Plaintiffs could execute deeds in lieu of foreclosure at "negotiated values;" or Plaintiffs could refinance the Loan. Additionally, HSBC assured Plaintiffs that "[t]he Bank is ready, able and willing to assist your negotiation of replacement financing." A copy of such letter is attached as Exhibit J.

-5-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

16.     Plaintiffs accepted HSBC's first and third proposals. Pursuant to the on-going work out agreement with HSBC, Plaintiffs sought the services of Century 21, to find buyers for the properties subject to the HSBC mortgage. By letter dated April 3, 2003, Century 21 reported on its efforts to sell the properties. A copy of such letter is attached as Exhibit K.

17.     By letter dated April 3, 2003, HSBC transmitted a copy of the Promissory Note Modification dated March 5, 2003. A copy of such letter is attached as Exhibit L.

18.     By letter dated April 4, 2003, Mr. Sadhwani wrote to HSBC notifying it that he was trying to obtain financing to pay off Plaintiff's Loan, and the attempt to sell the properties to pay off the Loan, enclosing a copy of the Century 21 letter (Exhibit "K"). A copy of such letter is attached and marked Exhibit M.

19.     While plaintiffs were attempting to find alternate financing and to sell their properties in furtherance of the workout agreement, in early May 2003 HSBC, without plaintiffs' knowledge, began negotiations with Joseph K. Fang to sell the Loan to Mr. Fang's Guam company, Paradise Marine Corporation ("PMC"). After over a month of negotiations, HSBC and Mr. Fang executed a Loan Purchase Agreement on June 25, 2003 for the sale of plaintiffs' Loan. In May 2003 HSBC did not disclose to plaintiffs that the Loan was for sale. HSBC also did not disclose to plaintiffs that the Loan was sold in June, 2003.

-6-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

20. On July 18, 2003, Plaintiffs received a document entitled "Notice of Intent to Sell Loan", dated July 15, 2003, a copy of which is attached as Exhibit N. This Notice came as a total surprise to Plaintiffs, since there was a workout agreement between plaintiffs and HSBC and plaintiffs were fulfilling their obligations under the workout agreement.

21. On July 22, 2003, Mr. Sadhwani telephoned Mr. Underwood. Mr. Underwood came to Mr. Sadhwani's office; when asked, Mr. Underwood declined to name the purchase price for the Loan. Mr. Sadhwani pleaded not to sell the Loan. Mr. Sadhwani asked Mr. Underwood whether the Bank would accept $3 million for the Loan; Mr. Underwood replied "No." Mr. Sadhwani then said how about $3.5 million. Mr. Underwood said: "Get me the money or guarantee, and I will try to stop the sale."

22. On July 31, 2003, Mr. Sadhwani detailed his attempts to settle the Loan. A copy of such letter is attached and marked as Exhibit O. Mr. Sadhwani saw Mr. Underwood and again pleaded not to sell the Loan. Mr. Underwood assured him that if he received the offer [i.e., money or bank letter] by August 8, Mr. Underwood said, "I will see what I can do."

23. Pursuant to the workout agreement, Mr. SAdhwani applied to First Hawaiian Bank for alternate financing. Mr. Sadhwani also had an oral agreement with two individuals that in the event bank financing was unavailable, he could borrow up to $3.5 million from both individuals in order to pay off his Loan with HSBC. He also applied to

-7-

obtain financing from Citibank, which denied his application. Mr. Sadhwani continued to work with Citibank to try to obtain other financing, but was told that Citibank could not assist him because HSBC had classified his loan as "non-performing."

24.     On August 5, 2003, Mr. Sadhwani obtained terms and conditions for alternative financing from First Hawaiian Bank for $3.5 million, a copy of which is attached and marked Exhibit P. On the same date, Mr. Sadhwani transmitted the First Hawaiian Bank letter to HSBC.

25.     On August 11, 2003, Mr. Underwood sent a letter to Mr. Sadhwani stating: "I am pleased to inform you that on Monday , the 11th of August 2003 your loan was sold to PMC." A copy of such letter is attached and marked Exhibit Q.

26.     Although Plaintiffs requested of the Bank and PMC a copy of the Loan purchase agreement, they both refused. Both also refused to divulge the purchase price. Plaintiffs subsequently learned that PMC purchased the Loan for $2.75 million, less than half the balance of the Loan.

27.     Plaintiffs fully complied with the terms of the Loan documents and the terms of the workout agreement.

28.     Many parcels of real property owned by the Plaintiffs were mortgaged to secure the Loan. These parcels are prime properties on Guam. Several of the buildings are Guam landmarks, e.g., the Tick Tock Building in East Agana; the HSBC Building, Marine

-8-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

Drive, Tamuning; the Deloitte & Touche Building along Marine Drive, Tamuning; and Sateena Mall in Dededo, among others. At one time, these properties were worth much more than $12 million. At one time, these properties secured a Loan to the Plaintiffs from HSBC in excess of $12 million. Yet, nowithstanding the terms and conditions of the Loan documents, the workout agreement between the parties, and plaintiffs' pleas for more time within which to obtain other financing in order to buy back their Loan, HSBC nonetheless sold the Loan to PMC for $2.75 million, less $90,000.00.

FIRST CAUSE OF ACTION

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

29.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 28 above as if fully set forth herein.

30.     HSBC, as a party to the Loan agreement and the work out agreement with plaintiffs, has a duty to deal fairly with Plaintiffs and in good faith.

31.     In the March 21, 2003 letter (Exhibit J), HSBC offered three (3) proposals to work out the Loan: Plaintiffs could sell the mortgaged properties; Plaintiffs could execute deeds in lieu of foreclosure "at negotiated values"; or Plaintiffs could refinance the Loan. On this latter option, HSBC agreed that it was "ready, able and willing to assist your negotiation of replacement financing."

32.     Plaintiff accepted the first and third proposals offered by HSBC. Relying on

-9-

Case 1:03-cv-00036     Document 258     Filed 08/16/2004     Page 9 of 36

these work out proposals, Plaintiffs immediately listed certain properties for sale with Century 21 Realty Management and applied to various banks, including First Hawaiian Bank, and Citibank to obtain alternative financing. Plaintiffs obtained terms and conditions for alternative financing from First Hawaiian Bank and forwarded such terms and conditions to HSBC on August 5, 2003. Plaintiffs also had an oral agreement with two individuals to borrow up to $3.5 million from both individuals to pay off his Loan with HSBC.

33.     HSBC failed and refused to allow plaintiffs a reasonable time under the workout agreement to sell their properties or to pay off their Loan.

34.     HSBC acted in bad faith and failed to deal fairly with Plaintiffs as follows:

A.     By misrepresenting to plaintiffs that it intended to perform on the workout agreement when in fact it had no intention of complying with the workout agreement and instead intended to sell plaintiffs' Loan;

B.     By refusing to allow plaintiffs a reasonable time under the workout agreement to sell their properties or to obtain alternate financing;

C.     By misrepresenting that it would try to stop the sale of the Loan if plaintiffs obtained alternate financing when the Loan had already been sold to PMC;

D.     By misrepresenting to Citibank that the Plaintiffs' Loan was "non-performing" when in fact the plaintiffs were current in their payments and the Loan was

-10-

subject to a workout agreement with HSBC;

        E.      By failing to inform plaintiffs that it was selling the Loan and refusing to give plaintiffs the opportunity to purchase or pay off their Loan at the same price offered by PMC or other parties.

        F.      By discriminating against Plaintiffs and treating other HSBC customers more favorably in the settlement of their loans, including but not limited to, giving them longer and more reasonable periods of time to settle their loans or to obtain alternate financing; giving them discounts on their loans; allowing friendly foreclosures; or allowing their customers to continue servicing their loans with HSBC.

        G.      By discriminating against Plaintiffs and giving more favorable consideration and treatment to Joseph Fang, a principal of PMC, who was a former executive of HSBC and a long-time special customer of HSBC, to the detriment of plaintiffs.

35.      As a result of HSBC's bad faith and failure to deal fairly with Plaintiffs, Plaintiffs have suffered damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

36.      Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 35 above as if fully set forth herein.

37.      HSBC represented to Plaintiffs that it would give a "hairline discount" on the

-11-

Loan if Plaintiffs paid off the Loan.

38.     HSBC also represented to Plaintiffs that it was willing to work out the Loan with Plaintiffs and further represented that Plaintiffs could resolve its indebtedness by accepting the options proposed by HSBC, as detailed in paragraph 15, above.

39.     In reliance upon HSBC's representations, Plaintiffs were induced to list their properties for sale with Century 21 Commonwealth Realty and to apply for alternative financing with various banks and individuals.

40.     Had HSBC given Plaintiffs a reasonable time to sell their properties and/or obtain alternative financing, Plaintiffs would have saved thousands of dollars in interest and loan payments and increased costs, and they would not be required to make the loan payments as required by PMC.

41.     HSBC intentionally misrepresented that it would give a "hairline discount" on the Loan if Plaintiffs paid off the Loan; that it was interested in pursuing a commercially reasonable work out, when it had no desire or intention to work out the Loan; and that it would try to stop the sale of the Loan if plaintiffs obtained alternative financing, when it had no desire or intention to stop the sale of the Loan to PMC.

42.     As a result of the intentional misrepresentations made by HSBC to Plaintiffs, Plaintiffs have suffered damages in an amount to be proved at trial.

## THIRD CAUSE OF ACTION

## BREACH OF CONTRACT - PROMISSORY NOTE AND BUSINESS LOAN AGREEMENT

43. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

44. Plaintiffs and HSBC entered into a valid loan contract by executing the BLA. The BLA was executed as a part of the same transaction and executed on the same date as the Promissory Note. The BLA refers to and incorporates by reference therein, all notes executed by the Sadhwanis and includes "without limitation any and all commercial loans and financial accommodations" from HSBC to the Sadhwanis, "whether now or hereafter existing." (Exhibit B at 1) The BLA modified the Promissory Note by explicitly restricting the sale or transfer of the Loan to one or more participation interests only. The parties clearly intended, and the banking industry usage confirms, that "participation" means a lead bank selling or transferring a portion of the loan to another bank or financial institution, not to a fishing company.

45. Plaintiffs fulfilled all of their obligations required under the BLA and the Note. HSBC breached the BLA and the Note by selling the Loan to PMC, as the sale of the Loan to PMC does not constitute a sale "of one or more participation interests in the loan."

46. As a proximate result of HSBC's breach of contract, Plaintiffs suffered damages including but not limited to, increased interest payments, increased costs, and

-13-

other damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT - PROMISSORY NOTE MODIFICATION AGREEMENT

47.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 46 above as if fully set forth herein.

48.    Plaintiffs and HSBC entered into a valid loan contract for the Loan.

Paragraph 1 of the Promissory Note Modification Agreement (**Exhibit "C"**) provides:

> **Extension of Maturity Date.** <u>The Maturity Date of the Note is
> hereby extended for a period of time up to and including
> August 31, 2003. The Lender will review the note every six
> months,</u> and reserves the right in its sole discretion to call for
> repayment of principal and interest then outstanding and
> unpaid. <u>Default on the terms of the Note will supercede this
> review process,</u> and entitle the Lender to call for immediate
> repayment of one. (Emphasis added)

49.    Plaintiffs complied with the terms and conditions of the Loan documents, the

Amendment to Credit Facility/Lease, or the Promissory Note Modification Agreement.

50.    The Promissory Note Modification Agreement amended the parties'

Promissory Note and explicitly provided that the maturity date of the Note is "extended

up to and including August 31, 2003." The workout agreement between the parties

implicitly extended the date of maturity under the Promissory Note Modification

Agreement. While the workout agreement did not contain a specific deadline for plaintiffs

to sell their properties and/or obtain alternate financing, the law implies a reasonable time

-14-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

under the circumstances of the case. Plaintiffs performed their obligations under the terms of the workout agreement. When HSBC sold the Loan to PMC, HSBC breached the Promissory Note Modification Agreement, as amended by the workout agreement.

51.    Because the workout agreement implicitly extended the maturity date under the Promissory Note Modification Agreement, HSBC failed to fulfill the terms of the Promissory Note Modification Agreement to review the Note every six months, in violation of the Promissory Note Modification Agreement.

52.    As a proximate result of HSBC's breaches of contract, Plaintiffs suffered damages including but not limited to, increased interest payments, increased costs, and other damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**BREACH OF CONTRACT - WORKOUT AGREEMENT**

53.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 52 above as if fully set forth herein.

54.    Plaintiffs and HSBC entered into a valid workout agreement, where HSBC offered proposals to work out the Loan and Plaintiffs accepted two of the proposals. Plaintiffs immediately listed certain properties for sale with Century 21 Realty Management and Plaintiffs tried to obtain alternative financing with other banks and individuals.

-15-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

55. HSBC failed to allow Plaintiffs a reasonable period of time to obtain alternative financing or to sell their properties to settle their Loan; failed to assist Plaintiffs' negotiations for replacement financing; misrepresented to Citibank that plaintiffs' Loan was "non-performing"; failed to give a "hairline discount" on the Loan; attempted to sell Plaintiffs' Loan to other third parties; and sold the Loan to PMC. All of these acts constitute breaches of the workout agreement.

56. As a proximate result of HSBC's breaches of the work out agreement, Plaintiffs suffered damages including but not limited to increased interest payments, increased costs, as well as other damages to be proven at trial.

## SIXTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

57. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

58. Because of the longstanding, close and confidential relationship between HSBC and Plaintiffs, and by virtue of the trust and confidence which HSBC encouraged Plaintiffs to place in the Bank and which the Plaintiffs did place in the Bank, as well as the assurances that the Bank gave Plaintiffs that it would agree to a commercially reasonable work out, HSBC owed to Plaintiffs a duty of fiduciary care.

59. HSBC breached its fiduciary duties owed to Plaintiffs by its acts, including

-16-

but not limited to the following:

A.   By disclosing confidential information without Plaintiffs' authorization, including but not limited to, account and deposit information, loan payment history, and other banking transactions between Plaintiffs and HSBC, to PMC, Citibank, and others.

B.   By failing to assist Plaintiffs' negotiations for replacement financing, as HSBC had represented;

C.   By failing and refusing to give plaintiffs a reasonable time to sell their properties and/or obtain alternative financing, as required by the parties' work out agreement;

D.   By failing to give a "hairline discount" on Plaintiffs' Loan as represented by HSBC.

E.   By selling the Loan to PMC, a Guam corporation that is not licensed to conduct banking and has never conducted banking business in Guam.

F.   By failing to notify plaintiffs that their loan was for sale and refusing to allow plaintiffs the opportunity to purchase or pay off their Loan at the same price offered by PMC or other parties.

G.   By discriminating against Plaintiffs and treating other HSBC customers more favorably in the settlement of their loans, including but not limited to, giving them longer and more reasonable periods of time to settle their loans or to obtain alternate

-17-

financing; giving them discounts on their loans; allowing friendly foreclosures; or allowing their customers to continue servicing their loans with HSBC.

       H.     By discriminating against Plaintiffs and giving more favorable consideration and treatment to Joseph Fang, a principal of PMC, who was a former executive of HSBC and a long-time special customer of HSBC, to the detriment of plaintiffs.

      60.     As a proximate result of the breaches of fiduciary duty as alleged herein, Plaintiffs have suffered damages, including but not limited to, increased interest payments, increased costs, and other damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**BREACH OF DUTY NOT TO DIVULGE PLAINTIFFS'
CONFIDENTIAL BANKING INFORMATION**

      61.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 60 above as if fully set forth herein.

      62.     Plaintiffs were depositors and borrowers with HSBC. HSBC has a general common law duty not to disclose the financial condition of plaintiffs to third parties. In addition, it is an implied term of the contract between HSBC and plaintiffs that HSBC will not divulge to third persons without plaintiffs' consent, either the state of plaintiffs' account or any of plaintiffs' transactions with HSBC. Like other banks, HSBC demanded and received financial information from the Plaintiffs. Unless provided as demanded by HSBC, it, HSBC, would not loan funds to Plaintiffs. Having no choice, Plaintiffs did provide such

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

-18-

information to HSBC with the explicit understanding that HSBC would not divulge such information to third parties who may be competitors of the Plaintiffs' business without Plaintiffs' consent. The competition for rentals of buildings and sales of various electronic products is extremely stiff given the economic condition of the Island. Like other banks, HSBC has a general common law duty not to disclose information received by it from the Plaintiffs concerning Plaintiffs' financial condition, business plans, rentals, marketing and pricing strategies, and a host of other information, including personal matters, without the consent and permission of the Plaintiffs. Thus, it is an implied condition of the contract between HSBC and the Plaintiffs that HSBC will not divulge to third persons without Plaintiffs' consent and permission the financial condition and the business affairs of the Plaintiffs.

63.     The purchaser of Plaintiffs' Loan is PMC, a Guam corporation, whose primary purpose, according to its Articles of Incorporation, is "to engage in the business of commercial fisheries operation."

64.     PMC does not now and has never obtained a license to do banking business on Guam; PMC is not now and has never been in the banking business; PMC is not required to keep confidential any information concerning Plaintiffs' Loan, banking relationship with HSBC, deposit accounts and transactions.

65.     HSBC expressly or impliedly agreed that it, HSBC, will not divulge to third persons the terms or the state of Plaintiffs' accounts with the HSBC, any of their

-19-

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

transactions with HSBC, or any other information about the Plaintiffs acquired by HSBC throughout the 25 years of their banking relationship without plaintiffs' authorization.

66. HSBC disclosed confidential information about plaintiffs' financial condition, their deposit accounts and transactions with HSBC, their proprietary business information, and the status of plaintiffs' Loan with HSBC, to PMC, First Hawaiian Bank, Citibank, and others. Such conduct by HSBC constitutes a breach of HSBC's general duty not to disclose the financial condition of plaintiffs to third parties. In addition, such conduct by HSBC constituted a breach of the implied contract between HSBC and plaintiffs that HSBC will not divulge to third persons without plaintiffs' consent, either the state of plaintiffs' accounts or any of plaintiffs' transactions with HSBC. Such conduct by HSBC also violated the Bank's own policies and procedures regarding the confidentiality of its customers' accounts and banking information.

67. As a proximate result of HSBC's breach of its duty not to disclose plaintiffs' financial condition, its breach of the implied contract not to divulge plaintiffs' accounts or any of plaintiffs' transactions with HSBC and breach of its own policies and procedures, Plaintiffs suffered damages including but not limited to increased interest payments, increased costs, as well as other damages to be proven at trial.

**EIGHTH CAUSE OF ACTION**

**<u>PUNITIVE DAMAGES</u>**

68. Plaintiffs' reallege and incorporate by references the allegations contained in

paragraphs 1 through 67 above as if fully set forth herein.

69.     In doing the acts herein alleged, HSBC acted with oppression, fraud and malice and Plaintiffs are therefore entitled to punitive damages.

WHEREFORE, Plaintiffs pray judgment against HSBC as follows:

1.  For compensatory and consequential damages according to proof.

2.  For punitive damages according to proof.

3.  For costs of suit and for such other and further relief as the Court may deem appropriate.

### JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated this 16th day of August, 2004.

> **ARRIOLA, COWAN & ARRIOLA**
> Attorney for Plaintiffs
>
> BY:     _____
>         **ANITA P. ARRIOLA**

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

## CERTIFICATE OF SERVICE

I, ANITA P. ARRIOLA, hereby certify that on August 16, 2004, I caused to be served

via hand delivery, a **THIRD AMENDED COMPLAINT FOR DAMAGES; DEMAND**

**FOR JURY TRIAL** to:

> **Jacques G. Bronze**
> **Bronze & Tang, P.C.**
> **2nd Floor, BankPacific Building**
> **825 S. Marine Drive**
> **Tamuning, Guam 96913**

Dated this 16th day of August, 2004.

_____
**ANITA P. ARRIOLA**

# HongkongBank

*Member HSBC Group*

The Hongkong and Shanghai Banking Corporation Limited
436 So. Marine Drive, Tamuning, Guam 96911 U.S.A.

| HSBC CORPORATE BANKING | | |
|---|---|---|
| RECEIVED BY / DATE: | *(signature)* | 31 Dec 97 |
| CRF COPY BY / DATE: | *(signature)* | 31 Dec 97 |
| I/E INITIAL / DATE: | *(initials)* | 06 Feb 98 |

29 December 1997

Our Ref: GUM CBA 970995

**PRIVATE AND CONFIDENTIAL**
K. Sadhwani's Inc.
Sharp Plaza Building
136 C Kayen Chando
Sateena Mall
Dededo, Guam 96912

Attn: Mr. Alan Sadhwani, President

RE: <u>RENEWAL AND AMENDMENT OF CREDIT FACILITIES</u>

Dear Mr. Sadhwani:

With reference to our discussions we, The Hongkong and Shanghai Banking Corporation Limited (the "Bank"), are pleased to confirm our agreement to the amendment and renewal of the undermentioned credit facilities granted to K. Sadhwani's Inc. (the "Borrower"). These facilities are made available on the specific terms and conditions outlined herein and upon the satisfactory completion of the security detailed below. These facilities are subject to review at any time and in any event by 31 October 1998 and also subject to our overriding right of withdrawal and repayment on demand, including the right to call for cash cover for prospective and contingent liabilities.

| A. | FACILITY TYPE | OLD LIMITS | NEW LIMITS |
|---|---|---|---|
| 1. | Term Loan | NIL | USD6,500,000 |
| 2. | Term Loan | USD1,151,643 | USD 800,000 |
| 3. | Term Loan | NIL | USD 500,000 |
| 4. | Overdraft | NIL | USD 250,000 |
| 5. | Import Line: | | |
| | a) Letters of Credit (LC) of which | USD2,500,000 | USD1,500,000 |
| | b) Clean Import Loans (CIL) | USD1,500,000 | NIL |
| 6. | Standby Letters of Credit (Standby LC) | USD 330,000 | USD 225,000 |
| 7. | Term Loan | USD 386,000 | NIL |
| 8. | Term Loan | <u>USD4,900,000</u> | <u>NIL</u> |
| | | <u>USD9,267,643</u> | <u>USD9,775,000</u> |

*Incorporated in Hong Kong with limited liability*
P.O. Box 27C, Agana, Guam 96932 • Telephone: (671) 646-3757–62 • Cables: Hongbank
Telex: 6309 • Fax: (671) 646-3767

*Please address all letters to The Manager*

EXHIBIT
"A"

K. Sadhwani's Inc.
GUM CBA 970995
29 December 1997
Page 2 of 6

B. **PURPOSE:**

1. To consolidate Term, Revolving and Clean Import Loans.
2. To term our past due Clean Import Loans.
3. To finance the purchase of a warehouse complex.
4. For working capital purposes.
5. To facilitate the importation of stock.
6. To issue Standby LCs in favor of suppliers/airlines.

C. **INTEREST RATES:**

1-4. 0.75% over the Bank's Base Lending Rate adjusted monthly.
5a. LC - 1/8 of 1.00% of LC amounts per month.
6. Standby LC - 1/8 of 1.00% of Standby LC amounts per month.

The Bank's Base Lending Rate means the base index rate established by the New York Office of the Bank from time to time in good faith in its discretion for general pricing of its short term loans to ordinary commercial borrowers. Such rates may be established and changed from time to time.

Interest on overdue payments, both principal and interest, will accrue at 5% over the above rate.

D. **REPAYMENT TERMS:**

1. USD83,225 per month inclusive of interest for 5 years with a balloon repayment due at the end of the 60th month. Repayments are based on a 10 year amortization.
2. USD25,535 per month inclusive of interest for 3 years.
3. USD6,402 per month inclusive of interest for 5 years with a balloon repayment due at the end of the 60th month. Repayments are based on a 10 year amortization.
4. Interest monthly, principal payable on demand. Interest charges will be automatically charged from the checking account.
5a. Due at sight.
6. Due upon claim in accordance with Standby L/C terms.

E. **OTHER CHARGES:**

A non-refundable renewal fee of USD5,000.00 is due upon acceptance of this letter.

F. **SECURITY:**

1.  Consolidated first mortgage over the following properties for the full facility amount:
    a.   Lot No. 2136-1-2,Tamuning, Guam (Dallas Lounge Building).
    b.   Lot Nos. 2141-1-3NEW & 2141-1-1-R1 Tamuning, Guam (Sharp Plaza Building).
    c.   Lot Nos. 2023-2-1-R1, 2025-4, & 2023-2-1-1 Tamuning, Guam (Tick Tock Building).
    d.   Lot No. 7, Block 8, Tamuning, Guam (Perezville vacant land).
    e.   Lot Nos. 10054-6, 10054-7, 10054-8, & 10054-R8, Dededo, Guam (Vacant Lot).
    f.   Lot No. 2104-6NEW, Tamuning, Guam (HongkongBank Building).
    g.   Lot No. 16 & 19, Block 10, Dededo, Guam (Sateena Shopping Mall).
    h.   Lot Nos. 2136 #1-9-1, 2136 #1-8-1, & 2136 #1-7-1, Tamuning, Guam.
    I.   New property to be acquired (Second Mortgage) Tamuning, Guam.

2.  Consolidated Title Insurance policy over the above properties for the mortgaged amount showing the bank as beneficiary.

3.  First leasehold mortgage for USD139,000 over Lot No. 006 H45 (the Saipan Tick Tock Building), Chalan Kanoa, Saipan.

4.  Title Insurance Policy on security item no. 3 above for the mortgaged amount showing the Bank as beneficiary.

5.  Hazard insurance policies on the improved properties listed above for not less than their replacement value showing the Bank as loss payee.

6.  Assignment of rental income over the above properties.

7.  Uniform Commercial Code First (UCC1) Financing Statement on all inventory, receivables, furniture, fixtures and equipment of the Borrower showing the Bank as senior lien holder.

8.  Hazard insurance policy on the items covered by the UCC1 Financing Statement above in form and content satisfactory to the Bank showing the Bank as loss payee.

9.  Joint and several personal guarantees of Ashok and Laju Sadhwani for the full facility amount.

G. **COVENANTS:**

1.  The Borrower shall maintain Gearing and Debt-to-Equity ratios (defined in the Appendix to this document) of no greater than 3.50 and 4.0 respectively.

2.  The Borrower will at all times retain an adjusted Tangible Net Worth (defined in the Appendix to this document) of no less than USD 2.3 million.

3.  The Borrower will not enter into any additional financial commitments without the Bank's prior written consent.

4. The audited financial statements of the Borrower should be submitted to the Bank no later than four months after the end of its fiscal year. Interim financial statements should be submitted to the Bank on a semi-annual basis, no later than 60 days after the end of each half year.

5. A detailed inventory report to be submitted by the Borrower to the Bank on a half yearly basis by the 15th of the following month.

## H. OTHER TERMS AND CONDITIONS:

1. This facility is subject to review at any time and, in any event, by 31 October 1998.

2. The net worth statement of Ashok and Laju Sadhwani shall be submitted to the Bank on request.

3. The Bank reserves the right to require updated property appraisals once every two years by an appraiser approved by the Bank. The cost of the appraisal shall be for your account and will be automatically debited to your account if no other arrangements are made.

4. All appraisal/processing/legal/recording/inspection fees, if any, shall be for the Borrower's account. Your account will be debited automatically for these charges.

5. In the event the Bank has not received evidence that a required insurance policy has been renewed at least 10 days prior to expiry, the Bank reserves the right to purchase the required insurance without reference to you. The cost of this insurance will be automatically debited to your account or added to the loan amount payable.

6. Sale proceeds from any mortgaged property sales are to be applied to outstanding loans.

7. The loan documents, including without limitation the Business Loan Agreement (or Credit Agreement, whichever applies), shall contain terms and conditions satisfactory to the Bank with respect to any items not specifically provided herein.

Notwithstanding the other terms mentioned above, we reserve our customary overriding right of repayment upon demand.

If the effect of any, or a change in any, law or regulation is to increase the cost to us of advancing, maintaining or funding this facility or to reduce the effective return to us, we reserve the right to require payment on demand of such amounts as we consider necessary to compensate us for any increased costs which continued to be incurred after the serving of 60 days notice.

Please arrange for the authorized signatories of your company, in accordance with the terms of the mandate given to the Bank, to sign and return to us the duplicate copy of this letter to signify your confirmation as to the correctness of the security held, and your continued understanding and

K. Sadhwani's Inc.
GUM CBA 970995
29 December 1997
Page 5 of 6

acceptance of the terms and conditions under which these facilities are granted.

These facilities will remain open for acceptance until the close of business on 31 December 1997 and if not accepted by that date will be deemed to have lapsed.

We are pleased to be of continued assistance.

Yours sincerely,

Stephen J. Grantham
Assistant Vice President - Corporate Banking

SJG\egv
enc.

## BORROWER'S ACKNOWLEDGMENT AND ACCEPTANCE:

On behalf of K. SADHWANI'S INC., I hereby accept the terms and conditions of this commitment letter.

By: Mr. Alan Sadhwani
Its: President
Date: **31DEC97**

## GUARANTORS' ACKNOWLEDGMENT:

As guarantors, we hereby acknowledge the terms and conditions of this offer letter.

Mr. Alan Sadhwani
Date: **31DEC97**

Mrs. Laju Sadhwani
Date: **31DEC97**

## APPENDIX

" **Adjusted Tangible Net Worth**" as defined by the Bank, includes capital stock plus retained earnings and other reserves (including the hidden reserve accruing from the market value of fixed assets) less tangible assets.

"**Gearing**", as defined by the Bank, is total interest bearing debt divided by adjusted tangible net worth.

"**Debt to Equity**", as defined by the Bank, is total debts divided by adjusted tangible net worth.



# BUSINESS LOAN AGREEMENT

**CONFIDENTIAL**

| Principal $9,775,000.00 | Loan Date | Maturity | Loan No 001-100023 | Call | Collateral | Account 001-100023 | Officer CR71 | Initials |
|---|---|---|---|---|---|---|---|---|

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** K. SADHWANI'S INC.
SHRAP PLAZA 136 C KAYEN CHANDO SATEENA
MALL
DEDEDO, GU 96912

**Lender:** The Hongkong and Shanghai Banking Corporation, Limited
436 South Marine Drive
Tamuning, GU 96911

THIS BUSINESS LOAN AGREEMENT between K. SADHWANI'S INC. ("Borrower") and The Hongkong and Shanghai Banking Corporation, Limited ("Lender") is made and executed on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans and other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. All such loans and financial accommodations, together with all future loans and financial accommodations from Lender to Borrower, are referred to in this Agreement individually as the "Loan" and collectively as the "Loans." Borrower understands and agrees that: (a) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements, as set forth in this Agreement; (b) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (c) all such Loans shall be and shall remain subject to the following terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of December 31, 1997 and shall continue thereafter until all Indebtedness of Borrower to Lender has been performed in full and the parties terminate this Agreement in writing.

**DEFINITIONS.** The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means K. SADHWANI'S INC.. The word "Borrower" also includes, as applicable, all subsidiaries and affiliates of Borrower as provided below in the paragraph titled "Subsidiaries and Affiliates."

**CERCLA.** The word "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

**Cash Flow.** The words "Cash Flow" mean net income after taxes, and exclusive of extraordinary gains and income, plus depreciation and amortization.

**Collateral.** The word "Collateral" means and includes without limitation all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Debt.** The word "Debt" means all of Borrower's liabilities excluding Subordinated Debt.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

**Event of Default.** The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "EVENTS OF DEFAULT."

**Grantor.** The word "Grantor" means and includes each and all of the persons or entities granting a Security Interest in any Collateral for the Indebtedness, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with any Indebtedness.

**Indebtedness.** The word "Indebtedness" means and include any Documentary Credits (DCs)/Bills Receivable (BR) of which Trust Receipts (TR), Clean Import Loans (CILs).

**Lender.** The word "Lender" means The Hongkong and Shanghai Banking Corporation, Limited, its successors and assigns.

**Liquid Assets.** The words "Liquid Assets" mean Borrower's cash on hand plus Borrower's readily marketable securities.

**Loan.** The word "Loan" or "Loans" means and includes without limitation any and all commercial loans and financial accommodations from Lender to Borrower, whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means and includes without limitation Borrower's promissory note or notes, if any, evidencing Borrower's Loan obligations in favor of Lender, as well as any substitute, replacement or refinancing note or notes therefor.

**Permitted Liens.** The words "Permitted Liens" mean: (a) liens and security interests securing Indebtedness owed by Borrower to Lender; (b) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (c) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (c) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (e) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (f) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean and include without limitation any type of collateral security, whether in the form of a lien

EXHIBIT "B"

CONFIDENTIAL

charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**SARA.** The word "SARA" means the Superfund Amendments and Reauthorization Act of 1986 as now or hereafter amended.

**Subordinated Debt.** The words "Subordinated Debt" mean indebtedness and liabilities of Borrower which have been subordinated by written agreement to indebtedness owed by Borrower to Lender in form and substance acceptable to Lender.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total Debt.

**Working Capital.** The words "Working Capital" mean Borrower's current assets, excluding prepaid expenses, less Borrower's current liabilities.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Loan Advance and each subsequent Loan Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following documents for the Loan: (a) the Note, (b) Security Agreements granting to Lender security interests in the Collateral, (c) Financing Statements perfecting Lender's Security Interests; (d) evidence of insurance as required below; and (e) any other documents required under this Agreement or by Lender or its counsel, including without limitation any guaranties described below.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents, and such other authorizations and other documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any advance a condition which would constitute an Event of Default under this Agreement.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of Loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation which is duly organized, validly existing, and in good standing under the laws of the Territory of Guam and is validly existing and in good standing in all states in which Borrower is doing business. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage. Borrower also is duly qualified as a foreign corporation and is in good standing in all states in which the failure to so qualify would have a material adverse effect on its businesses financial condition.

**Authorization.** The execution, delivery, and performance of this Agreement and all Related Documents by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; do not require the consent or approval of any other person, regulatory authority or governmental body; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Borrower or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

**Financial Information.** Each financial statement of Borrower supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used, or filed a financing statement under, any other name for at least the last five (5) years.

**Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the "CERCLA," "SARA," the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the properties, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties. (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters. (c) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from any of the properties; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Borrower's ownership or interest in the properties, whether or not the same was or should have been known to Borrower. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination or expiration of this Agreement and shall not be affected by Lender's acquisition of any interest

PMC 00623

in any of the properties, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all tax returns and reports of Borrower that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note and all of the Related Documents are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Commercial Purposes.** Borrower intends to use the Loan proceeds solely for business or commercial related purposes.

**Employee Benefit Plans.** Each employee benefit plan as to which Borrower may have any liability complies in all material respects with all applicable requirements of law and regulations, and (i) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan, (ii) Borrower has not withdrawn from any such plan or initiated steps to do so, (iii) no steps have been taken to terminate any such plan, and (iv) there are no unfunded liabilities other than those previously disclosed to Lender in writing.

**Location of Borrower's Offices and Records.** Borrower's place of business, or Borrower's Chief executive office, if Borrower has more than one place of business, is located at SHRAP PLAZA 136 C KAYEN CHANDO SATEENA MALL, DEDEDO, GU 96912. Unless Borrower has designated otherwise in writing this location is also the office or offices where Borrower keeps its records concerning the Collateral.

**Information.** All information heretofore or contemporaneously herewith furnished by Borrower to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Borrower to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

**Survival of Representations and Warranties.** Borrower understands and agrees that Lender, without independent investigation, is relying upon the above representations and warranties in extending Loan Advances to Borrower. Borrower further agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

**Litigation.** Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with generally accepted accounting principles, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with, as soon as available, but in no event later than one hundred sixty (160) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender, and, as soon as available, but in no event later than sixty (60) days after the end of each fiscal half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared and certified as correct to the best knowledge and belief by Borrower's chief financial officer or other officer or person acceptable to Lender. All financial reports required to be provided under this Agreement shall be prepared in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Tangible Net Worth.** Maintain a minimum Tangible Net Worth of not less than **$2,300,000.00**.

**Net Worth Ratio.** Maintain a ratio of Total Liabilities to Tangible Net Worth of less than **4.00 to 1.00**. Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the properties insured; (e) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (f) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amounts and under the conditions spelled out in those guaranties.




| Guarantors | Amounts |
|------------|---------|
| ASHOK H. SADHWANI | Unlimited |
| LAJU A. SADHWANI | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Borrower shall have established on its books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Borrower, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Borrower's properties, income, or profits.

**Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Borrower learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable federal, state and municipal laws, ordinances, rules and regulations respecting its properties, charters, businesses and operations, including without limitation, compliance with the Americans With Disabilities Act and with all minimum funding standards and other requirements of ERISA and other laws applicable to Borrower's employee benefit plans.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificate.** Unless waived in writing by Lender, provide Lender at least annually and at the time of each disbursement of Loan proceeds with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with all environmental protection federal, state and local laws, statutes, regulations and ordinances; not cause or permit to exist, as a result of an intentional or unintentional action or omission on its part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except U.S. federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (a) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (c) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (a) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (b) except as allowed as a Permitted Lien, sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets, or (c) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (a) Engage in any business activities substantially different than those in which Borrower is presently engaged, (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, (c) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of stock of Borrower, or (d) purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (a) Loan, invest in or advance money or assets, (b) purchase, create or acquire any interest in any other enterprise or entity, or (c) incur any obligation as surety or guarantor other than in the ordinary course of business.

PMC 00625

Arabic

عربى

**Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in the Territory of Guam. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the Territory of Guam. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other. T' Agreement shall be governed by and construed in accordance with the laws of the Territory of Guam.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Multiple Parties; Corporate Authority.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loans to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loans and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loans irrespective of the failure or insolvency of any holder of any interest in the Loans. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Costs and Expenses.** Borrower agrees to pay upon demand all of Lender's expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. Lender may pay someone else to help collect the Loans and to enforce this Agreement, and Borrower will pay that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post–judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Borrower, notice to any Borrower will constitute notice to all Borrowers. For notice purposes, Borrower will keep Lender informed at all times of Borrower's current address(es).

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used herein shall include all subsidiaries and affiliates of Borrower. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any subsidiary or affiliate of Borrower.

**Successors and Assigns.** All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns. Borrower shall not, however, have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival.** All warranties, representations, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will survive the making of the Loan and delivery to Lender of the Related Documents, regardless of any investigation made by Lender or on Lender's behalf.

**Time Is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waiver.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any obligations of Borrower or of any Grantor as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of Lender.

PMC 00627

CONFIDENTIAL Page 7

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT, AND BORROWER AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED AS OF _31 December 1997_

BORROWER:

K. SADHWANI'S INC.

By: _____
ASHOK H. SADHWANI, PRESIDENT

LENDER:

The Hongkong and Shanghai Banking Corporation, Limited

By: _____
Authorized Officer

LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.24 (c) 1997 CFI ProServices, Inc.  All rights reserved. [GU-C40 KSI.LN C1.OVL]

PMC00628

CONFIDENTIAL

"PAY TO THE ORDER OF PARADISE MARINE CORPORATION WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, EXCEPT AS PROVIDED IN THE AGREEMENT FOR PURCHASE AND SALE OF LOANS DATED ~~AUGUST~~ 12 Sure, 2003 BETWEEN THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED AND PARADISE MARINE CORPORATION."

THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED

BY: _____
TITLE: ___ MANAGER GUAM _____

11th August 2003

PMC 00629



# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $6,500,000.00 | | 12-24-2002 | 100023-362 | | | | CR71 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** K. SADHWANI'S INC.
SHARP PLAZA 136 C KAYEN CHANDO SATEENA
MALL
DEDEDO, GU 96912

**Lender:** The Hongkong and Shanghai Banking Corporation, Limited
436 South Marine Drive
Tamuning, GU 96911

---

**Principal Amount: $6,500,000.00**          **Initial Rate: 9.250%**          **Date of Note:** 31 December 1997

**PROMISE TO PAY.** K. SADHWANI'S INC. ("Borrower") promises to pay to The Hongkong and Shanghai Banking Corporation, Limited ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Million Five Hundred Thousand & 00/1 Dollars ($6,500,000.00), together with interest on the unpaid principal balance from December 31, 1997, until paid in full. The interest rate will not increase above 24.000%.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan on demand, or if no demand made, in 59 regular payments of $83,225.00 each and one irregular last payment estimated at $4,096,148.70. Borrower's first payment is due January 24, 1998, and all subsequent payments are due on the same day of each month after that. Borrower's final payment due December 2 2002, will be for all principal and all accrued interest not yet paid. Payments include principal and interest. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or such other place as Lender may designate in writing. Unless otherwise agreed or required by applicable law, payments will be applied first to accrued unpaid interest, then to principal, and any remaining amount to any unpaid collection costs and late charges.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the RATE ESTABLISHED BY THE NEW YORK OFFICE OF THE LENDER ("Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. Borrower understands that Lender may make loans based on other rates as well. The interest rate change will not occur more often than each MONTH. The Index currently is 8.500% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 0.750 percentage points over the Index, adjusted if necessary for the minimum and maximum rate limitations described below, resulting in an initial rate of 9.250% per annum. Notwithstanding any other provision of this Note, the variable interest rate or rates provided for in this Note will be subject to the following minimum and maximum rates. NOTICE: Under no circumstances will the interest rate on this Note be less than 4.000% per annum or more than (except for any higher default rate shown below) the lesser of 24.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (a) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (b) increase Borrower's payments to cover accruing interest, (c) increase the number of Borrower's payments, and (d) continue Borrower's payment at the same amount and increase Borrower's final payment.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, they will reduce the principal balance due and may result in Borrower making fewer payments.

**DEFAULT.** Borrower will be in default if any of the following happens: (a) Borrower fails to make any payment when due. (b) Borrower breaks any promise Borrower has made to Lender, or Borrower fails to comply with or to perform when due any other term, obligation, covenant, or condition contained in this Note or any agreement related to this Note, or in any other agreement or loan Borrower has with Lender. (c) Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the Related Documents. (d) Any representation or statement made or furnished to Lender by Borrower or on Borrower's behalf is false or misleading in any material respect either now or at the time made or furnished. (e) Borrower becomes insolvent, a receiver is appointed for any part of Borrower's property, Borrower makes an assignment for the benefit of creditors, or any proceeding is commenced either by Borrower or against Borrower under any bankruptcy or insolvency laws. (f) Any creditor tries to take any of Borrower's property on or in which Lender has a lien or security interest. This includes a garnishment of any of Borrower's accounts with Lender. (g) Any guarantor dies or any of the other events described in this default section occurs with respect to any guarantor of this Note. (h) A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired. (i) Lender in good faith deems itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, without notice, and then Borrower will pay that amount. Upon default, including failure to pay upon final maturity, Lender, at its option, may also, if permitted under applicable law, increase the variable interest rate on this Note to 9.000 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower also will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law. This Note has been delivered to Lender and accepted by Lender in the Territory of Guam. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the Territory of Guam. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other. This Note shall be governed by and construed in accordance with the laws of the Territory of Guam.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $15.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** Borrower grants to Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however, all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such accounts.

EXHIBIT "C"

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. In particular, this section means (among other things) that Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the Territory of Guam (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan, or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETE COPY OF THE NOTE.

BORROWER:
K. SADHWANI'S INC.

By: _____
ASHOK H. SADHWANI, PRESIDENT

LENDER:
The Hongkong and Shanghai Banking Corporation, Limited

By: _____
Authorized Officer

Variable Rate. Balloon.     LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.24 (c) 1997 CFI ProServices, Inc. All rights reserved. [GU–D20 KSI2.LN C3.OVL]

"PAY TO THE ORDER OF PARADISE MARINE CORPORATION WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, EXCEPT AS PROVIDED IN THE AGREEMENT FOR PURCHASE AND SALE OF LOANS DATED ~~AUGUST 25th~~ June, 2003 BETWEEN THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED AND PARADISE MARINE CORPORATION."

THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED

BY: _____
TITLE: _____ MANAGER GUAM

11th August 2003

# AMENDMENT TO CREDIT FACILITY/LEASE

This instrument is made as of this _6th_ day of _November_ , 2002, by and among **THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**, a foreign corporation ("Lender") and **K. SADHWANI'S, INC.**, (the "Borrower"), and **ALAN SADHWANI** and **LAJU SADHWANI**, (the "Guarantors").

**RECITALS:**

A.   Borrower has heretofore executed and delivered in favor of Lender certain banking facilities amended by that certain Workout Agreement dated May 31, 2001 which provided for Borrower's repayment of the original principal amount of **SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS AND NO CENTS ($7,500,000.00)** (the "Note");

B.   It has been agreed that the Maturity Date of the Note shall be extended for a period of time up to and including December 31, 2002;

C.   It has been agreed that the Lender shall prepay monthly rental payments of $23,281.00 to Borrower for the period October 2002 through May 2003 which shall be applied to reduce the principal balance of the Note; and

D.   Lender, Borrower and Guarantors have agreed to amend the Note as provided below.

**NOW, THEREFORE,** for and in consideration of the premises and of the covenants hereinafter contained, the parties agree as follows:

1.   <u>Confirmation of Obligations</u>. Borrower does hereby expressly confirm and agree that Borrower is primarily, jointly and severally, liable to Lender under the terms of the Note (as now existing and as herein amended), whether as a maker, guarantor, mortgagor or by way of assumption of liability. All terms of the Note and of any Mortgage securing the Note, and of any other document, instrument or thing arising in connection with the loan contemplated herein, shall continue in full force and effect, except as specifically amended herein.

2.   <u>Confirmation of Principal Balance</u>. The parties confirm that, as of September 27, 2002, the unpaid principal balance of the Note is the sum of $6,821,494.56.

3.   <u>Extension of Maturity Date</u>. The Maturity Date of the Note is hereby extended for a period of time up to and including December 31, 2002. The Lender will review the note every six months, and reserves the right in its sole discretion to call for repayment of principal and interest then outstanding and unpaid. Default on the terms of the Note will supercede this review process, and entitle the Lender to call for immediate repayment of principal and interest then outstanding and unpaid.

EXHIBIT
D

4. <u>Interest Rate</u>. Interest shall continue to accrue on all unpaid principal balances at the rate of Lender's Base Lending Rate ("BBLR") plus one percent (1.0%).

5. <u>Payments</u>. Monthly repayments of accrued principal and interest shall be modified from the existing SEVENTY-FIVE THOUSAND DOLLARS AND NO CENTS ($75,000) to the amount of FIFTY-ONE THOUSAND SEVEN HUNDRED NINETEEN DOLLARS AND NO CENTS ($51,719.00) . The decrease in monthly repayment represents the existing monthly repayment of $75,000.00 less the monthly rental payment of $23,281.00. The modified payment shall be payable on the 30th day of each month for the period October 2002 to May 2003. Commencing June 30, 2003, the payments shall increase to the sum of SEVENTY-FIVE THOUSAND DOLLARS AND NO CENTS ($75,000.00) per month until the Note is paid in full.

6. <u>Satisfaction of Lease</u>. Borrower acknowledges that Lender has prepaid all rents due and payable under the lease dated July 23, 1992, as extended and modified, in the amount of $186,248.00. Borrower agrees that Lender has performed and satisfied all of the duties and obligations imposed by the lease and is hereby released from any further obligation whatsoever.

7. <u>No Waiver</u>. Nothing contained herein shall be construed as a waiver of any right or remedy which Lender may have under the terms of the Note or mortgages or other security instruments securing repayment of the Note.

IN WITNESS WHEREOF, Borrower, Lender and Additional Borrower have executed these presents on the day and year first above written.

"LENDER"

THE HONGKONG AND SHANGHAI
BANKING CORPORATION LIMITED

By:_____
Name:_____
Its:_____

"BORROWER"

K. SADHWANI'S, INC.

By:_____
Name:_____
Its:_____

"GUARANTORS"

_____
ALAN SADHWANI

_____
LAJU SADHWANI



# HSBC

Our Ref: GUM CCU 030014

**PRIVATE AND CONFIDENTIAL**                    17 February 2003
K. Sadhwani Inc.
371 South Marine Drive
Tamuning, Guam 96911

Attn.:  Mr. Alan Sadhwani, President

**Re:    13FEB03 Meeting at HSBC Guam Office**

Dear Alan,

Thank you for taking time to meet Magnus Montan, Guy Priestley, and myself on February 13, 2003 in the Bank. This letter is to memorialize the discussion, namely:

1.  We expressed great concern over the prolonged economic depression on Guam, which casts doubt upon your company's ability to meet its financial obligations and specifically its scheduled loan repayments

2.  We re-emphasized that the Bank is leaving the island, and will not be able to renew or extend the facility when it becomes due for repayment on 31 August 2003; therefore, we encouraged you to take urgent steps to identify how you will repay us on that date

3.  You agreed to provide the Bank with a written plan to address point 2 above, and meet with us again on 24 February 2003

4.  You said that you have listed the securing real estate properties for sale with Century 21, and asked them to refer all offers to you. ~~You further suggested that we contact them to discuss progress in finding buyers and other related information~~

Please sign the acknowledgement below and return it to us at your earliest convenience. We look forward to meeting with you again on 24 February 2003 to discuss your plan.

Sincerely,

Lawrence Zhang
Vice President Credit and Risk Management

    cc: Guy Pristley, CEO

**The Hongkong and Shanghai Banking Corporation Limited**
HSBC Box 10001 PMB, Saipan, MP 96950 U.S.A.
The HSBC Building, Garapan, Saipan, MP 96950
Telephone: (670) 234-2468 • Fax: (670) 234-8882

*Incorporated in Hong Kong SAR with limited liability.*

EXHIBIT
"E"

## ACKNOWLEDGEMENT

I acknowledge that the above points are true and correctly reflect the content of our discussion.

_____
Alan Sadhwani

March . 5 . 03
_____
Date

# PROMISSORY NOTE MODIFICATION AGREEMENT

## INSTALLMENT LOAN NO.100023-361

This Promissory Note Modification Agreement ("Agreement") is entered into this ____ day of ____MARCH____, 2003, by and among THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD., a foreign corporation ("Lender") and K. SADHWANI'S, INC. ("Borrower"), and ALAN SADHWANI and LAJU SADHWANI, (THE "Guarantors").

On _08 November 2002_ Borrower executed an Amendment To Credit Facility/Lease (the "Note") in the amount of _SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS AND NO CENTS ($7,500,000.00)_ payable to the order of the Bank. The outstanding balance of the Note as of December 31, 2002 is SIX MILLION FIVE HUNDRED SEVENTY ONE THOUSAND NINE HUNDRED THREE AND FORTY TWO CENTS (USD6.571.903.42).

NOW, THEREFORE, in consideration of the premises and the covenants herein contained, the parties agree to amend as follows:

1. Extension of Maturity Date. The Maturity Date of the Note is hereby extended for a period of time up to and including August 31, 2003. The Lender will review the note every six months, and reserves the right in its sole discretion to call for repayment of principal and interest then outstanding and unpaid. Default on the terms of the Note will supercede this review process, and entitle the Lender to call for immediate repayment of principal and interest then outstanding and unpaid. *in 11/6/0=*

2. Effective date. This Agreement and the regular payment modification provided *Agreement* ~~herein~~ shall be deemed effective as of December 31, 2002.

3. General. The terms, conditions, and covenants of the Note, the guarantees, the security agreement, and all other loan documents which may secure the Note or which may have been executed in relation to the Note or to the loan transaction which the Note evidences remain in full force and effect except as amended by the express terms of this Agreement, and none other.

IN WITNESS WHEREOF, the parties have executed this Modification Agreement the day and date first above written.



EXHIBIT
" F "

PROMISSORY NOTE MODIFICATION AGREEMENT
INSTALLMENT LOAN NO.100023-361

**LENDER:**

THE HONGKONG AND SHANGHAI
BANKING CORPORATION LIMITED

By: _____

Name: FREDERICK GRANILLO

Its: ASSISTANT VICE-PRESIDENT -CREDIT CONTROL


"BORROWER"

K. SADHWANI'S, INC.

By: _____

Name: A.H. SADHWANI

Its: PRESIDENT.


"GUARANTORS"

_____

ALAN SADHWANI

_____

LAJU SADHWANI



Our Ref: GUM CCU 030021

*[handwritten]* Trad March 18 - 7053

**PRIVATE AND CONFIDENTIAL**                          06 March 2003
K. Sadhwani Inc.
371 South Marine Drive
Tamuning, Guam 96911

Attn.: Mr. Alan Sadhwani, President

Re:     05MAR03 Meeting at HSBC Guam Office


Dear Alan,


Thank you for taking time to meet Guy Priestley, Fred Granillo and myself on March 5, 2003 in the Bank. This letter is to memorialize the discussion, namely:

1.  You provided the signed Promissory Note Modification Agreement which formally extends the facility to 31 August 2003. We re-emphasized that there will be no further extensions and encouraged you to take urgent steps to identify how you will repay us on that date.

2.  You did not provide a written plan to repay us on the due date, as you had agreed in the 13 February 2003 meeting. Instead, you reiterated that you have listed the securing real estate properties for sale with Century 21, and that you would accept only reasonable offers. We noted that this is unacceptable in that it is not a written plan, nor did you quantify the term 'reasonable'. We reiterated that we need to know how the loan will be paid off by 31 August 2003 and asked again that you provide a written plan no later than 12 March 2003. You agreed.

3.  We told you that the Bank is prepared, without in any way committing itself at this stage, to consider a discount on the loan balance if you elect to give the secured properties to the Bank. This "friendly foreclosure" method would transfer the burden of property liquidation to the Bank and minimise legal fees for both parties. If you wish to explore this approach, we ask that you assign a value to the property and submit a written proposal for our consideration.

4.  You agreed to allow the bank to directly contact Century 21 to discuss progress in finding buyers and other related information.


**The Hongkong and Shanghai Banking Corporation Limited**
Post Office Box 27-C, Hagåtña, Guam 96932 U.S.A.
436 South Marine Drive, Tamuning, Guam 96913
Tel: (671) 647-8588  Fax: (671) 646-3767

*Incorporated in Hong Kong SAR with limited liability.*



Please sign the acknowledgement below and return it to us at your earliest convenience.
We look forward to receipt of your written plan on 12 March 2003.

Sincerely,

Lawrence Zhang
Vice President - CRM


## ACKNOWLEDGEMENT

I acknowledge that the above points are true and correctly reflect the content of our discussion.

_____                    _____
Alan Sadhwani                                              Date



# HSBC



## The Hongkong and Shanghai Banking Corporation Limited

*Post Office Box 27-C*
*Hagatna, Guam 96932*

| | | |
|---|---|---|
| *To* | K. Sadhwani's Inc. | *Date*     13 March 2003 |
| | Attn: A.H. Sadhwani | *File Ref:* |
| | *Fax No:* 687-1555/646-6917 | *Total no of pages = cover +0* |
| *From* | Frederick Granillo | *If you do not receive all pages, please* |
| | Assistant Vice President Credit Control | *telephone or telex immediately* |

| | | |
|---|---|---|
| *Fax No:* 646-3767 | *Telephone/Telex* | *Urgent* [X] *Yes* [ ] *No* |
| *Subject* Written Plan | | *Confidential* [X] *Yes* [ ] *No* |

*This facsimile is intended for the named recipient only and may contain privileged and confidential information. If you have received this facsimile in error, please notify us immediately. Please do not disclose the contents to anyone or copy it in anyway. Thank you*

Message:

Dear Mr. Sadhwani:

The deadline for the requested plan was yesterday as stated in a letter dated 6 March 2003 referenced GUM CCU 030021. Please provide the written plan today, as we have agreed upon, so that we understand how you intend on repaying the loan by the revised maturity date. Please also consider our recommended approach under "friendly foreclosure."

In addition to the above, in review of our files we have noted that the last appraisals done on the mortgaged properties were performed during 2000. As such, given significant market changes, we request that updated appraisals be done on all mortgaged properties to determine the actual current values. We will have Captain and Co. provide an appraisal quotation for your review. The appraisals are to be completed no later than 15 April 2003.

If you have any questions, please feel free to contact me at 647-8528.

Regards,

Frederick Granillo

EXHIBIT "H"

# K. Sadhwani's Inc.

371 South Marine Drive • Tamuning, Guam 96913

Phone 671-649-5948/49/50 • Fax 671-646-6917 • Email ticktock@guamcell.net

March 14 2003

Dear Mr. Granillo

I am working with a bank to pay off our out standing loan with you.

As for friendly foreclosure I do not understand what you want exactly.
Please give me more details.

You were talking about discounting , please explain how that will happen.

In future please fax me at 671 649 5938 this is direct fax to my office

Thanking you

Regards

Alan Sadhwani.



EXHIBIT
"I"



Our Ref: GUM CCU 030030

21 March 2003

Mr. Sadhwani
c/o K. SADHWANI INC.
371 South Marine Drive
Tamuning, Guam 96911

**RE: PAYOFF PLAN**

Dear Mr. Sadhwani:

    We are concerned that you have not taken seriously the Bank's notice to K. Sadhwani Inc. that it will not be able to renew or extend its loan facility when it becomes due for repayment on August 31, 2003. You have previously negotiated an extension of your loan facility and the liquidation of several parcels of real property assets sufficient to reinstate the loan facility not two years ago. In fact, you executed several deeds in lieu of a foreclosure via the private power of sale contained in the mortgages to secure an extension of your loan facility with the bank.

    Your recent fax on March 14, 2003 requested the details of a friendly foreclosure. As stated above, I believe that you are familiar with the process that the Bank used to liquidate the real property. It is possible that the bank may accept deeds in lieu of foreclosure at a negotiated release price in order to reduce the balance of your loan facility. This process provides certainty to the winding down of your business and satisfaction of its debt to the Bank. The Bank cannot guarantee that there will not be a resulting deficiency from the liquidation process. However, you have the control and discretion to reduce the exposure to a deficiency to a minimum by negotiating such an agreement.

    You represented that you have listed your property with Century 21 Realtors. We request a copy of the listing agreements or a written authorization allowing Century 21 to provide copies to the Bank immediately. If you are able to sell your property at market price and have such listing agreements, the Bank may consider tolling collection efforts pending the closing in escrow of written accepted purchase offers with net proceeds paid to the Bank. The tolling of collection efforts would have to be part of a general liquidation or refinancing agreement. The Bank does not wish to negotiate with you on a parcel by parcel basis.

    In the event that you cannot sell the properties through the efforts of Century 21, the Bank may consider accepting deeds in lieu of foreclosure at negotiated values. If you are not willing to negotiate a liquidation agreement, then the Bank may be forced to foreclose via the private power of sale contained in the bank's mortgages. You may assist the Bank in this process by providing interested buyers and cooperate through the foreclosure process. The

**The Hongkong and Shanghai Banking Corporation Limited**
Post Office Box 27-C, Hagåtña, Guam 96932 U.S.A.
436 South Marine Drive, Tamuning, Guam 96913
Tel: (671) 647-8588  Fax: (671) 646-3767

*Incorporated in Hong Kong SAR with limited liability.*



foreclosure process does, however, add costs, expenses and attorneys' fees to the amount secured by your mortgages and could result in an increased deficiency amount.

If you are seriously making an effort to refinance your loan facility, you may avoid this entire process. We request immediate confirmation of your loan application and efforts to obtaining refinancing. The Bank is ready, able and willing to assist your negotiation of replacement financing.

If you do not respond to this letter with the required information by close of business, April 4, 2003, the Bank will refer this matter to its attorneys at Klemm, Blair, Sterling & Johnson. The firm will contact you thereafter to address the issues in this letter.

I look forward to your response.

Yours sincerely,

Frederick Granillo
Assistant Vice President, Credit Control



**Realty Management Company**
P.O. Box 7988
Tamuning, GU 96931
Website: www.guamproperties.com
Email: remco@ite.net
Business (671) 647-5003
Fax (671) 646-6604

April 3, 2003

Alan Sadwani
Ai's Mechanical
Tamuning, Guam

Via Fax. 649-5938

Dear Alan,

    As per our phone conversation I am writing you with an update of our marketing efforts for your commercial buildings located on marine Drive (Old HSBC office building, Old Guam Marketing building/Deloitte & Touche Building). The buildings have been shown to a number of prospective buyers and tenants We have presented the building to such tenants as GWA, DEDCA, Fire Department, Revenue & Taxation, PSA, Metro Bank, Camacho Family (for their lending institution, Community First, Sony and other prospective tenants. To date the strongest interest is PSA if we can work out the parking /area situation

    On the selling side I have shown the buildings to an investment group from Korea, and Mr & Mrs. Fang. The Korean group have left island and plan to return Mid April with their decision. It is my understanding they are an electronic firm who have sold some property here on Guam and are trying to re-invest it to income producing property. The Fang's also were interested in doing a 1031 type exchange to income producing properties here in Guam. I have not heard from them in a while but I will contact them this week to se if there is interest in their making an offer They seemed very serious after inspecting all three of the buildings.

    I hope this brings you up to date on our marketing efforts. Please feel free to contact me if you have any questions.

Sincerely,

Christopher Felix CPM,CIPS
President      CCIM

EXHIBIT
"K"

*Each Office is Independently Owned and Operated*

# HSBC ◆X◆

**The Hongkong and Shanghai Banking Corporation Limited**
Post Office Box 27-C
Hagatna, Guam 96932

| | | | |
|---|---|---|---|
| To | K. Sadhwani's Inc. | Date: | 03 April 2003 |
| | Attn: A.H. Sadhwani | File Ref: | |

Fax No   646-6917

*Total no  of pages – cover +2*

From   Frederick Granillo
Assistant Vice President Credit Control

*If you do not receive all pages, please telephone or telex immediately*

Fax No   646-3767          *Telephone/Telex*

| | | |
|---|---|---|
| Urgent: | [X] Yes | [ ] No |
| Confidential: | [X] Yes | [ ] No |

*Subject* **Promissory Note Modification Agreement**

*This facsimile is intended for the named receipient only and may contain privileged and confidential information. If you have received this facsimile in error please notify us immediately. Please do not disclose the contents to anyone to copy it to outside parties. Thank you*

Message:

Dear Mr. Sadhwani:

Please see attached Promissory Note Modification dated 05 March 2003.

If you have any questions, please feel free to contact me at 647-8528.

Regards,

Frederick Granillo

EXHIBIT
"L"

# K. Sadhwani's Inc.

371 South Marine Drive • Tamuning, Guam 96913
Phone 671-649-5948/49/50 • Fax 671-646-6917 • Email ticktock@guamcell.net

April 4 2003

Mr. Granillo
The Hongkong and Shanghai Banking Corporation Limited
Post office Box 27-C
Hagatna Guam 96932

Dear Mr. Granillo,

In my previous letter I have mentioned to you that I am trying to get financing to pay my
Outstanding loan with HSBC. I have not received confirmation on my loan as of today.
Hope to receive shortly.

I am working with Realty Management to sell the properties to pay off the loan.

If I am unsuccessful then I will hand over to you certain properties.

Please give me sometime, I will work with you to satisfy outstanding loan

Thanking you

Alan Sadhwani

Incl: letter from Century 21 ( Chris Felix )



EXHIBIT
"M"



**HSBC**

# PRIVATE AND CONFIDENTIAL

15th July 2003

K. Sadhwani Inc.
371 South Marine Drive
Tamuning, Guam 96911

Attn.: Mr. Alan Sadhwani, President

Dear Alan,

## NOTICE OF INTENT TO SELL LOAN

Notice is hereby given that the Hongkong & Shanghai Banking Corporation Limited ("HSBC") has entered into a loan purchase agreement with Paradise Marine Corporation (the "Buyer") whereby HSBC has agreed to sell, transfer and assign to the Buyer all of HSBC's right, title and interest in and to HSBC's loan with K. Sadwani Inc., including all mortgages, security agreements, promissory notes and any investments securing such loan, and together with any liens, security interests, charges and other rights related thereto (the "Loan") provided the Buyer complies with the requirements of the agreement upon closing. The Closing for the sale is currently scheduled for 11th August 2003 or such other date as agreed by the parties. Should the Closing occur, the Buyer shall be a party to the Loan and any related loan documents and HSBC shall be absolutely released from any obligation, covenants, and agreements under said Loan and any related loan documents. Further, in the event that the Closing shall occur, you will receive further notice regarding the manner in which all further loan payments shall be paid.

Yours faithfully,

I.C.Underwood
Manager Guam.

The Hongkong and Shanghai Banking Corporation Limited
Post Office Box 27-C, Hagåtña, Guam 96932 U.S.A.
436 South Marine Drive, Tamuning, Guam 96913
Tel: (671) 647-8588  Fax: (671) 646-3767

*Incorporated in Hong Kong SAR with limited liability.*



EXHIBIT
"N"

# K.Sadhwani's Inc.

### 371 South Marine Dr.
### Tamuning Guam 96913-3911
### Phone  671 649-5948

HSBC
P.O.Box 27-C
Hagatna Guam

Dear Mr. Underwood

You gave me until today to propose a repayment plan for the loans with you. Your letter dated  15 2003 I
 Received on July 18 03. You gave me a Notice of Intent to sell loan. I want to assure that I have been
working hard to repay the debt to you. The decision by the bank to sell the loan has opened up new
possibilities for us to settle the debt. However 12 days has proved to be too short a time for me to put
together an offer to settle the debt. Since it is summer time many of the bank managers with whom I am
negotiating are away from their offices. While they   have verbally assured me that they will be able to make
substantial funds available, they cannot give a commitment in this short a time. I am sure that that you better
then anyone
Understands the way banks work. Therefore I am asking that you postpone the sale of the loan for thirty
days and that you give me until August 31, 2003 to make you an offer.

I realize that the bank wishes to settle this matter. I promise you that I want to settle it as well. The bank and
I have had twenty five [25] years of mutually profitable relationship and I have never defaulted on any of
my obligations to the bank. I recognize that the bank must make business decisions in its best interest, but
I hope that by granting this last extension of thirty days will allow us to end our business relationship on
Good terms. If not ,then will be forced to consider other options.

Yours Truly

Alan Sadhwani



# K.Sadhwani's Inc.

### 371 South Marine Dr.
### Tamuning Guam 96913-3911
### Phone 671 649-5948

August 5 2003

HSBC
P.O.Box 27-C
Hagatna Guam

Dear Mr. Underwood

As you requested a letter from bank indicating that they will loan K. Sadhwani's Inc 3.5 million to Settle my out standing debt with HSBC is enclosed.

I hope this is acceptable to you.

Yours truly

Alan Sadhwani





First Hawaiian Bank
Guam Business Banking Center
400 Route 8
Mongmong, Guam 96910-2010

August 5, 2003

Mr. Alan Sadhwani, President
K. Sadhwani's, Inc.
371 South Marine Drive
Tamuning, Guam 96913

Loan for $3,500,000

Dear Mr. Sadhwani:

First Hawaiian Bank (the "Bank") is pleased to provide the following indication of the terms and conditions for a new term. This letter shall not be construed as a commitment on the part of the Bank, and is only provided for indication purposes only. A commitment, should one be issued, shall be subject to modification and formal approval from the officers of the Bank, and would be in accordance with the Bank's normal underwriting standards.

The Loan will be made to K. Sadhwani's, Inc., a Guam corporation, (the "Borrower"), subject to the following terms and conditions:

TERMS

Loan Amount: $3,500,000

Interest Rate Prior to Maturity:

**OPTION I**
Prevailing three-year fixed rate fixed for the first three years of the loan, adjusted every three years thereafter to prevailing (currently 5.75%).

**OPTION II**
Prevailing five-year fixed rate fixed for the first five years of the loan, adjusted every five years thereafter to prevailing (currently 6.75%).

Required Payments:

**OPTION I**
Principal amortized over 15 years with monthly payments of interest and principal of approximately $29,064.35 which would amortize the Loan over a period of 15 years. Term: 9 years.

**OPTION II**

Principal amortized over 15 years with monthly payments of interest and principal of approximately $30,971.83 which would amortize the Loan over a period of 15 years. Term: 10 years.

Loan Fee:

1.50% of the total loan amount or $52,500 due upon acceptance of the commitment letter, should one be issued.

Property:

1) First mortgage over the leased fee interest and Assignment of Rental Income on commercial property containing 2,482+/- square meters described as Lots 2141-1-1-R1 and 2141-1-3NEW, Tamuning, improved with a three-story commercial building known as the Sharp Plaza.

2) First leasehold mortgage and Assignment of Rental Income on a two-acre leasehold parcel described as Lot 2, Tract 217, Dededo, improved with three one-story commercial and buildings known as the Sateena Mall.

3) First fee simple mortgage and Assignment of Rental Income on commercial property containing 1,549.77+/- square meters described as Lots 2023-2-1-1, 2023-2-1-R1, and 2025-4, Tamuning, Guam (Tick Tock Building)

4) First fee simple mortgage and Assignment of Rental Income on commercial property containing 3,195.96+/- square meters described as Lot 2104-6NEW, Tamuning improved with a commercial building (HSBC Building)

Guarantees:

Personal continuing guarantee of all individuals who retains 25% ownership of K. Sadhwani's, Inc., namely Mr. Ashok (Alan) Sadhwani and Mrs. Laju Sadhwani (collectively the "Guarantors").

Loan Conditions:

1) The Guarantors shall submit annual personal financial statements within 30 days after each

year end, and personal income tax returns within
15 days of filing..

2) Borrower shall submit CPA Audited financial
   statements annually within 120 days from the
   end of its fiscal period.

3) The Borrower shall submit CPA-prepared
   Corporate Income Tax returns within 15 days of
   filing.

4) The Borrower shall submit, upon request,
   interim financial statements prepared by the
   Borrower.

5) The Borrower shall submit annual company
   prepared rent rolls and operating statements
   within 30 days of each fiscal year end.

6) Loan is subject to the Bank's receipt and
   satisfactory review of the Borrower's and
   Lender's Hazardous Waste Report
   Questionnaires.

Maximum Loan to Value Ratio:           60%

Interest Rate After
 Maturity or Default:                  Four percentage points (4%) higher than the higher
                                       of (i) the rate which would be charged in absence of
                                       default or (ii) the Bank's prime rate, fluctuating with
                                       prime.

CONDITIONS

1.   Security. The Loan shall be secured by:

    (a)   A mortgage (the "Mortgage"), constituting (i) a first lien upon the Borrower's
estate in the Property together with all buildings, fixtures, equipment and appurtenant
improvements comprising the Improvements, (ii) a first security interest in all fixtures,
furniture, furnishings, equipment, appliances and any other personal property now owned
or hereafter acquired by the Borrower and situated on the Property, and (iii) an assignment

of rentals. (The property subject to the Mortgage is hereafter referred to as the "Mortgaged Property".)

(b) A security agreement ("Security Agreement"), granting to the Bank a first security interest in certain collateral (the "Collateral"), including, but not limited to, (i) all contracts, permits and authorizations, respecting the management and operation of the Improvements, and (ii) all furniture, furnishings, equipment, appliances and other personal property owned by the Borrower and incorporated in the Improvements or located on the Property.

(c) A financing statement (the "Financing Statement") to perfect the first security interest of the Bank in certain of the Mortgaged Property and in the Collateral.

(d) A separate assignment of rentals and lessor's interest in leases (the "Assignment of Rentals"), assigning to the Bank all rentals and rights of the Borrower as lessor under the Tenant Leases.

5.  Escrow. At least 30 days prior to the Closing Date, the Borrower shall select and inform the Bank of the name of the escrow company which will process the payoff of any loans currently secured by the Property. The escrow company shall, at the Borrower's cost and expense, provide the Bank with copies of any documents which the Bank may require for preparation of the Loan documents.

6.  Optional Prepayment. Provided that a minimum of three (3) business day's notice is given to the Bank, the Borrower shall have the option to prepay principal on any monthly payment date and shall be subject to a prepayment charge equal to the product of (A) the prepayment multiplied by or (B) a percentage equal to the number of years (in whole numbers rounded upwards) from the date of prepayment to the next adjustment date; in any event, the prepayment charge shall be no less than 1%.

Until the Loan is paid in full (principal and interest), no optional prepayment pursuant to this paragraph 6 shall be credited to or relieve the Borrower to any extent from its obligation thereafter to pay the monthly installments in the amount required by this commitment.

7.  Additional Closing Requirements. The Borrower shall furnish to the Bank on or before the Closing Date the following:

(a) (i) A copy of the Articles of Organization of the company and By-Laws certified by the Department of Revenue and Taxation of the Government of Guam.

(ii) A certificate of good standing issued by the Department of Revenue and Taxation of the Government of Guam.



(b)  Title Insurance; Chattel Lien Report.

(i)  A policy of title insurance, together with such endorsements and reinsurance as the Bank may require (such policy, endorsements and reinsurance being hereinafter referred to as the "Title Policy") issued by any title company authorized to do business in the Territory of Guam and approved by the Bank, in the amount of the Loan, insuring that the Mortgage is a valid first lien on the Mortgaged Property, free and clear of all defects, liens, encumbrances and exceptions to title whatsoever, except such as the Bank may approve in writing. Without limiting the foregoing, the Title Policy shall effect full coverage, against losses arising out of encroachments against boundary or setback lines, against losses from existing or subsequent mechanics' or materialmen's liens which may gain priority over the Mortgage, and against losses arising out of zoning ordinances and regulations and such other losses with respect to which the Bank may request coverage. The endorsements shall include, without limitation, a CLTA 100 endorsement (or its equivalent), a survey endorsement and an assignment of rents endorsement.

(ii)  A chattel lien report in form UCC-3 completed and certified by the Director of the Department of Revenue and Taxation verifying that a search of the public records has not disclosed any security interest liens or encumbrances against any personal property owned by the Borrower, except the Financing Statement.

(c)  Survey (also referred to as an ALTA survey); Certification

(i)  A perimeter survey map, prepared and certified as correct by a registered surveyor, disclosing (A) the location of the perimeter of the Property, (B) all easements and rights-of-way, (C) the lines of the street abutting the Property and the width thereof, (D) the location of the Improvements and their relation by distance to the perimeter of the Property, established setback lines and the street lines and (E) encroachments, if any.

(d)  Appraisal Report. A report prepared by the Bank's Appraisal Department or ordered by the Bank from a recognized real estate appraiser, appraising the fair market value of the Mortgage Property in accordance with the Uniform Standards of Professional Appraisal Practice and applicable Bank regulations resulting in a Loan-to-Value ratio of not more than 60%.

(e)  Insurance. Fire and extended coverage insurance, including typhoon insurance, with adequate coinsurance, for the full insurable value of the Improvements, fixtures and equipment, together with flood insurance (if the Improvements are required to be so insured by the Bank's Federal Regulators), and such other insurance customarily required by prudent lenders or required by the Bank.



(f)    Financial Statements.  Current financial statements of the Borrower.

(g)    Governmental Authorizations.   Evidence satisfactory to the Bank that the construction and the use of the Improvements fully comply with all federal and territorial statutes, laws, ordinances and regulations relating to land use classification, zoning, coastal zone management, subdivision, setback, environmental, ecological and pollution control, and waste product and sewage disposal (or, if such compliance is not necessary, verification that such compliance is not necessary.

(h)    Hazardous Materials.

(i)    If requested by the Bank, the Borrower will, at its own cost and expense, furnish to the Bank prior to the Closing Date an environmental inspection report by an independent environmental consultant acceptable to the Bank, identifying and evaluating any existing or potentially hazardous or toxic materials on, under or about the Mortgaged Property.  If such report discloses any hazardous or toxic materials in amounts or of a nature unacceptable to the Bank, the Bank shall have the option of either refusing to fund the Loan or requiring an additional environmental inspection and audit report acceptable to the Bank as a condition to the closing of the Loan.

(ii)   The Mortgage shall contain warranties by the Borrower that the Mortgaged Property and the soil and groundwater thereunder are free of any hazardous or toxic materials.  In addition, the Mortgage shall incorporate covenants by the Borrower (A) to keep and maintain the Mortgaged Property, including the soil and ground water thereunder, in full compliance with all federal, state and county laws relating to environmental conditions and hazardous and toxic materials, and (B) to indemnify the Bank from and against any loss, damage, cost or expense which may be sustained or incurred by the Bank as the result of any violation of such laws by the Borrower, or as the result of any work required to remove any hazardous or toxic materials or to remedy any adverse conditions.

8.    Due-on-Sale and Secondary Financing.  The Borrower will not, without the Bank's prior written consent, obtain any other financing secured by a lien or security interest on any portion of the Mortgaged Property or Collateral.  The Borrower will not, without the Bank's prior written consent, sell, convey, assign, transfer or encumber in any way any interest in the Mortgaged Property or Collateral.  The Mortgage and Security Agreement shall provide that a breach of either of such covenants shall constitute an event of default and permit the Bank to declare the entire indebtedness owing by the Borrower to the Bank to be immediately due and payable.

9. <u>Loan Closing Expenses</u>. Whether or not the Loan is closed, the Borrower shall pay all expenses incurred by the Bank in the issuance of this Loan commitment and the satisfaction of the conditions thereof, including, but not limited to, premiums for the Title Policy, survey costs, property inspection costs, recording fees, taxes, appraisal fees, fees and expenses of legal counsel for the Bank (and each participant in, or purchaser of, the Loan), and any other costs incurred by the Bank in connection with any of the matters provided for in this commitment.

10. <u>Accuracy of Information, etc</u>. This commitment is subject to the accuracy as of the date hereof, of all information, data, representations, exhibits, and other material submitted in connection with the Borrower's application.

11. <u>Approval of Bank and its Counsel</u>. All documents, agreements, contracts, leases, instruments, certificates, survey maps, Plans and Specifications, appraisals, financial statements, operating statements, reports and opinions required by this commitment must be in form and substance satisfactory to the Bank and its counsel. Any insurance or title insurance policy must be in form and amount satisfactory to the Bank. The Bank reserves the right to review after the acceptance of this commitment all information, documents, Plans and Specifications previously furnished by the Borrower and this commitment is not an indication or agreement that such items have been approved by the Bank or its counsel. If requested by the Bank, the Borrower shall deliver to the Bank on the Closing Date, an opinion of Borrower's independent legal counsel, in form and substance satisfactory to the Bank.

If the above terms and conditions are acceptable, please execute the form of acceptance on the enclosed copy of this letter and return the same to us and all other required documents detailed herein. As stated above, the above terms are for indication purposes only and are subject to formal approval by the Bank.

We hope you will find the above terms favorable and look forward to your reply. However, if you have any questions, please call me at 475-7853.

Sincerely,

FIRST HAWAIIAN BANK

PATRICK B. OLIVA
Assistant Vice President

K. Sadhwani's, Inc.
Letter of Indication
August 5, 2003
Page 8


<u>ACCEPTED BY BORROWER</u>:
K. SADHWANI'S, INC.


By_____

Its_____

Date:_____



By_____

Its

Date:_____



**HSBC**

11 August 2003

K.Sadhwani's Inc.
371 South Marine Drive
Tamuning, Guam 96911

Dear Mr. Sadhwani

I refer to my letter of 15 July 2003.

I am pleased to inform you that on Monday 11th August 2003 your loan was sold to Paradise Marine Corporation. The terms and conditions of your loan remain unchanged, but Paradise Marine Corporation will contact you shortly and let you know where to make your payments.

Yours sincerely

T.C. Underwood
Manager Guam

The Hongkong and Shanghai Banking Corporation Limited
Post Office Box 27-C, Hagåtña, Guam 96932 U.S.A.
436 South Marine Drive, Tamuning, Guam 96913
Tel: (671) 647-8588 Fax: (671) 646-3767

Incorporated in the Hong Kong SAR with limited liability.



EXHIBIT
" ___ "