JOAQUIN C. ARRIOLA
ANITA P. ARRIOLA
ARRIOLA, COWAN & ARRIOLA
259 Martyr Street, Suite 201
Hagåtña, Guam 96910
Tel:    (671) 477-9730
Fax:    (671) 477-9734



Attorneys for Plaintiffs Alan Sadhwani, et al.

# IN THE UNITED STATES
# DISTRICT COURT OF GUAM

<table>
<tr><td>

ALAN SADHWANI, LAJU SADHWANI,<br>
and K. SADHWANI'S INC., a Guam<br>
corporation,

<br><br>

         Plaintiffs,

<br>

   vs.

<br><br>

HONGKONG AND SHANGHAI<br>
BANKING CORPORATION, LTD., a<br>
Foreign corporation,<br>
JOHN DOE I through JOHN DOE X,

<br><br>

         Defendants.

</td><td>

CIVIL CASE NO. 03-00036

<br><br><br>

**NOTICE OF FILING OF<br>
ADDITIONAL CASES AND<br>
REFERENCES**

</td></tr>
</table>

<div style="writing-mode: vertical-rl">ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910</div>

Pursuant to G.R. 4.1(a), plaintiffs attach the following cases cited in their Opposition to

Defendant Hongkong Shanghai Banking Corporation, Ltd.'s Memorandum of Points and Authorities

in Support of Motion to Dismiss Plaintiffs' First, Third, Fourth, Sixth and Seventh Causes of Action:

    1.    <u>Ada's Inc. v. First Hawaiian Bank</u>, Superior Court of Guam, Civil Case

No.CV0785-02, Decision and Order dated July 7, 2003.

    2.    <u>Hemlani v. Ticor, Title Guaranty</u>, Superior Court of Guam, Civil Case No.

CV1500-98, Decision and Order dated March 21, 2001.

ORIGINAL

3.    <u>Gayle v. Hemlani</u>, 2000 Guam 5 (2000).

4.    The American Bankers Association, <u>Banking and Finance Terminology</u>, p. 281 (4th
Ed. 1999).

Respectfully submitted this 17th day of September, 2004.

**ARRIOLA, COWAN & ARRIOLA**
Attorneys for Plaintiffs

By: *Anita P. Arriola*
    **ANITA P. ARRIOLA**

## CERTIFICATE OF SERVICE

I, ANITA P. ARRIOLA, hereby certify that on September 17, 2004, I caused to be served via

hand delivery, **NOTICE OF FILING OF ADDITIONAL CASES AND REFERENCES** to:

> **Jacques G. Bronze**
> **Bronze & Tang, P.C.**
> **2nd Floor, BankPacific Building**
> **825 S. Marine Drive**
> **Tamuning, Guam 96913**

Dated this 17th day of September, 2004.

**ANITA P. ARRIOLA**

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

Territorial Law Library



# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| ADA'S INC., a Guam Corporation, and<br>ANTHONY SGRO, | CIVIL CASE NO. CV0785-02 |
| Plaintiffs/*Kehante siha*, | |
| v. | |
| FIRST HAWAIIAN BANK, and JOHN<br>DOES 1-20, | *DISISION YAN OTDEN[1]* |
| Defendants/*Difendante siha*. | |

The Court set the hearing on Defendant First Hawaiian Bank's motion to dismiss the above action for March 03, 2003. At the appointed time, the parties advised the Court they would submit the motion based upon the memoranda filed by the respective parties. Plaintiffs were represented by Rodney J. Jacob, Esq., of Calvo & Clark, LLP, while Defendant was represented by Thomas C. Moody, III, Esq., of Klemm, Blair, Sterling & Johnson. The Court, having reviewed the memoranda filed by the parties, now renders this Decision and Order.

## *I. MANMALOFFAN[2]*

On May 31, 2002, Plaintiffs filed the above captioned action against Defendant First

---

[1]Decision and Order

[2]Background

Hawaiian Bank and John Does 1 - 20. Therein, Plaintiffs alleged the following causes of action

against Defendants:

1. BREACH OF COVENANT OF GOOD FAITH
   A. Unreasonable Delay In Closing Agana Paradise Fitness Center Loan.
   B. Refusal to Act In a Commercially Reasonable Manner
   C. Misrepresenting Intention in Order to Increase Likelihood of Default
   D. Charging for Appraisals of Unpledged Property
   E. Refusing to Replace an Obviously Hostile Officer
   F. Fabricated Technical Defaults of Loan Ratios.
II. BREACH OF LOAN COMMITMENT
III. TORTIOUS INTERFERENCE WITH BUSINESS RELATION
IV. TORTIOUS INTERFERENCE WITH BUSINESS RELATION
V. PERMANENT INJUNCTION
VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs' complaint contained twenty-one (21) pages and one hundred ten (110) numbered

paragraphs. Plaintiffs seek an injunction against Defendants enjoining First Hawaiian Bank (FHB)

"from pursuing any private powers of sale"and "from collecting on any assignment of rents or notes

payable." In addition, Plaintiffs seek general, consequential, special, and exemplary damages against

Defendants.

Defendant FHB, in lieu of filing an answer to the complaint, has filed this motion to dismiss

the complaint. The motion is based upon Rules 8(a), (e), and 12(b)(6) of the Rules of Civil

Procedure. Defendant also seeks to strike paragraphs 42, 51 and 69 of the complaint pursuant to

Rule 12(f), alleging those paragraphs to be impertinent, argumentative, irrelevant, and scandalous.

The pertinent Rules of Civil Procedure cited by Defendant provide as follows:

**8(a) Claims For Relief.** A pleading which sets forth a claim for relief, whether
an original claim, counterclaim, cross-claim, or third-party claim, shall contain
(1) a short and plain statement of the grounds upon which the court's jurisdiction
depends, unless the court already has jurisdiction and the claim needs no new
grounds of jurisdiction to support it; **(2) a short and plain statement of the claim
showing that the pleader is entitled to relief;** and (3) a demand for judgment for the
relief to which the pleader seeks. Relief in the alternative or of several different

types may be demanded.

**(e) Pleading To Be Concise and Direct: Consistency.**
(1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required.
(2) A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or equitable grounds. All statements shall be made subject to the obligations set forth in Rule 11.

**12(b)(6) How Presented.** Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (6) failure to state a claim upon which relief can be granted,
No defense or objection is waived by being joined to one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for which relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

**12(f) Motion to Strike.** Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

## DINISKUTA[3]

Defendant FHB complains that plaintiffs pleadings are too long and not short and concise

---

[3]Discussion

as required by Rule 8(a). A reading of Rule 8(a) reveals that it does not prohibit long and detailed pleadings, but only requires that the pleadings show that plaintiff is entitled to the relief which he seeks. See the Fifth Circuit Court ruling in **Black v. First Nat. Bank of Mobile, Ala.** 255 F.2d 373 C.A.5 1958:

> As we said in <u>John Walker & Sons v. Tampa Cigar Co., 5 Cir., 197 F.2d 72, 73:</u>
>
> <u>'Rule 8 of the Federal Rules of Civil Procedure, 28 U.S.C.A.</u>, provides that a pleading shall set forth a short, plain statement of the claim showing that the pleader is entitled to relief * * *. Absent from this rule is the old requirement of common law and code pleading that the pleader set forth 'facts' constituting a cause of action. It is also elementary that a complaint is not subject to dismissal unless it appears to a certainty that the plaintiff cannot possibly be entitled to relief under any set of facts which could be proved in support of its allegations. Even then, a court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted."
>
> We follow it with a brief discussion giving our reasons for thinking that it was error to dismiss the action. It is in the light of these principles that the question posed must be answered. In their light, appellee's inveighing against the pleadings that they are prolix and complicated, is answered by the consideration that the very fact of their complexity tends to make more clear that an order dismissing the complaint rather than one requiring its simplification compounds and increases the error inherent in the attempt to dispose, on the pleadings, of the issues for decision here. In complete disregard of this consideration, the appellee, First National Bank, devotes a large part of its brief to the proposition that, because the amended complaint does not, as required by the rules, contain a short and plain statement of the claim and, what it calls a pall of confusion and self contradiction overhangs and clouds it, in short because the pleading is obscure, the dismissal was required. We have held to the contrary in the two cases......
>
> See also *American Nurses'Ass'n v. State of Ill.*, 783 F.2d 716, C.A. 7 (Ill), 1986:
> .................. a plaintiff can plead himself right out of court. But the court is not to pounce on the plaintiff and by a crabbed and literal reading of the complaint strain to find that he has pleaded facts which show that his claim is not actionable, and then dismiss the complaint on the merits so that the plaintiff cannot replead.

Case 1:03-cv-00036    Document 293    Filed 09/17/2004    Page 7 of 51

A complaint, however, is subject to dismissal under Rule 8(a) if it is incomprehensible. *Carpenter v. Williams*, 86 F.3d 1015, 1016 (10th Cir.1996). A complaint may be dismissed with prejudice if allowing further amendments would be futile. *Cf. **Grossman v. Novell, Inc.**, 120 F.3d 1112, 1126 (10th Cir.1997)* (affirming a dismissal with prejudice after the denial of a motion for leave to amend the complaint under **Fed.R.Civ.P. 15** because amendment would be futile).

In its motion to dismiss the bad faith action, Defendant argues that when a duty is breached in a commercial contract the resulting claim is merely a breach of contract claim with its resulting remedies. Thus, plaintiffs complaint fails to state a claim under Rule 12(b)(6).

In *McCalister vs. Citibank, 829 P. 2d 1253(1992)*, the Court, while recognizing that a covenant of good faith and fair dealing was implied in every contract, indicated that the remedy for its breach was ordinarily by action on a contract, but tort damages may be available if a special relationship existed between the contracting parties. In the case, no special relationship was found between the bank and its customer and the customer could not recover for the alleged tortious breach of the implied covenant of good faith and fair dealing that occurred when the bank breached its alleged promise to renew the customer's credit line at a competitive interest rate.

A bank which leased a safe deposit box to a customer owed no duty of good faith to the customer. *Eller vs. National Bank of Texas, N.A., 975 S.W. 2d 803, (1998)*.

In **Wallace v. National Bank of Commerce,** 938 S.W.2d 684 Tenn.,1996. , the Court stated:

> Common-law duty of good faith in performance of contract does not apply to formation of contract, and thus, common-law duty of good faith does not extend beyond agreed-upon terms of contract and reasonable contractual expectations of the parties. Restatement (Second) of Contracts §
> When determining whether complaint fails to state claim upon which relief can be granted, courts should construe complaint liberally in favor of plaintiff.
> It is true that there is implied in every contract a duty of good faith and fair dealing

in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.

In *Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn.App.1986), which was relied upon by the Court of Appeals in *TSC Industries, Inc. v. Tomlin,* the Court of Appeals held that in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument. In a later decision, the Court of Appeals held that good faith in performance is measured by the terms of the contract. "They [the parties] may by agreement, however, determine the standards by which the performance of obligations are to be measured."

In *Price v. Wells Fargo Bank, 261 Cal. Rptr. 735, (1989),* the Court stated:

In the present case, appellants do not contend that their agreement with Wells Fargo satisfies the rigorous five-part test of the *Wallis* decision. Nor do they seek to prove special circumstances that might conceivably give a fiduciary character to a lender/borrower relationship. Relying on *Commercial Cotton* and *Barrett,* the complaint alleges only that plaintiffs "were customers of WELLS FARGO BANK, NATIONAL ASSOCIATION and had bank accounts, including checking, with defendant, WELLS FARGO, maintained at the Merced Branch of WELLS FARGO, and have been the beneficiaries of a fiduciary relationship with defendant, WELLS FARGO." These allegations, together with a description of the loan transactions, plainly are insufficient to state a tortious breach of the covenant of good faith and fair dealing. For the first time in this appeal, appellants argue that Wells Fargo is liable in tort under *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158. The tort defined in *Seaman's,* however, is distinct from breach of the implied covenant of good faith and fair dealing; it occurs when a party "seeks to shield itself from liability by denying, in bad faith and without probable cause" that the contract exists. In their opening brief, appellants urge that Wells Fargo in fact denied the existence of a "renewal agreement." This theory,

however, finds no expression in the pleadings and cannot be considered for purposes of summary judgment. *(Kruse v. Bank of America* (1988) 201 Cal.App.3d 354, 373- 376, 248 Cal.Rptr. 217.)

Turning to more firmly established legal principles, appellants urge that the record shows a triable issue of fact concerning contractual breach of the implied covenant of good faith and fair dealing in both the original loans and the March 19, 1984, repayment agreement. "Every *479 contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Rest.2d Contracts, § 205.) The term "good faith" has been described as an " 'excluder' " phrase which is 'without general meaning (or meanings) of its own and serves to exclude a wide range of heterogenous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.' " *(Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, 697, 254 Cal.Rptr. 211, 765 P.2d 373, quoting Summers, "Good Faith" *in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va.L.Rev. 195, 201.) For example, the covenant precludes an owner from interfering with work of a contractor in performance of a construction agreement. (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 745, p. 676.) Appellants here argue that Wells Fargo breached the implied covenant by taking a "hard line" in repayment negotiations. In particular, they rely on the testimony of John Richards, an expert witness of Wells Fargo, who conceded that, in his opinion, Pamela Bogle was not justified in publishing a notice of foreclosure sale after having received a $90,000 payment on June 10, 1985. The necessary implication of appellants' argument is that the bank owed them a duty of reasonable forbearance in enforcing its creditor's remedies. They do not, however, cite any authority supporting this proposition, and we are aware of none. Contracts are enforceable at law according to their terms. The covenant of good faith and fair dealing operates " 'as a kind of "safety valve" to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language.' " *(Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, 684, 254 Cal.Rptr. 2 11, 765 P.2d 373, quoting Summers, *The General Duty of Good Faith--Its Recognition and Conceptualization* (1982) 67 Cornell L.Rev. 810, 812.) It does not impose any affirmative duty of moderation in the enforcement of legal rights. The equitable doctrines of estoppel or waiver may, of course, bar unfair tactics in the enforcement of agreements, but appellants have not raised any such equitable defenses.

In *Mann Farms Incorporated, v. Traders State Bank of Poplar, Montana and Northeast Montana Bank Shares, 801 P. 2d 73, (1990),* in a borrowers bad faith action against the bank for the

Case 1:03-cv-00036    Document 293    Filed 09/17/2004    Page 10 of 51

bank's revocation of conditional loan agreement the Supreme Court held that:

> (1) bank's revocation of its conditional offer to loan money did not offend reasonable commercial standards of fair dealing, and did not result in any breach of implied covenant of good faith and fair dealing; (2) no "fiduciary relationship" existed between bank and potential borrowers, for purpose of breach of fiduciary duty claim; and (3) bank's telephone call to other bank with whom potential borrowers had dealt qualified as legitimate credit check, which would not subject first bank to any liability for interference with borrower's contracts.
> Affirmed.

The Court further stated that tort damages are available, for contracting party's breach of implied covenant of good faith and fair dealing, only if contract involves a special relationship.

Furthermore, plaintiff must show that defendant acted dishonestly or outside of accepted commercial practices in order to deprive plaintiff of benefit of contract, in order to maintain cause of action for breach of implied covenant of good faith and fair dealing, whether action is based in contract or on special relationship criteria giving rise to tort.

In the above case, the Bank did not breach any implied covenant of good faith and fair dealing in revoking conditional commitment to extend financing to customers, where commitment was based on debtor's financial statement, and debtors had failed to disclose $74,000 debt to third party.

Defendant also argues that the Guam Supreme Court has not recognized a separate cause of action sounding in tort for bad faith breach of a commercial contract. Such a breach does not give rise to an independent tort claim, although an exception to this rule may apply in the case of a breach of the covenant by an insurance carrier.

Bad faith actions against insurance companies are indeed abundant in civil cases filed in the courts. Generally these cases are commenced against an insurer by an insured for the

Page 8 of 17

insurer's failure to defend or settle a claim against the insured. These actions have been allowed

because the courts have recognized that insurers owe a certain duty to their insured under the

terms of their contract for insurance. While these bad faith claims have generally been

recognized when filed by the insured (first party claimant), they have been extended to third party

claimants based upon an assignment from the first party and have recently been extended wholly

to third party claimants in certain jurisdictions. These actions all stand for the proposition that a

breach of a duty by an insurer under an insurance contract gives rise to an independent action in

tort for bad faith in favor of the insured, his assignee and even a third party.

The concept of a bad faith action within the context of a breach of a commercial contract

in the banking area is relatively new and changing. Courts are beginning to see that such actions

are plausible in the context of certain pleadings. Some see no difference between the problem of

a bank customer and that of an insured. In *Lee v. Bank of America*, 267 Cal. Rptr. 387 (1990),

Associate Justice Johnson, while concurring in the majority's decision sustaining the bank's

demurrer, stated in dissent:

> In sum, based upon the Supreme Court's analysis of the special relationship test,
> a bank and its customers possess the requisite special relationship which warrants
> permitting the bank customer to proceed on a tort theory of breach of the covenant
> of good faith and fair dealing.
> To deny the existence of this relationship is to deny the realities involved. As we
> move closer and closer to a cashless society we become more and more reliant
> upon the services provided by banks and other financial institutions. If a bank
> so chooses, it may deny its customer access to her money for an indefinite period
> and the bank customer will have no recourse short of litigation. Until that
> litigation is resolved, the customer may be unable to purchase even the most basic
> necessities. I see no difference between this perilous dilemma and that involving
> an insured.

Accordingly, I would hold a bank customer has a cause of action against its bank for breach of the covenant of good faith and fair dealing.

In Garrett v. BankWest, Inc., 459 N.W. 2d 833 (1990), the court stated:

> Garrett cites *K.M.C. Co., Inc. v. Irving Trust Co.,* **757 F.2d 752 (6th Cir.1985)** to support his claim that bad faith existed. **[FN9]** In this case Irving Trust extended K.M.C. $3.5 million in credit. All of K.M.C.'s receipts went into an account controlled by Irving Trust. K.M.C. relied upon the line of credit for its operation since it could not secure other financing on short notice. Without any notice Irving Trust refused to advance any money on the line of credit or to release the account funds. The court held that notice of cutting off the line of credit was a prerequisite to execution of the contract. The failure of Irving Trust to give notice left K.M.C. at its mercy and was a breach of good faith even though *847 Irving Trust had not breached any specific provisions of the contract.

It is abundantly clear, however, as evidenced by the cases cited above, that there is a general rule of law which requires banks to adhere to an implied duty of good faith and fair dealing in its relationship with and toward its customers. See also 55 A.L.R. 4th 1026 (1987), citing UCC and non-UCC cases..

With the above in mind, the Court will address the various claims of the plaintiffs in light of Defendant's arguments.

## I.     BREACH OF COVENANT OF GOOD FAITH.

Plaintiffs allege breach of the covenant of good faith against FHB. Defendant has generally argued that the breach of a commercial contract by the bank does not give rise to an action for bad faith. Defendant is generally correct in that assertion. There are many cases which stand for the proposition that a bank's breach of a certain obligation does not give rise to an independent action for bad faith but rather an action that is based upon a breach of contract.

Case 1:03-cv-00036    Document 293    Filed 09/17/2004    Page 13 of 51

Thus a breach of contract should be the appropriate remedy. The same can be said with insurance contracts. An insured should more appropriately commence an action for breach of contract against its insurer for its failure to defend or settle an insurance claim. However, when the insurer has engaged in bad faith conduct during the course of a third party claim against its insured, the insured may maintain a separate action for the said bad faith.

Following the above analogy, when a customer complains of a breach by a bank of a commercial contract, a breach of contract action should be an appropriate remedy. However, a bad faith action commenced by a customer should not be dismissed simply because there is an available remedy under a breach of contract claim or merely because of the filing of the breach of contract claim. It is after all the general rule of law that a bank is required to adhere to an implied duty of good faith and fair dealing toward its customers. A bank's failure to adhere to this implied duty should not bar a bad faith action merely because there is a remedy in a breach of contract action. Furthermore, the fact that there is such a duty on banks with regards to their relationships with their customers indicate that a bad faith in one that is authorized under the law when facts alleging such bad faith are plead. Plaintiffs must allege some act of dishonesty by the bank and allege that the bank acted outside accepted commercial practices. When Plaintiffs do make such allegations, an appropriate cause of action is raised by the Plaintiff.

In the instant case, the plaintiffs allege various facts which they argue establishes bad faith on Defendant's part. The Court notes that plaintiffs must be given the opportunity to make such an allegation especially at this stage of the proceeding. While the plaintiffs may indeed have a breach of contract claim, an action based upon bad faith may also be commenced based upon the allegations of the complaint. Dismissal of Plaintiffs' cause of action at this stage of the

proceeding is inappropriate. Therefore, the motion to dismiss with regard to the bad faith claim is denied.

## II. BREACH OF LOAN COMMITMENT

In their complaint, Plaintiffs allege that Defendant verbally committed to make a loan to Ada's Inc. for the construction of the Paradise Fitness Center. This loan was to close on or about June, 1998. The loan, however, did not close until January, 1999. The delay in providing the construction loan breached Defendant's verbal commitment to Ada's Inc. and resulted in damages to Plaintiff Ada's Inc. Plaintiffs seek damages as a result of the said breach.

Defendant moves to dismiss the breach action, citing 7 G.C.A. §11305(7). This section provides a three year period of limitation for an action not founded upon an instrument in writing. The Court finds merit in Defendant's motion. In their complaint, Plaintiffs allege Defendant verbally committed to close the Paradise Fitness Loan on or about June, 1998. Thus, any breach on the verbal commitment occurred in June, 1998 and the statute would have accrued then. Applying a three year limitation period, Plaintiffs' breach of commitment action should have been commenced on or before June, 2001. Plaintiffs' did not bring this action until May 31, 2002. Defendant's motion to dismiss the second cause of action is thus granted.

## III.  TORTIOUS INTERFERENCE WITH BUSINESS RELATION

Plaintiffs bring a tort action with regard to Defendant's conduct in relation to the service of notices of assigned rentals. Plaintiffs allege notices were served on tenants whose rentals were not pledged as collateral to Defendant. Furthermore, notices were sent presumably to occupants in buildings not even owned by Plaintiff. Plaintiffs allege that Defendant's purpose was to injure

Page 12 of 17

Ada's Inc. by restricting Plaintiff's cash flow and scaring tenants into moving out or to stop paying rent. Plaintiffs further allege a wrongful and wilful intent to injure, harass, and humiliate Ada's Inc. This interference by Defendant in Plaintiff's relationship with certain of its tenants is the basis of the tortious interference claim.

Defendant argues that Plaintiff's claim, if any, from its action in serving notices of the assigned rentals is one for breach and not for tort. The Court disagrees. As it has pointed out supra, actions of a party with respect to a breach of a contract may lead to a tort action with regard to the same actions. The fact that a party has a remedy for breach under a contract theory does not restrict the same party from filing a tort claim if the other party's action rise to such a claim. The Court must allow Plaintiffs to proceed further in this matter based upon those allegations. The allegations provide relief if proven at trial. Thus, the Court will deny defendant's motion to dismiss the third cause of action-Defendant's tortious interference with Plaintiff's tenants.

## IV.    TORTIOUS INTERFERENCE WITH BUSINESS RELATION

Plaintiffs have also filed another tortious interference claim against Defendant. Therein, Plaintiffs allege that FHB demanded that Ada's Inc. breach its agreement with Rural Development for FHB's benefit. Plaintiffs further allege that this particular conduct of FHB interfered with Plaintiff's business relationship with Rural Development.

Defendant moves to dismiss this claim because the allegations do not establish the essential elements of a tort. The Court agrees. Unlike the first claim of tortious interference, the second claim fails to specify any direct action made or taken by FHB with regard to Rural Development and FHB. The fact that FHB demanded Plaintiff to breach its agreement with

Rural Development without direct action on the part by FHB vis-a-vis Rural Development does not give rise to a tortious interference claim. Defendant's motion is granted.

## V.       PERMANENT INJUNCTION

Plaintiffs seek a permanent injunction against FHB alleging it will suffer irreparable harm and injury unless the Defendant is restrained from moving forward on its attempts to sell Ada Inc.'s property.

Defendant, in its motion papers, fails to address this issue and states only that its motion to dismiss the bad faith claims if granted would dispose of this particular claim for relief. Thus, by Defendant's analogy, if any one of Plaintiff's claims is not dismissed, then the Permanent Injunction remains viable.

## VI.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs last cause of action is their sixth claim. Plaintiff Anthony Sgro seeks damages for intentional infliction of emotional distress by Defendant.

Defendant argues that outrageous conduct, an element of intentional infliction of emotional distress, is not alleged by Plaintiff Sgro in his complaint. Moreover, Sgro has failed to plead essential facts that FHB intended to inflict injury or at least recklessly engaged in conduct "with the realization that Mr. Sgro would be medically or psychologically damaged." Sgro, however, counters by saying that his allegations of bad faith and heavy-handed collection efforts by FHB has caused him to be hospitalized and to seek psychiatric care and medication.

The Court finds that Sgro's allegations of bad faith, coupled with further allegations of underhanded collection efforts on the part of FHB sufficiently raises a prima facie case for

intentional infliction of emotional distress. The Court will therefore deny Defendant's motion to dismiss the sixth cause of action.

## VII.  MOTION TO STRIKE

Defendant has moved the Court to strike paragraphs 4-31, 39, 42, 51, 59, 60-65, and 71-76. Defendant maintains these numbered allegations are immaterial to the complaint. Defendant further describes these allegations as an apparent effort by Plaintiffs to manufacture a basis for tort liability based upon an exaggeration of claims in an attempt to support such tort liability.

Furthermore, pursuant to Rule 12(f), Defendant further moves to strike Paragraphs 42 and 69 and other immaterial allegations.

Paragraph 42 provides:

The proposal offered no real solutions to Ada's Inc.'s decline in revenues. Rather, First Hawaiian's offer was nothing more than a thinly-veiled attempt to grab more collateral to secure its pre-existing loans to the detriment of Ada's Inc. and its other creditors and with the intent to cause the financial demise of Ada's Inc. Ada's Inc. refused to accept such a ridiculous offer, however, it did not stop pursuing a good-faith effort to pursue a realistic work out plan.

Paragraph 69 provides:

Ada's Inc.'s initial loan officer who arranged all the Ada's Inc. loans was former Vice-President Chris Murphy, who has since departed First Hawaiian. Since Mr. Murphy's departure, First Hawaiian officer assigned to Ada's Inc.'s account, Wilton Wong, who has criticized the original loans and done everything he could to raise technical issues and spread negative information about Mr. Sgro and Ada's Inc., rather than work with the company in the manner that banks normally do.

Defendant contends that Paragraph 42 contains impertinent and argumentative allegations while Paragraph 69 constitutes scandalous material. In addressing Defendant's motion to strike, the Court must take into consideration that parties must be allowed to make allegations if

Page 15 of 17

relevant to their cause of action. Plaintiffs sue Defendant for bad faith. Showing bad faith in a commercial setting requires a heavy burden. While Paragraph 69 may appear to be scandalous to a party defending a bad faith action, it may be a necessary component of its pleading when a party is required to show instances of bad faith on Defendant's part. While these allegations are vehemently denied by Defendant, it is an essential element of Plaintiffs' case. Certainly the pleadings evidenced by the said paragraphs and the other paragraphs which Defendant asks the Court to strike may in some form or another show bad faith on the part of Defendant. Because these allegations have some relevancy to the bad faith claim, they should not be stricken by the Court. Again the Court points out that certain of the pleadings, standing alone, may be a basis for a motion to strike. But when viewed in the overall context of the entire pleadings, it may have relevancy to a bad faith claim.

## DITETMINASIÓN[4]

After having carefully considered the arguments of the parties, the Court hereby:

1. Denies the motion to dismiss the claim for breach of covenant of good faith;

2. Grants the motion to dismiss the claim for breach of loan commitment;

3. Denies the motion to dismiss the first tortious interference claim;

4. Grants the motion to dismiss the second tortious interference claim;

5. Denies the motion to dismiss the Permanent Injunction claim;

6. Denies the motion to dismiss the intentional infliction of emotional distress claim;

---

[4]Conclusion

7. Denies the motion to strike Paragraphs 42 and 69 and other paragraphs;

With regard to the dismissed claims, Plaintiffs are granted leave to amend, said amendment, if so exercised, to be filed within ten days from the date of this decision. Defendants are ordered to file a responsive pleading within twenty days from the days hereof or within ten days after amendment of the complaint. *Este i sinneda i Kotte*[5].

So ordered this 7th day of July, 2003.

Joaquin V. E. Manibusan, Jr.
Judge, Superior Court of Guam

I do hereby certify that the foregoing
is a full, true and correct copy of the
original on file in the office of the
clerk of the Superior Court of Guam
Dated at Hagatna, Guam

JUL 0 7 2003

Ann D.L. Rivera
Deputy Clerk, Superior Court of Guam

---

[5]These are the findings of the Court.

Page 17 of 17

LAW LIBRARY

RECEIVED

MAR 2 3 2001

GUAM LAW LIBRARY

**IN THE SUPERIOR COURT OF GUAM**

P.D. Hemlani,                                    )
                                                 )       **CIVIL CASE NO. CV1500-97**
        Plaintiff,                               )
                                                 )
                                                 )       **DECISION AND ORDER**
    vs.                                          )
                                                 )
                                                 )
TICOR TITLE INSURANCE, INC.,                     )
                                                 )
        Defendant.                               )
                                                 )

## INTRODUCTION

The matter before the Court came on Plaintiff P.D. Hemlani's ("Hemlani") Motion for Partial Summary Judgment filed on March 8, 2000. On April 26, 2000, Defendant Ticor Title Insurance, Inc. ("Ticor") filed an Opposition to the motion and also filed its own Motion for Partial Summary Judgment. On December 13, 2000, a hearing was held before the HONORABLE JUDGE STEVEN S. UNPINGCO, who took the matter under advisement. Attorney Jerry J. Tang appeared on behalf of Hemlani and Attorney John A. Spade appeared on behalf of Ticor. After considering the parties' briefs, oral arguments and the applicable law, the Court now issues its Decision and Order.

## BACKGROUND

The underlying facts of this case involve a purchase of land transaction between Minor Basis Corporation and Hemlani on January 16, 1992. The lot in question, Lot No. 220-R1, Piti, was owned by brothers Joseph and George Perez. On January 16, 1992 the parcel was conveyed to Minor Basis in exchange for $74,264.16 plus a purchase money mortgage in the amount of $225,000.00. Joseph Perez conveyed the property on behalf of himself and also purported to act as attorney in fact for George. On the same date, the property was resold to Hemlani for

Case 1:03-cv-00036    Document 293    Filed 09/17/2004    Page 21 of 51

$528,000.00. This included Hemlani taking over or assuming the $225,000.00 mortgage. Also on the same date, Ticor issued a policy of title insurance to Hemlani in the sum of $528,000.00.

On October 21, 1993 Hemlani filed a declaratory judgment action against Minor Basis seeking a determination of the validity of his title. On August 11, 1994 George Perez filed an amended complaint in intervention against Hemlani seeking to quiet title to his undivided one-half interest in the property. George argued that Joseph lacked the authority to convey the property. On September 15, 1994, Ticor was informed of the claim by George and proceeded to assume the defense of Hemlani pursuant to the insurance contract. On April 25, 1996 the Superior Court granted George's motion for summary judgment concluding that Joseph lacked the legal authority to convey the property on George's behalf. George was deemed to own an undivided one-half interest in the property. The judgment became final on June 27, 1997. On the same date, the parties entered into a stipulated judgment ordering partition of the property and decreeing that Hemlani and George each owned a one-half interest. Hemlani then sought compensation for his loss on March 24, 1997, in the amount of $525,000.00. This request was denied by Ticor. The current action was filed on October 27, 1997 seeking monetary damages and attorney's fees. On September 25, 1998 Ticor was able to obtain George's property for $235,000.00. On December 10, 1998 Ticor offered to convey the property to Hemlani in full satisfaction of Hemlani's claim. On December 11, 1998 the offer was refused.

## DISCUSSION

In its motion, Hemlani seeks partial summary judgment on the following issues: 1) Ticor's inability to satisfy its obligations under the insurance policy by tendering title once its litigation to perfect title failed and 2) Ticor's obligation to provide indemnification to Hemlani within 30 days of the adverse judgment. Hemlani argues that certain provisions of the contract make it clear that Ticor could not simply tender title to George's ½ of the property to cure its breach of the policy. Second, Hemlani feels that Ticor was under an obligation to pay the amount of Hemlani's loss within 30 days after the amount of the loss was fixed.

In regards to Hemlani's first argument, he relies on sections 7 and 6 of the title insurance policy. These provide as follows:

Page 2 of 9

7. Limitation of Liability

No claim shall arise or be maintainable under this policy (a) if the company after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise removes such defect, lien or encumbrance or establishes the title or the lien of the insured mortgage as insured, within a reasonable time after receipt of such notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or the lien of the insured mortgage, as insured, as provided in paragraph 3 hereof; or (c) for liability voluntarily admitted or assumed by an insured without prior written consent of the Company.

6. Determination and Payment of Loss

(a) The liability of the company under this policy shall in no case exceed the least of;

(i)   the actual loss of the insured claimant; or
(ii)  the amount of the insurance stated schedule A, or, if applicable, the amount of the insurance as defined in paragraph 2 (a) hereof; or
(iii) if this policy insures the owner of the indebtedness secured by the insured mortgage and provided said owner is the insured claimant, the amount of the unpaid principal of said indebtedness, plus interest thereon, provided such amount shall not include any additional principal indebtedness created subsequent to date of policy, except as to amounts advanced to protect the lien of the insured mortgage and secured thereby.

(b) The Company will pay, in addition to any loss insured against by this policy, all costs imposed upon an insured in litigation carried on by the Company for such insured, and all costs, attorneys' fees and expenses in litigation carried on by such insured with the written authorization of the Company.

(c) When the amount of loss or damage has been definitely fixed in accordance with the conditions of this policy, the loss or damage shall be payable within 30 days thereafter.

Hemlani argues that since Ticor's efforts at litigating the matter failed, Ticor was obligated to indemnify him pursuant to section 7 (b) of the policy. Hemlani further states that Ticor did have other options available to resolve the matter, including clearing title. However, pursuant to section 7 (a) Ticor had to resolve the matter by whatever means before litigation concluded adversely, otherwise, section 7 (b) would become applicable. Since Ticor failed to resolve the matter within a reasonable time after receiving notice of the situation and before litigation failed, Ticor is now obligated to indemnify Hemlani.

In addition to the above, Hemlani argues that section 6 (c) of the policy required that Ticor pay the amount of damage once that amount was fixed. Here, Hemlani argues that once a decision was made in the Superior Court that George Perez was the owner of ½ of the lot, the amount of damage was fixed at ½ the value of the lot. As such, Ticor was obligated to make

payment within 30 days. Since it failed to do so, Ticor is now prevented from tendering title to cure its breach.

In response, Ticor argues that the defect in title obligated them to assume Hemlani's defense against George Perez, which they did. Second, Ticor had the obligation to indemnify Hemlani against loss or damage. Ticor argues that it had many options available to satisfy its obligations while Hemlani argues that Ticor was limited to paying damages.

Ticor argues that its duty to indemnify arose not at the outset, when title was given to Hemlani but only after the judgment in the Superior Court ruled in favor of George Perez. Additionally, Ticor argues that sections 5 and 7 (a) of the contract provide them with numerous options such as settling George's claim or paying monetary damages to Hemlani. Furthermore, section 7 (a) also allows Ticor another option of removing any defects and to secure clear title to the insured property.

Here, Ticor undertook the defense of Hemlani and once that proved unsuccessful, they took steps to purchase George's property and tender it to Hemlani. This was Ticor's option pursuant to section 7 (a). In other words, Ticor took steps to provide Hemlani with clear and unencumbered title. Ticor asserts that Hemlani is now seeking a windfall.

In addition to the above, Ticor argues that the term "reasonable time" contained in 7 (a) is a question of fact defeating summary judgment. Ticor argues that the 17-month delay between the entry of judgment in favor of George Perez and the tender of clear title to Hemlani was a reasonable time. In any event, Ticor argues this is a question of fact. Ticor would like the Court to rule that they had the option of clearing title to the property within a reasonable time in lieu of paying monetary damages. Furthermore, Ticor argues that Hemlani was obligated to provide proof of loss pursuant to section 4 of the policy. However, this was never done. As a result, section 6 (c) was never triggered.

In sum, Ticor argues that Hemlani filed a premature action against Ticor, that it failed to provide proof of loss to set the amount of damages, and that Ticor's obligation to indemnify never arose until after judgment was entered. Despite all of this, Ticor still took steps to remedy the situation by purchasing the property of George Perez and tendering it to Hemlani. Ticor

argues that Hemlani wanted clear title and sued to get it. Now that litigation has failed, Ticor has taken steps to give Hemlani what he wanted. Unfortunately, Hemlani no longer wants title.

**Summary Judgment Standard**

A motion for summary judgment is governed by GRCP 56, which provides that "The judgment sought shall be rendered forthwith if...there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] GRCP Rule 56(c). The party who is seeking summary judgment has the burden to show that there are no genuine issues of material fact. *See* Celotex Corp. v. Katrett, 477 U.S. 317, 106 S.Ct. 2548 (1986). Moreover, once the moving party has met this burden, the nonmoving party must come forward and make some affirmative showing with specific acts that evidence exists to support its claims and that there is a genuine issue of material fact for trial. *Id. See also* Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).

"A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit..." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987). If the movant can demonstrate that there are no genuine issues of material fact, the non movant cannot rely merely on allegations contained in the complaint, but must produce at least some significant probative evidence tending to support the complaint. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 25050, 2510 (1986).

Where credibility is at issue, summary judgment may not be granted. Only after an evidentiary hearing or full trial can credibility issues be appropriately resolved. S.E.C. v. Koracorp Industries, Inc., 575 F.2d 692, 698 (9th Cir.1978), cert denied, 439 U.S. 953 (1978). Discretion plays no real role in the grant of summary judgment. Id.

In addition, the court must view the evidence and draw inferences in the light most favorable to the nonmovant. E.E.O.C. v. Local 350, Plumbers and Pipefitters, 982 F.2d 1305, 1307 (9th Cir.1992). The "court's ultimate inquiry is to determine whether the 'specific fact' set

---

[1] Summary Judgement must be granted "forthwith," unless the court determines that further time for discovery should be allowed. *See* GRCP 56(f).

Page 5 of 9

forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Serv., 809 F.2d at 631.

"A title insurance policy is not an agreement to guarantee the state of the title but is, rather, an agreement to indemnify the policy-holder." D. Barlow Burke, Jr., Law of Title Insurance, 2nd Ed., § 2.1.1 (1993) (citing Ortego v. First American Title Ins. Co., 569 So. 2d 101 (La. Ct. App. 1990)). In construing a policy of title insurance, rigid rules of title law have been held not to apply, and the nature and purpose of the contract and the reasonable requirements of the underwriter are the controlling considerations. *See* Summonte v. First American Title Ins. Co., 436 A.2d 110 (1981). Also, title insurance policies should be liberally construed in favor of the insured. Overholtzer v. Northern Counties Ins. Co., 116 Cal.App.2d 113, 122 (1953). Ambiguities in the policy are to be resolved in favor of the insured. *See* Paramount Properties Co. v. Transamerica Title Ins., 1 Cal. 3d 562 (1970).

Here, under the terms of the policy, including the sections quoted above, the Court finds that Ticor had several options available to remedy the situation. Ticor could settle the claims, defend Hemlani against George Perez's claim, or pay the amount of the insurance and terminate its liability under the policy. *See* Sections 3 (c), 5, and 7 (a) of the Title Insurance Policy.[2] These options are expressly contained in the insurance policy. Furthermore, these options are clear, unambiguous, and not capable of any other interpretation. What the contract does not provide, is that once the insurer decides to defend the insured or for any other reason chooses to litigate, it is permanently foreclosed from pursuing any other option to resolve the situation in the insured's favor. Plaintiff's interpretation of the contract is unsupported by the policy's language or by applicable case law.

---

[2] Section 3 (c) provides as follows: The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured; and the Company may take any appropriate action, whether or not is shall be liable under the terms of this policy, and shall not thereby concede liability or waive any provision of this policy.

Section 5 provides in part as follows: The Company shall have the option to pay or otherwise settle for or in the name of an insured claimant any claim insured against, or to terminate all liability and obligations of the Company hereunder by paying or tendering payment of the amount of insurance under this policy.

Plaintiff's interpretation of the contract appears to hinge on the importance of section 7 (b) of the policy. Plaintiff feels that this section gives Plaintiff the right to collect on the insurance policy since the adverse judgment fixed the amount of loss at ½ the value of the property. The Court is not convinced by Plaintiff's interpretation. Instead, the Court finds that once litigation failed, section 7 (b) gave Plaintiff the right to sue Ticor and seek indemnification for its losses. However, the fact that Plaintiff could sue does not mean that Ticor was foreclosed from pursuing its other options expressly contained in the policy. The policy does not state so and neither does any case cited by the Plaintiff.

A case near in point to the present case is Nebo, Inc. v. Transamerica Title Ins. Co., 21 Cal. App. 3d 222 (1971). In Nebo, Transamerica attempted to perfect title through litigation but lost. However, Transamerica subsequently acquired good title by purchase rather than litigation. Despite Transamerica's efforts, the Court ultimately ruled in favor of Nebo since the title acquired by Transamerica was not what Nebo had bargained for in the transaction. Nebo, Inc. v. Transamerica Title Ins. Co., 21 Cal. App. 3d 222, 228-29 (1971). The Court, however, did not have any problem with Transamerica's post litigation efforts. What Nebo shows is that a title insurance company can perfect title or otherwise settle claims even after litigation had failed. So long as title is perfected within a reasonable time, the insured would have no claim against the title insurance company.

In the present case, it is undisputed that Ticor promptly assumed the defense of Hemlani once Hemlani demanded that it do so. Ticor assumed the defense by paying Hemlani's attorneys' fees and costs associated with litigating the adverse claim filed by George Perez. Thus, it is clear that Ticor complied with its duty to defend. In fact, there has been no claim that Ticor failed in this respect. Due to the circumstances of this case, Ticor had very little choice but to defend Hemlani. George Perez's claim went straight to the heart of Hemlani's title and was therefore covered by the title insurance policy. Although Ticor defended against the claim, it was not prohibited from exploring other options to settle the claim and tender clear title to Hemlani within a reasonable time, as provided for in the policy. Otherwise, Ticor would be in a very precarious situation, having to choose between defending against the claim and trying to

settle the matter through other means. Under Plaintiff's interpretation, Ticor could only do one or the other, it could not choose to defend the ongoing action while at the same time explore other avenues should litigation fail. Hemlani believes that Ticor could either defend the action or settle the claim, not both. The Court finds this interpretation to be illogical and unsupported by the facts and the law.

Although Ticor had several options available, there was still the possibility that it would have to indemnify Hemlani in accordance with the terms of the policy if Ticor was unable to remedy the situation within a reasonable time. *See* Nebo, 21 Cal. App. 3d at 228. Once a reasonable time had passed and the efforts of the title insurance company have not resulted in perfect title, then the insured would be entitled to collect on the policy. At that point the insured would have suffered a loss upon which he or she may collect on the title insurance policy. *See* James M. Pedowitz, Esq., *25 Common Questions About Title Insurance*, Title Insurance: The Lawyer's Expanding Role, 1985, at 561. Therefore, an aggrieved insured would be able to collect on the policy and would not be forced to wait in limbo before it could seek indemnification. In this particular case, since litigation had ended, Hemlani was perfectly within his rights to sue, however, the resolution of his case would depend on whether Ticor was able to perfect title within a reasonable time.

The Court's finding that Ticor is not prohibited from perfecting title after earlier litigation efforts have failed does not entirely resolve the present motion. The Court must make clear that it is not forcing Hemlani to accept Ticor's tender of title. The Court merely finds that Ticor was not foreclosed from attempting to perfect title once litigation failed. The ultimate resolution of this case would depend on how several outstanding issues are addressed by this Court in future hearings. Specifically, the Court finds that genuine issues of material fact exist which must be resolved at trial.

First, and most importantly, the issue of whether Ticor perfected title within a reasonable time is a question of fact. *See* Nebo, 21 Cal. App. 3d at 228. What constitutes a reasonable time would depend upon the situation of the parties, the nature of the transaction, and the facts of the particular case. Id. (citations omitted). Second, it is unclear whether the insured, Hemlani,

furnished the required proof of loss in accordance with section 4 of the title insurance policy. Although Hemlani made some mention of meeting this requirement during the hearing, the Court is not satisfied that the issue is resolved and further inquiry is required. Third, the Court also finds that the issue of whether the amount of loss or damage had been definitely fixed in accordance with the conditions of the policy is still unresolved. These issues of fact are central to this case and must be resolved before a final judgment may be rendered. Therefore, summary judgment is unwarranted at this time.

## CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Partial Summary Judgment is hereby DENIED. Defendant's Motion for Partial Summary Judgment is hereby GRANTED.

SO ORDERED this 2 1 day of March, 2001.

**HONORABLE STEVEN S. UNPINGCO**
**Judge, Superior Court of Guam**

I do hereby certify that the foregoing
is a full true and correct copy of the
original on file in the office of the
clerk of the Superior Court of Guam

Dated at Hagatna, Guam

MAR 2 1 2001

Cynthia T. Tuong
Deputy Clerk, Superior Court of Guam

# IN THE SUPREME COURT OF GUAM

### ANDREW M. GAYLE,
Plaintiff/Counter-Defendant/Appellee

#### vs.

### P. D. HEMLANI,
Defendant/Counter Claimant/Appellant

---

### HOWARD TRAPP,
Plaintiff/Counter-Defendant

#### vs.

### P. D. HEMLANI,
Defendant/Counter Claimant-Appellant

Supreme Court Case No. CVA99-047
Superior Court Case Nos. CV0074-98 and 0325-98

## OPINION

### Filed: September 8, 2000

### Cite as: 2000 Guam 25

Appeal from the Superior Court of Guam
Argued and submitted on June 15, 2000
Hagåtña, Guam

Appearing for the Defendant/Counter-
  claimant/Appellant:
Steven A. Zamsky, Esq.
ZAMSKY LAW FIRM
Suite 501, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910

Appearing for the Plaintiff/Counter-
  Defendant/Appellee:
Duncan G. McCully, Esq.
McCULLY & BEGGS, P. C.
Suite 200, 139 Murray Blvd.
Hagåtña, Guam 96910

BEFORE: BENJAMIN J. F. CRUZ, Chief Justice, PETER C. SIGUENZA, Associate Justice and JOHN A. MANGLONA, Designated Justice.

**SIGUENZA, J.:**

[1]      The Appellant, P.D. Hemlani, appeals an adverse decision of the Superior Court of Guam on a Motion for Summary Judgment by Appellees Andrew M. Gayle and Howard Trapp. We agree with the lower court's disposition of the Appellant's counterclaims of breach of fiduciary duty, constructive fraud and professional negligence, and therefore affirm its decision in the entirety.

## I. PROCEDURAL AND FACTUAL BACKGROUND

[2]      On June 15, 1971, ABC Company of Guam (hereinafter "ABC") entered into an Option Agreement with Jose L.G. Crisostomo. The Option gave ABC the right to purchase certain real property located in Inarajan, Guam. It was anticipated that Jose L.G. Crisostomo would obtain ownership from the estate of Crisostomo's father, for which he had been appointed administrator. However, Jose L.G. Crisostomo died shortly thereafter, and probate was opened for his estate. (In the Matter of the Estate of Jose Leon Guerrero Crisostomo, Island Court Probate Matter No. 114-71). In December of 1971, the administrator of his estate filed a Petition with the Island Court to order and approve the sale and conveyance of the subject property to ABC. Ostensibly, the court granted the Petition, conditioned upon the closure of Mr. Crisostomo's father's probate.[1]

---

[1]Neither party was able to provide a copy of the order. The essentials of the order, however, were contained in the preliminary recitals of the subsequent extensions of the Option Agreement.

[3]     On January 4, 1972, ABC, as seller, and P.D. Hemlani (hereinafter "Hemlani"), as buyer, executed

an Option Agreement. In consideration for the payment of $2,000.00, Hemlani was given the exclusive

option to purchase the subject property at a higher price than what ABC would have paid in the exercise

of its option. The Option Agreement contained the following recital:

> 7. *Representation*. The Seller warrants and represents that the grant of this option is
> contingent upon the Island Court of Guam authorizing the sale of said real property from
> the estate of Jose Leon Guerrero Crisostomo (Probate Matter 114-71). In the event the
> Island Court shall fail to authorize the sale the Seller shall refund to the Buyer the full
> amount of the option payment.

Further, the Option Agreement, by its terms, provided that Hemlani had by February 12, 1972, to exercise

the option.

[4]     However, on February 10, 1972, ABC and Hemlani executed the first of two extensions of the

Option Agreement. In addition to extending the time within which Hemlani could exercise the option to

purchase from February 12, 1972 to August 12, 1972, it also was provided that:

> "Said ABC Company does further agree to exercise all diligent and reasonable efforts to
> assist in the closing of the probate matters which have prevented the said company from
> now conveying title to the said lots."

[5]     The second extension was executed by the parties on October 12, 1972, and again extended the

time for exercise of the option "until execution by the administrator of the estate of the agreement of sale"

of the Inarajan property has been made in the estate of Jose Leon Guerrero Crisostomo.

[6]     On November 29, 1973, Robert E. Shelton, then-counsel for Hemlani, requested an update of the

status of the probate matter and documentation of any and all efforts made to assist in the closing of the

matter. It was asserted that Hemlani was ready, willing and able to perform under the terms of the option

and extension; and, if the documentation requested was not received, that he would take whatever steps were proper.

[7]     In 1974, Hemlani, now represented by attorney Jack A. Rosenzweig, filed suit against ABC Company in the Superior Court of Guam, Civil Case No. CV 0806-74, for the specific performance of the Option Agreement. During the course of discovery, it was learned that Andrew M. Gayle and Howard Trapp (hereinafter "Gayle" and "Trapp", respectively) were partners in ABC. At all relevant times, both Gayle and Trapp were attorneys licensed to practice in Guam. We further observe that the firm of Trapp & Gayle represented the administrator of the Estate of Jose L.G. Crisostomo.

[8]     On February 17, 1978, Hemlani, ABC Company, Gayle and Trapp stipulated to the dismissal, with prejudice, of the suit. As part of the stipulated dismissal, the parties executed a Revised Option Agreement which purported to reaffirm the grant of the option to purchase originally given on January 4, 1972. The Revised Option Agreement provided that Hemlani would have until February 17, 1983, to exercise the option to purchase. The Agreement further affirmed the other terms of the original Option with some modification as to the schedule of payments. The Revised Agreement reiterated the fact that the court had permitted the administrator of the estate of Jose L.G. Crisostomo to execute an agreement to sell the property to ABC but only upon the closing of the estate of Crisostomo's father; and further stated that ABC, Gayle and Trapp, collectively "seller", agree to:

> [U]ndertake to obtain the closing of the said estate of Joaquin Maria Crisostomo so that the Property will be distributed to the estate of Jose Leon Guerrero Crisostomo and thereafter the Seller shall obtain equitable title thereto by means of an executed and approved contract of sale from the estate of Jose Leon Guerrero Crisostomo, pursuant to the order of the Court. Such efforts shall be at no cost to the Buyer.

---

**[9]**    On March 4, 1980, a little over two years after the Revised Option Agreement had been executed, Rosenzweig inquired of Gayle and Trapp the status of the estate of Joaquin Maria Crisostomo, and requested a plan of action for resolution of the probate matter. Rosenzweig again communicated to Gayle and Trapp on January 26, 1981, about concerns that the property had a tax lien imposed upon it and of his disappointment that progress had not been made to clear up title on the property because an adverse claimant in the probate case had not been available. Moreover, it was stated that:

> I cannot impress too much upon you the fact that my client is coming to the belief that your client (i.e. Messrs. Trapp & Gayle) are merely stringing him along and have no intention of ever clearing up the title to the lots, thus preventing him from exercising the option in a meaningful manner. I have kept Mr. Hemlani at bay by insisting that responsible individuals would not recommit themselves to an option as Howard and Andy did, unless they were confident that they could fulfill the promises that they made regarding title. As time goes on and on and on without there being any discernible progress in clearing up the title difficulties, I lose more and more credibility with my client who is inclined to take the hard-line approach. I have no doubt that the time is getting closer when my client will either recommence litigation or simply take the case from this office and place it in the hands of an attorney who is less patient and amiable than I. I would expect that any subsequent litigation would not be limited to merely a breach of contract claim, but would also raise issues of fraud and bad faith.

**[10]**    The Revised Option Agreement was extended, in writing, on September 13, 1983. It provided that Hemlani would have until July 17, 1985 to exercise the option and that ABC agrees to "continue to undertake to obtain the closing of the Estate of Joaquin Maria Crisostomo".

**[11]**    On November 1, 1985, an Extension to Option Agreement was filed with the Department of Land Management which provided, *inter alia*, (1) that ABC shall have until January 1, 1987 to undertake the closing of the Estate of Joaquin Maria Crisostomo; (2) that the deadline for Hemlani's exercise of the option is extended to July 17, 1988; and (3) that the instrument dated October 29, 1985, be retroactively effective

as of July 17, 1985. All other terms of the various agreements would remain in full force and effect.

[12]     On September 6, 1988, Hemlani's new counsel, Jerry E. Hogan, had written to Gayle's attorney requesting an update. In addition, the letter alleged that Hemlani had even paid real property taxes at the request of Gayle. On December 23, 1988, ABC's counsel responded and confirmed that ABC was not delaying the matter to defeat Hemlani's option rights. Another letter was sent by Hogan on December 30, 1988. In that letter, ABC's attorney, by way of acknowledgement dated February 10, 1987, agreed that Hemlani was to have ten days to exercise the option to purchase after ABC Company obtained ownership of the property and notified Hemlani of the same in writing.

[13]     Hogan wrote to Gayle on February 9, 1989, and requested Gayle's position on whether Hemlani's option had been forfeited. Additionally, Hogan stated that "I must insist that this question be resolved. My client is pushing me to resolve this matter and has authorized me to file a declaratory judgment action if need be."

[14]     On March 16, 1993, Hemlani 's counsel informed Gayle of his intention to sue. It appeared that nothing happened until February 3, 1994, when Hemlani's counsel gave notice to Gayle again of his intention to maintain an action against the principals of ABC Company if Gayle failed to file a motion in the probate case to seek enforcement of the original option agreement entered into by the parties. On April 22, 1994, ABC Company filed a Petition with Decree Confirming Contract for Sale and Order of Conveyance of Real Estate in the probate case for Jose Leon Guerrero Crisostomo. An Objection to the Petition was filed on July 13, 1994. On September 17, 1996, the Petition of ABC Company was dismissed with prejudice by stipulation.

---

**[15]**    It is undisputed that Gayle and Trapp and their various law offices did legal work for Hemlani. In

addition, it appeared that Trapp assigned all of his interest in ABC Company to Gayle around March of

1994.

**[16]**    On January 9, 1998, Gayle filed a Complaint in the Superior Court of Guam, Civil Case No.

CV0074-98, requesting a declaratory judgment that the Option Agreement was void and of no effect, that

its enforcement was barred by the applicable statutes of limitations, and that Hemlani was barred under the

doctrine of collateral estoppel and *res judicata* from pursuing any claims against Gayle. Hemlani,

represented by present counsel, filed his Answer and Counterclaim basically admitting a majority of the

allegations in the Complaint. He asserted as counterclaims: (1) professional negligence; (2) breach of

fiduciary obligation; and (3) constructive fraud. On February 6, 1998, Trapp filed a similar complaint

against Hemlani, Superior Court of Guam Civil Case No. CV0325-98. Hemlani filed his answer and

counterclaim against Trapp. On October 15, 1998, both cases were consolidated.

**[17]**    On March 8, 1999, Gayle filed a Motion for Summary Judgment which prayed for a declaration

that he had no liability other than the return of the payment made by Hemlani for the option and for dismissal

of Hemlani's counterclaims because (1) they were barred by the relevant statute of limitations, (2) they

failed to state a claim upon which relief can be granted, (3) the counterclaims are based in part on claims

which were raised or should have been raised in the 1974 litigation between the parties and are therefore

precluded by *res judicata*, or (4) that Hemlani was precluded from basing any claim for damages on any

transaction or event which occurred prior to the dismissal of the 1974 litigation.

**[18]** The matter came before the trial court for hearing on April 28, 1999. In its written Decision and Order of May 13, 1999, the trial court granted Gayle's Motion for Summary Judgment and held that Hemlani's only remedy was the return of the option payment. The court below found that 7 GCA § 11305 barred Hemlani's breach of fiduciary duty claim. It reasoned that any awareness Hemlani had of any injury and any fiduciary relationship between the parties had vanished as of 1974 when Hemlani first filed suit. The court rejected Hemlani's argument that the limitations period was tolled until 1996 because he could not have been aware of the breach until ABC had withdrawn its Petition in the probate proceedings. However, the court held that Hemlani was not able to advance an issue of material fact as it related to the existence of a fiduciary duty between the parties to survive summary judgment. Additionally, the court found that the constructive fraud claim was similarly barred by the statute of limitations. Similar to its analysis with respect to the fiduciary duty claim, the court concluded that any confidential relationship terminated upon the filing of the 1974 lawsuit. Finally, the court rejected Hemlani's claim for professional negligence finding that Hemlani was not an intended beneficiary of Gayle's representation of ABC Company. The court concluded that Hemlani was entitled only to a refund of the option payment.

**[19]** With respect to Trapp, the court found that some aspects in that case were not briefed by either party and that it would be inappropriate for it to rule on Hemlani's counterclaims against Trapp. Judgment was entered on October 19, 1999 dismissing Trapp's complaint and Hemlani's counterclaim without prejudice (CV0325-98) but ordering Hemlani's counterclaim against Gayle dismissed with prejudice and ordering the refund of the option payment (CV0074-98). By agreement of the parties, only the case involving Gayle is the subject of the instant appeal.

## II. DISCUSSION

[20]     Jurisdiction is not disputed and is found pursuant to Title 7 Guam Code Annotated §§ 3107 and

3108(a) (1994 ). We review a grant of summary judgment *de novo*. *Guam v. Marfega Trading*, 1998

Guam 4, ¶ 9; *Kim v. Hong*, 1997 Guam 11, ¶ 5; *Iizuka Corporation v. Kawasho Int'l*, 1997 Guam 10,

¶ 7. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Guam

R. Civ. P. 56(c) (1995). There is a genuine issue if there is "sufficient evidence "which establishes a factual

dispute requiring resolution by a fact-finder. *Iizuka*, 1997 Guam 10 at ¶ 7 (citation omitted). However, the

dispute must be as to a "material fact." *Id*. "A 'material' fact is one that is relevant to an element of a claim

or defense and whose existence might affect the outcome of the suit. . . Disputes over irrelevant or

unnecessary facts will not preclude a grant of summary judgment." *Id.*

[21]     If the movant can demonstrate that there are no genuine issues of material fact, the non-movant

cannot merely rely on allegations contained in the complaint, but must produce at least some significant

probative evidence tending to support the complaint. *Id*. at ¶ 8 (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986)). In addition, the court must view the evidence and

draw inferences in the light most favorable to the non-movant. *Id.* (citation omitted).

[22]     The trial court's determination that the claims advanced by Hemlani were time-barred by the

relevant statute of limitations, is reviewed as a question of law, *de novo. Grimmett v. Brown*, 75 F. 3d

506, 510 (9th Cir. 1996); *Washington v. Garrett*, 10 F. 3d 1421, 1429 (9th Cir. 1993). When the statute

of limitations begins to run is also question of law reviewed *de novo.I n re Hanna*, 72 F. 3d 114, 115 (9th

Cir. 1996). However, if the question turns on what a reasonable person should know, a mixed question

of law and fact is presented, and the lower court's conclusion is reviewed for clear error. *Rose v. United*

*States*, 905 F. 2d 1257, 1259 (9ᵗʰ Cir. 1990) (citation omitted).

[23]     The court below, and the parties agreed, that the relevant statute of limitations applicable to

Hemlani's causes of action for breach of fiduciary duty and constructive fraud was found pursuant to Title

7 GCA Section 11305 which provides, in relevant part:

>     Within Three Years--.
>
> > (4) An action for relief on the ground of fraud or mistake. The cause of
> > action in such case not to be deemed to have accrued until the discovery
> > by the aggrieved party of the facts constituting the fraud or mistake.

7 GCA § 11305 (1996).

[24]     We have held that the statute of limitations will begin to run when the plaintiff suspects or should

suspect that his injury was caused by wrongdoing or that someone has done something wrong to him.

*Custodio v. Boonprakong et. al.*, 1999 Guam 5, ¶ 27 (interpreting the discovery rule in the context of

Title 7 GCA § 11308 (1994) with respect to a medical malpractice claim) (citation omitted). Further, we

observed that:

> A plaintiff need not be aware of the specific acts necessary to establish the claim. . . .
> [o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, he
> must decide whether to file suit or sit on his rights. . . Consequently, if a suspicion exists,
> the plaintiff cannot sit back and wait for the facts to find him as the burden of finding the
> facts falls upon his shoulders.

*Id.* (citations and internal quotations omitted).

[25]     The existence of a fiduciary relationship between the parties is a fact to consider in determining

whether a plaintiff has exercised reasonable diligence in the inquiry of the existence and cause of his injury.

*See Bourland v. Salas*, DCA Civ. No. 82-0224A, 1986 WL 68919 (D. Guam Ap. Div., Oct. 24, 1986)

(citation omitted). However, although the   relationship does relax the requirement of diligent inquiry,

discovery does not mean actual knowledge. *Id.* at \*4.  Discovery occurs when a plaintiff could have

discovered the wrongful acts with reasonable diligence. *Id.* (citation omitted).  Reasonable diligence is

tested by an objective standard, and when the uncontroverted evidence irrefutably demonstrates that the

plaintiff discovered or should have discovered the fraudulent conduct, the issue may be resolved by

summary judgment. *Id.* (citations omitted).


## A.  BREACH OF FIDUCIARY DUTY CLAIM

[26]     Turning to Hemlani's first cause of action, the issue is whether this particular claim was brought

within the limitations period of three years. Examining the record before us we conclude that any breach

of a fiduciary claim that Hemlani could have asserted against Gayle was time-barred.

[27]     We have dealt with a case involving the allegation of the breach of fiduciary duty owed by an

attorney to his client. *See Estate of Benavente v. Maquera*, 2000 Guam 9. In that case, we analogized

the attorney-client relationship with that of a beneficiary-trustee relationship, and held that there is a

rebuttable presumption that "[t]ransactions between an attorney and client where an attorney obtains an

advantage from his client are presumed to be without sufficient consideration and under undue influence

exercised by the attorney." *Id.* at ¶ 15. (citing *Oliker v. Gershunoff*, 195 Cal. App. 3d 1288, 1294

(1988)). The primary effect of the presumption is to shift the burden of proof to the attorney. *Id.* We

further held that:

> In order for an attorney to overcome the presumption of undue influence which arises
> where the attorney enters into a business transaction with his client, the attorney is required
> to establish by "clear and satisfactory" extrinsic evidence that: (1) the business transaction
> entered into between the attorney and client had been equitable to the client in all material
> respects; (2) prior to entering into the business transaction with the client, the attorney
> made full disclosure to the client of all material information relating to the business
> transaction; and (3) the client had consented to the business transaction after full disclosure
> had been made by the attorney to the client.

*Id.* at ¶ 16. (citation omitted).

[28]    It is not necessarily determinative that the representation may have concluded before the transaction

was entered. A transaction between an attorney and his former client must be scrutinized for signs of

unfairness despite the fact that the attorney-client relationship has terminated for most purposes.

*Hunniecutt v. State Bar*, 44 Cal. 3d. 362, 371-372, 243 Cal.Rptr. 699 (Cal. 1988).

> Since the duty of fidelity and good faith arising out of the confidential relation of an attorney
> and client is founded, not on the professional relation *per se*, but on the influence which the
> relation creates, such duty does not always cease immediately upon the termination of the
> relation but continues as long as the influence therefrom exists.

*Id.* at 372 (citing *Colstad v. Levine*, 67 N.W.2d 648, 654-655 (Minn. 1954)). Thus, insomuch as a

fiduciary obligation is owed by an attorney to a current or former client in a transaction wholly unrelated

to the representation, it is relevant to make an inquiry into whether the influence of the relation still exists

at the time of the transaction.

//

//

[29]    In this case, it was undisputed that Hemlani frequently utilized Gayle's services on other legal

matters before and after the original option agreement between ABC and Hemlani was executed. It is also

undisputed that Gayle had not disclosed his involvement as a partner in ABC Company to Hemlani and that

he was unaware of the fact that Gayle represented the administrator of the Estate of Crisostomo, the

original owner of the subject of the property, at the time of the Option Agreement. On these fact alone,

it is very obvious that Gayle breached his duty to Hemlani by his self-dealing and non-disclosure of his

interest in the transaction. However, it can not be disputed that Hemlani knew or should have known of

the breach, at the latest, by the time it was disclosed during the discovery conducted in the 1974 litigation.

Thus, any suit should have been brought within three years of its discovery in June 1976.

[30]    We find incredulous Hemlani's contention that even after the 1974 litigation between himself and

Gayle was terminated, he could still assert a breach of fiduciary duty against Gayle. In examining the nature

of a fiduciary or confidential relationship, one California court has found that:

> The essence of a fiduciary or confidential relationship is that the parties do not deal on
> equal terms, because the person in whom trust and confidence is reposed and who accepts
> that trust and confidence is in a superior position to exert unique influence over the
> dependent party.

*Barbara A. v. John G.*, 145 Cal. App. 3d 369, 383, 193 Cal. Rptr. 422, 431-432 (Cal. Ct. App. 1983).

Thus, if the basis of the duty of fidelity and good faith and fair dealing arises not from the professional

relation *per se* but from the influence the relation creates, then the ultimate issue before this court is whether

Hemlani has come forward with evidence that demonstrates the existence of a genuine issue of fact,

specifically, that he could have reposed trust and confidence even after he discovered Gayle's infidelity.

[31]    Hemlani attempts to create a genuine issue of material fact by averring in his affidavit in support of

the opposition to summary judgment that he had trust and confidence in Gayle and his firm. However, the

evidence militates against a finding that Hemlani reposed within Gayle the trust and confidence typical in

a fiduciary relationship as attorney-client. The record here indicates that Hemlani employed several

attorneys to follow up on his interest in the exercise of the option. Mr. Rosenzweig's letter of January 26,

1981, indicated Hemlani's discontent with and suspicion of Gayle in his conduct to date on the issue of

clearing up the title to the property. Moreover, Rosenzweig further represented to Gayle that Hemlani was

more inclined to seek resolution via litigation and that it was his opinion that issues of fraud and bad faith

could also be raised. Hemlani's subsequent counsel, Mr. Hogan, consistently sought to follow up on the

status of the property's title. In a letter of February 9, 1989, Mr. Hogan indicated that Hemlani wanted to

file a declaratory action. Over the passage of time, the record seems to indicate that Hemlani's legal

representatives were diligent in their followup and aggressively seeking action from Gayle.

[32]    Moreover, the Revised Option Agreement of February 17, 1978 and Gayle's conduct provide

no basis for liability for the breach of fiduciary duty. Gayle's involvement with ABC Company and of his

firm's representation in the probate matters were fully disclosed to Hemlani. Hemlani consented to entering

into the Revised Option Agreement despite the disclosure and he had independent counsel throughout. In

terms of the equity of the transaction, Hemlani paid a potentially refundable $2,000 for the right to purchase

property from ABC. ABC's ownership of the property was also contingent upon the confirmation of sale

from the court in the probate matter. Thus, it does not appear that the transaction itself was not inequitable

on its face and that Gayle and Hemlani stood as ordinary parties to a contract and not in any confidential

relationship.

### 1. Continuing Wrong Doctrine

[33]     Hemlani argues that the cause of action accrued when Gayle's firm stipulated to the dismissal of

its petition to confirm the sale to ABC in the probate matter. To escape the operation of the statute of

limitations, Hemlani asserts that the facts justify application of the continuing wrong doctrine enunciated in

the case of *Tiberi v. Cigna*, 89 F. 3d 1423 (10th Cir. 1996). In that case, the Tenth Circuit Court of

Appeals articulated the doctrine as follows:

> In actions for relief, on the grounds of fraud or mistake . . . the cause of action shall not be
> deemed to have accrued until the fraud [or] mistake . . . shall have been discovered by the
> party aggrieved. . . . Normally, the limitations period begins to run when the plaintiff
> discovers the fraud or when, with reasonable diligence, the plaintiff could have discovered
> the fraud. . . . Under the continuing wrong doctrine, however, where a tort involves a
> continuing or repeated injury, the cause of action accrues at, and limitations begin to run
> from, the date of the last injury. . . . In other words, the statute of limitations does not begin
> to run until the wrong is over and done with.

*Id.* at 1430-1431. (citations and internal quotations omitted). In addition, the doctrine cannot be utilized

where a plaintiff's injury is definite and discoverable, and nothing prevents him from coming forward to seek

redress. *Id.* at 1431.

[34]     In *Tiberi*, the plaintiff brought an action against an insurance company for breach of contract, fraud,

misrepresentation, and unfair trade practices. In the original complaint, he alleged that the defendant's

misleading conduct subjected it o liability for *inter alia* constructive fraud, fraud, and negligent

misrepresentation. The appellate court held that there was a genuine issue of material fact as to whether

the statute should have been tolled by virtue of the continuing wrong doctrine. *Id.* at 1430. The court

he

rejected the defendants' argument that the continuing wrong doctrine was inapplicable because the plaintiff

had known of his injury and the cause thereof since at least four years before the final misrepresentation

was made. *Id.* 1431. The court held that the plaintiff should not be penalized for his delay because it was

defendant's misrepresentations that prevented him from ascertaining the cause of his injury. *Id.*

[35]     Hemlani contends that, like the plaintiff in *Tiberi*, he was subjected to numerous false

representations that tolled the statute. He argues that he was led to believe that the process of ABC's

assumption of title in the probate proceedings was continuing and that he had no knowledge of any breach

of fiduciary duty until Gayle had essentially prevented Hemlani from meaningfully exercising his option to

purchase with ABC by dismissing the petition. It was at that time, Hemlani argues, his cause of action

accrued because it was the final act of a continuing course of misconduct and only at that time could he

have realized any damages.

[36]     However, Hemlani misapprehends the applicability of the doctrine announced in *Tiberi*. As

discussed above, the breach of any fiduciary duty because of non-disclosure of a conflict would have

accrued as of three years after his discovery, at the latest in August 1979. Entering into the Revised Option

Agreement and the subsequent extensions, Hemlani had full disclosure, consented to, and received the

benefit of independent counsel. Any breach or non-performance on Gayle's part of the Option Agreement

consequently sounds in contract, rather than on the basis of any breach of fiduciary duty. Moreover, unlike

the plaintiff in *Tiberi*, Hemlani was not so beholden to Gayle's interests in the transaction that he could

invest a great deal of trust in Gayle. To the contrary, it is evident that he was aware of the adversarial nature

of his relationship with Gayle because he continually and aggressively sought performance from Gayle.

## 2. Estoppel

[37]      In a somewhat related argument, Hemlani alleges that Gayle is estopped from asserting the defense

because the issue of whether or not he was lulled into inaction as a result of Gayle's representations, is an

issue of material fact and summary judgment is precluded. In support of the argument, Hemlani cites to the

case of *Interdonato v. Interdonato*, 521 A. 2d 1124 (D.C. Ct. App. 1987). There the court observed

that "[a] defendant is estopped from asserting the statute of limitations as a bar to plaintiff's action if he has

done anything that would tend to lull the plaintiff into inaction and thereby permit the statutory limitation to

run against him." *Id.* at 1135. (citations omitted). The district court found that issues of material fact existed

as to whether the defendant was estopped from asserting the limitations bar. *Id.* In particular, because the

plaintiff had alleged that promises were made which lulled her into inaction from bringing her suit for breach

of fiduciary duty and fraud and the defendant had denied making such promises. *Id.*

[38]      However, in this case Hemlani was already aware of a breach of fiduciary duty owed to him by

Gayle as early as 1976. The flaw in Hemlani's argument is that it presumes that a fiduciary obligation inured

to his benefit; but, as discussed above, Gayle and Hemlani merely stand in relation to each other as parties

to a contract. While the issue of estoppel may be relevant for a cause of action for breach of contract or

maybe for fraud, the cause of action for breach of fiduciary duty was time-barred.

[39]      Therefore, we find that Hemlani could not have or, in fact, have ever reposed the trust and

confidence in Gayle typical of a fiduciary relationship after the 1974 litigation. We see no error in the lower

court's assessment that any fiduciary obligation that may have been owed to Hemlani vanished after that

first suit and that he is time-barred from pursuing the cause of action for breach of a fiduciary duty.

## B. CONSTRUCTIVE FRAUD CLAIM

**[40]**    The court below similarly found Hemlani's claim for constructive fraud was precluded by the statute

of limitations. Guam law defines constructive fraud as follows:

> Constructive fraud consists:
>
> 1. In any breach of duty which, without an actually fraudulent intent, gains an
> advantage to the person in fault, or anyone claiming under him, by misleading another to
> his prejudice, or to the prejudice of anyone claiming under him.

18 GCA § 85309 (1992).

**[41]**    This provision is patterned after Section 1573 of the California Civil Code. "The elements of a

cause of action for constructive fraud are (1) a fiduciary relationship; (2) non-disclosure; (3) intent to

deceive; and (4) reliance and resulting injury (causation)." *General American Life Insurance Co. v. Rana*,

769 F. Supp. 1121, 1126 (N.D. Cal. 1991) (citation omitted). However, California law does not require

that the fiduciary relationship element of constructive fraud constitute the legal requirements of establishing

a fiduciary duty. *Id.* at 1127. "In cases of constructive fraud, the term "fiduciary relationship" has been used

synonymously with the term confidential relationship." *Id.* (citation omitted). Further, the breach of duty

referred to in section 1573 must be one created by the confidential relationship. *Id.* (citations omitted).

**[42]**    Hemlani's claim in this regard is the non-disclosure of (1) Gayle's relationship with ABC and (2)

that Gayle was failing to undertake the court approval of the sale of property in the probate matter. With

respect to the non-disclosure of the relationship with ABC that is discussed above. Hemlani knew as of

1976  the relationship but did not pursue it. With respect to the inactivity on the probate matter, the

objective facts militate against finding that Hemlani reposed into Gayle the trust and confidence necessary

to establish a confidential relationship for purposes of this cause of action after the 1974 litigation. Without such a relationship, there was no duty to disclose his inactivity.

[43]    Moreover, Hemlani was well aware of the inactivity. As early as 2 years after the Revised Option Agreement was executed, Hemlani's attorneys consistently checked up on and communicated with Gayle and aggressively advocated their client's interest.

[44]    Further, because we conclude that Hemlani can not prove an essential element of the cause of action for constructive fraud, that is a confidential relationship after the 1974 litigation, he can not claim relief from the statute of limitations bar under the continuing wrong doctrine or estoppel.

## C. LEGAL MALPRACTICE CLAIM

[45]    In the case of *Johnson v. Superior Court*, 38 Cal.App. 4th 463, 45 Cal. Rptr. 2d 312 (Cal. Ct. App. 1995) theories of attorney liability to a third party were discussed. Of relevance here, was the California court's articulation of the *Goodman v. Kennedy* theory. *Id.* at 471, 45 Cal. Rptr. 2d at 316. Essentially, a duty is imposed in favor of a third party if the purpose of the retention of the attorney was for the specific objective of benefiting the third party. *Id.*

[46]    In the instant case, there is no dispute that Gayle and his firm were the attorneys for ABC at all times and that Gayle represented ABC in its acquisition of the property from Crisostomo, and in the sale of the property to Hemlani, for a profit to ABC. There is no allegation that Gayle breached a fiduciary duty to ABC nor has Hemlani provided any evidence that Gayle's representation of ABC was to inure to his specific benefit. Gayle's stipulation to withdraw ABC's petition for confirmation of the sale by the Estate

of Crisostomo was made in the face of a challenge by the heirs of Crisostomo and in the course of his representation of ABC. Every aspect of Gayle's conduct was geared to the benefit of ABC and not to Hemlani.

**[47]** Therefore, we hold that the trial court's conclusion that Gayle owed no professional or fiduciary duty to Hemlani and thus no action could have been maintained by Hemlani must be affirmed.

### III. CONCLUSION

**[48]** Therefore, because we find no error in the lower court's conclusions that the statute of limitations bars Hemlani's counterclaims of breach of fiduciary duty and constructive fraud and that he can not maintain an action for professional negligence the trial court's decision is AFFIRMED.

_____          _____
PETER C. SIGUENZA                                      JOHN A. MANGLONA
Associate Justice                                            Designated Justice

_____
BENJAMIN J.F. CRUZ
Chief Justice

# Banking & Finance
# TERMINOLOGY

**Fourth Edition**



1120 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 663-0000

1) In loan collection,
ient that is less than
. (2) A cardholder
less than the mini-
nt required to keep

**agreement** An
i bank and a dealer
acts to the bank in
ees that he or she
mited period of time
int if the borrower
greement may be
in which the dealer
iy back the vehicle
collateral by the
l period of time. *See*
: agreement; nonre-
:course plan;

**tion** A listing in nu-
:ks paid by check
: paid.

**ed mortgage** A
lly amortizes princi-
principal repayment
iunt, with a lump-
e remaining

**loan** A loan with
than the face value

**k** A bank that does
ssing for its own
by agreement, par-
icessing bank in its

**d** A bond that shares
ecified conditions, in
fied interest return.

**ferred stock** Pre-
iws its holders to
lividends (that is, in
amount the holder is
ears in which the

common stock dividend exceeds that of
preferred stock. This raises the dividend
to equal that of common stock.

**participation** An interest in a loan. A
participation is the acquisition by a third
party from the lender of an interest in a
loan. The acquisition of this interest may
occur concurrently with or subsequent to
the making of the loan. The participation
may be disclosed to the borrower or it
may occur without the borrower's knowl-
edge or consent. The lender is the "lead,"
and the third party acquiring the interest
in the loan is the participant. The rela-
tionship is frequently formalized by an
agreement in writing known as a partici-
pation certificate. The participant generally
acquires an undivided interest in the loan.
Generally accepted accounting principles
(GAAP) distinguish between a participa-
tion and a syndication, which results in
different accounting treatment for the
recognition of fee income.

**participation certificate (PC)** A
modified pass-through security, issued
and guaranteed by the Federal Home
Loan Mortgage Corporation, that repre-
sents an undivided interest in a pool of
conventional residential mortgages.

**participation loan** A loan in which
more than one lender participates, al-
though only one of the lenders services
the loan. The buyer buys only a portion
of the principal balance of the loan; the
seller retains the unsold portion. *See also*
participation.

**participation mortgage** *See* partici-
pation loan.

**participative management** A phi-
losophy of management that believes that
employees need to participate actively in
the running of the business in order to
feel commitment and ownership.

**partition** Division, apportionment, and
allocation of property between two or
more people who are entitled to fractional

interests in the whole property. A partition
is frequently used in connection with a
parcel of real property that must be sold to
satisfy interests of the parties owning
unallocated shares in such property.

**partnership** An association of two or
more persons for the conduct of an enter-
prise other than in corporate form. The
rights, duties, and responsibilities of the
people so associated may be covered by a
partnership agreement; if not, they are
determined by law. *See also* limited part-
nership.

**partnership agreement** A written
agreement between business partners that
outlines the provisions of their business
arrangements. *Also called* articles of
partnership.

**partnership freeze** A method of re-
stricting (freezing) the growth in value
for federal estate tax purposes of a
higher-bracket taxpayer's business or in-
vestment interests that are not in corporate
form. The higher-bracket taxpayer re-
ceives a limited but preferential interest
in a partnership holding the business or
investment interests, while the future ap-
preciation in the assets passes to the other
partners, who are usually taxpayers in
lower tax brackets. *See also* recapitalization.

**part-service benefit** The credit to-
ward a pension provided by an employer
for all or part of a participant's years of
service with the company before the
adoption of a pension plan. *Also called*
past service benefit.

**par value** (1) The nominal or face
value of a stock or bond certificate, ex-
pressed as a specific amount marked on
the face of the security. Par value is not
related to market value, which is the
amount a buyer is willing to pay for an
item. (2) An amount expressed in gold or
U.S. dollars declared by a country to be
the basic value of its currency, according
to the requirements of the International
Monetary Fund. *Also called* par.